UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| RENALDO WHITE and RANDOLPH NADEAU, individually and on behalf of all others similarly situated,<br><br>                            Plaintiffs,<br><br>    v.<br><br>SYMETRA ASSIGNED BENEFITS SERVICE COMPANY and SYMETRA LIFE INSURANCE COMPANY,<br><br>                            Defendants. | No. 2:20-cv-01866<br><br>COMPLAINT—CLASS ACTION<br><br>JURY DEMAND |

COMPLAINT
(2:20-cv-01866)

1

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 5

III.    PARTIES ........................................................................................................... 5

IV.     FACTUAL BACKGROUND ............................................................................. 6

        A.      Structured Settlements and the Conduct of Symetra and SABSCO ................... 6

                1.      The Creation and Regulation of SSAs .................................................... 6

                2.      The Rise of Factoring Companies ......................................................... 8

                3.      Symetra Enters the Factoring Business So It Can Enjoy the
                        Tax Benefit Yet Profit When Termination Is in Its Best
                        Interest .................................................................................................. 10

                4.      Symetra Created a System that Used Its Unique Position to
                        Evade and Thwart Power Language ....................................................... 17

        B.      Facts Specific to the Named Plaintiffs ............................................................. 19

V.      CLASS ACTION ALLEGATIONS ................................................................. 22

VI.     EQUITABLE TOLLING .................................................................................. 24

        A.      Discovery rule ................................................................................................... 24

        B.      Fraudulent concealment .................................................................................... 25

        C.      Estoppel ............................................................................................................. 25

VII.    CLAIMS ........................................................................................................... 25

VIII.   PRAYER FOR RELIEF ................................................................................... 39

IX.     DEMAND FOR JURY TRIAL ........................................................................ 40

COMPLAINT - i
(2:20-cv-01866)

## I.      INTRODUCTION

1.      At its core, this case is about the deceptive and misleading business practices of a multi-billion-dollar insurance conglomerate, Defendants Symetra Life Insurance Company ("Symetra") and its subsidiary, Symetra Assigned Benefits Service Company ("SABSCO"). Instead of living up to their commitment to protect personal injury victims, Defendants instead used their superior knowledge and unequal bargaining power to prey upon the very same injury victims they committed to protect. As described herein, Defendants engaged in deceptive and misleading business practices for one simple reason: to profit at the expense of unsophisticated and vulnerable injury victims who agreed to accept tax free periodic payments over time in the form of a structured settlement annuity ("SSA") rather than in a lump sum.

2.      For decades, Symetra promoted the use of SSAs to resolve personal injury or sickness, wrongful death, and workers compensation claims. It claimed that SSAs would protect the injury victims' settlement proceeds from dissipation. Defendants' conduct in this case shows just how predatory a for-profit life insurance company can act when left to its own devices. This case seeks to put an end to Defendants' deceptive and misleading business practices that are causing irreversible harm to injury victims across the nation.

3.      Injured parties with physical injuries or sickness, wrongful death, or workers compensation claims sometimes opt to "structure" their settlement with the responsible party. In a structured settlement agreement, the settlement proceeds take the form of periodic payments, rather than a lump sum. Typically, the responsible party assigns its obligation to pay the period payments to a different entity. That entity then purchases an SSA, issued by a highly rated insurance company, in order to fund the payments.

4.      SSAs are intended to ensure injury victims' long-term financial well-being. The scheduled periodic payments are tax free and can be designed to pay for needed medical care and living expenses, often for injury victims' lifetime. Most SSAs provide both certain or "guaranteed" periodic payments which are made to the annuitant's beneficiary or estate in the

event of his/her premature death, as well as additional payments, referred to as "life contingent" payments that commence at the expiration of the guaranteed period and continue for so long as the injury victim is living. According to the National Structured Settlement Trade Association ("NSSTA"), "[s]tructured [s]ettlements [e]nable [s]eriously [i]njured [p]eople and [t]heir [f]amilies to [l]ive with [e]conomic [s]ecurity, [d]ignity, [i]ndependence, and [f]reedom from [r]eliance on [g]overnment."[1]

5.      Defendant Symetra (formerly known as Safeco Life Insurance Company) is a life insurance company that issues SSAs.

6.      Defendant SABSCO (formerly known as SAFECO Assigned Benefits Company) is a Symetra subsidiary. SABSCO plays two roles in the conduct at issue in this case. First, after an injury victim settles with the responsible party, and opts for a structured settlement, the responsible party or their insurer assigns the settlement obligation to SABSCO.[2] SABSCO then purchases an annuity from its parent company Symetra to cover that obligation.[3] Second, once the SSA is in place, SABSCO turns around and preys upon annuitants of Symetra SSAs: it lures them into selling future periodic payments for a highly discounted lump sum without disclosing and actually concealing Defendants' profit motive and fatal conflict of interest.

7.      This case centers on Defendants' efforts to sabotage and unwind SSAs so they can earn outsized and undisclosed profits at the expense of the very same injury victims they committed to protect.

8.      Plaintiff Renaldo White is one such victim. At age ten, he was grievously injured when he was hit by a truck. He became the recipient, or "annuitant" of a Symetra SSA. SABSCO then bought certain future payments of that SSA from him for a steeply discounted lump sum.

---

[1] *NSSTA Position Paper* at p. 1, NSSTA (Sept. 2019), https://www.nssta.com/sites/default/files/library/2019/2019-09/2019_CAUCUS%233_NSSTA_Position_Paper0919.pdf.
[2] This is required under 26 U.S.C. § 130 to preserve the preferential tax treatment for Symetra and SABSCO.
[3] *Id.*

COMPLAINT - 2
(2:20-cv-01866)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

9.      Plaintiff Randolph Nadeau is another such victim. He was injured in an accident at a construction site when a piece of cast iron fell off a waste pipe, causing injuries to his back and leg, disabling him for a period of five years. He also became an annuitant of a Symetra SSA. SABSCO then bought certain future payments of that SSA from him for a steeply discounted lump sum.

10.      Plaintiffs White and Nadeau bring this lawsuit against Defendants individually, and on behalf of all other persons who are or were, at any time, annuitants of an SSA issued by Symetra that provided life contingent payments and who subsequently sold their rights to receive payments from those SSAs to a Symetra subsidiary.

11.      In purchasing injury victims' future payments at steep discounts, Symetra violates the duty that arose out of its commitment to issue long-term tax-free payment streams to those injury victims for needed medical care and living expenses. To make matters worse, Symetra uses its superior knowledge, reputation, financial clout, experience, and confidential information obtained during the underwriting process to profit at the injury victims' expense.

12.      To enable Symetra to issue and competitively price SSAs, the injury victims, through counsel or an SSA broker, provide Symetra with confidential medical and other protected information.

13.      Symetra uses this confidential information to price its SSAs, and to determine whether or not to apply a rated age to a particular injury victim, and—if so—what that rated age should be. The rated age indicates what the underwriters at an insurance company believe the victim's life expectancy will be. Symetra inputs information about the injury victims into its proprietary systems to come up with proposed periodic payment schedules that are used to quote settlement terms. Rated age underwriting is used in connection with life contingent payments. The higher the rated age, the higher the monthly lifetime payment amount. Even though Symetra regularly used rated age underwriting to win business, rated ages cannot be determined from the original structured settlement agreement or the SSA.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

14.     Among other things, this case challenges SABSCO's practice of using the confidential information it possesses and its superior bargaining power to escape from the promises it made to injury victims, and to earn undisclosed profits at the injury victims' expense.

15.     The improper scheme began in 2005, when SABSCO and another Symetra wholly-owned subsidiary called Clearscape Funding Corporation ("Clearscape") began offering to purchase periodic payments from injury victims with SSAs issued by Symetra. Symetra advertises and promotes this offering to the annuitants of its SSAs as a "funding service product."[4] This "funding service product" provides a lump sum in exchange for the annuitant transferring the right to future payments back to SABSCO. The service includes "coordinating the court approval process" of transferring the payments,[5] which is governed by state and federal laws.

16.     In reality, SABSCO's "funding service product" is a euphemism for a "cash now" factoring transaction. Structured settlement factoring companies exist solely to buy future SSA payments in exchange for lump sums. Unlike other factoring companies, however, Symetra leverages the confidential information it obtained in the underwriting process to get out of its obligation to make long-term payments it once argued were necessary to protect the annuitants and settlement awards from dissipation.

17.     Not only did Symetra gut the annuitants' periodic payment rights and rob them of financial security, all with the annuitants' own money, but Symetra also secretly enriched itself in the process. Defendants appropriated generous tax benefits conferred upon them by the federal government, which were created to encourage insurers to provide the lifetime benefits needed by Plaintiff White and Plaintiff Nadeau and other injury victims. Having completely appropriated the tax benefits for taking on such payment obligations, Defendants then turned around and used their unequal bargaining power and superior knowledge about the health condition and life

---

[4] Symetra Fin. Corp., Amendment 3 to Form S-1 at p. 118 (Dec. 29, 2009), https://investors.symetra.com/static-files/58dd5283-b1b9-4e2a-95ea-e01dbf0f9f6f.
[5] *Id.*

COMPLAINT - 4
(2:20-cv-01866)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

expectancy of Plaintiff White and Plaintiff Nadeau obtained in the SSA underwriting process to divest them of their lifetime tax-free periodic payments for pennies on the dollar.

18.    In the process, Plaintiff White and Plaintiff Nadeau, and other SSA annuitants like them, have been stripped of the very safety and security that the SSA was intended to provide in the first place. This case challenges the Defendants' deceptive and abusive business practices that have stripped injury victims of their financial safety net and undermined public policy, Congressional intent, and the intent of forty-nine (49) state legislatures.

## II.    JURISDICTION AND VENUE

19.    This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332(d). The parties are diverse for purposes of section 1332(d), as Plaintiff White is a citizen of the State of Tennessee, Plaintiff Nadeau is a citizen of the State of New York, and Defendants SABSCO and Symetra have their principal place of business in the State of Washington. The amount at issue exceeds $5,000,000, and the number of putative class members is greater than one hundred (100).

20.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as both SABSCO and Symetra maintain their principal place of business in Bellevue, Washington.

## III.    PARTIES

21.    Plaintiff White is an individual who resides in Memphis, Tennessee. Plaintiff White was the annuitant of an SSA issued by Symetra and the payment stream was purchased by SABSCO in an improper and inappropriate factoring transaction. Plaintiff White was not represented by counsel in connection with that factoring transaction.

22.    Plaintiff Randolph Nadeau is an individual who resides in Hague, New York. Plaintiff Nadeau was the annuitant of an SSA issued by Symetra and the payment stream was purchased by SABSCO in a series of improper and inappropriate factoring transactions. Plaintiff Nadeau was not represented by counsel in connection with those factoring transactions.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

23.     Defendant SABSCO, a Washington corporation, is a wholly owned subsidiary of Symetra Financial Company, which in turn is a wholly owned subsidiary of Sumitomo Life Insurance Company, an international insurance conglomerate. Defendant Symetra is a life insurance company regulated by the State of Iowa, with its principal place of business in the State of Washington. Both Defendants have a principal place of business at 777 108th Avenue NE, Suite 1200, Bellevue, WA 98004.

24.     In 2004, the SAFECO Assigned Benefits Service Company, known by the acronym "SABSCO", changed its name to the Symetra Assigned Benefits Service Company, continuing to be known by the acronym "SABSCO." Also in 2004, the Safeco Life Insurance Company changed its name to Symetra Life Insurance Company.

## IV.     FACTUAL BACKGROUND

**A.     Structured Settlements and the Conduct of Symetra and SABSCO**

**1.     The Creation and Regulation of SSAs**

25.     SSAs were first developed in the 1970s to provide long-term, periodic payments to tort victims for serious injuries that cause permanent disabilities. Their purpose is to ensure that tort victims receive regular payments to cover living and medical expenses over the course of a lifetime.

26.     Life insurance companies, including Symetra, lobbied Congress extensively to provide for tax-free treatment of SSAs. The insurance companies and their trade association, NSSTA, argued that SSAs benefit tort victims by protecting periodic payments from dissipation, maximizing benefits, and ensuring long-term financial security to injured victims and their families.

27.     Insurance companies also represented to Congress that providing tax benefits to assignment companies that are wholly owned by the financially secure insurance companies that

COMPLAINT - 6
(2:20-cv-01866)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

issue SSAs would further benefit injury victims and protect them from becoming wards of the state.[6]

28.     In 1983, Congress passed the Periodic Payment Settlement Act ("Periodic Payment Act"), Pub. L. No. 97-473 (1983), amending the Internal Revenue Code to make clear that the creation and sale of SSAs would be tax-free to the injured party and insurance company affiliates, like SABSCO, could exclude the payment they received from the settling defendant from income provided the funds were used to purchase an annuity contract for the sole and exclusive benefit of the settling plaintiff.

29.     While settling plaintiffs like White and Nadeau are not parties to the assignment from the responsible party to SABSCO, or the annuity contract between SABSCO and Symetra, they are intended third-party beneficiaries of those agreements and the sole named payees in the SSAs.

30.     In enacting the Periodic Payment Act, Congress adopted the arguments that Symetra and other insurance companies and their lobbyists promoted: that SSAs benefit personal injury victims by protecting settlement awards from dissipation, thereby ensuring long-term financial security for injury victims and their families.

31.     The tax exemptions conferred a valuable benefit on both the insurers and the SSA annuitants. By eliminating tax on these payments, Congress made each dollar of annuity purchase price more profitable to the insurer. Congress did so to incentivize the insurer to offer larger, longer, and more reliable payment streams to annuitants, who were the ultimate object of Congress's intentions and policy goals.

32.     The insurance industry assured Congress that this tax policy would decrease the likelihood that people who were annuitants of SSAs would become public charges or otherwise be left without sufficient assets to meet their financial, medical, and care needs. Ensuring that the

---

[6] 127 Cong. Rec. S15005 (daily ed. Dec. 10, 1981) (statement of Sen. Baucus).

COMPLAINT - 7
(2:20-cv-01866)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

payments remained in place for the entire duration of the annuity when purchased was the key to protecting people and meeting their needs over time.

33.     Because this was the goal, SSAs include standard anti-assignment language to prevent the annuitant from assigning payment streams. Some settlement agreements go beyond the standard and contain an even more powerful ban on assignment. This language, referred to hereinafter as "Power Language," states that "[the SSA annuitant] shall not have the power to sell, mortgage, anticipate or encumber these payments, or any part thereof, by assignment or otherwise." *See, e.g.*, *infra* ¶ 63 (excerpt Plaintiff White's settlement agreement).

34.     Power Language is intentionally inserted into settlement agreements for the sole benefit and protection of the injury victims. Power Language is not required by statute.

35.     Defendants in this case have, on multiple occasions, successfully argued in courts across the United States that Power Language bars assignment even when a court might otherwise determine that the assignment was in the annuitant's best interest.

**2.     The Rise of Factoring Companies**

36.     As SSAs became more prominent, a darker industry developed. Companies known as "factoring companies" began soliciting annuitants of SSAs, offering them immediate lump sum payments in exchange for a transfer of the rights to receive their future SSA payments. Factoring companies generally offer these lump sums at strikingly high discount rates, to the annuitant's detriment.

37.     In 2002, in response to the predatory behavior of factoring companies, Congress enacted section 5891 of the Internal Revenue Code, 26 U.S.C. § 5891, which imposes a stiff tax penalty for transfers made without court approval. In enacting section 5891, Congress acknowledged, again, that the Periodic Payment Act "sought to shield victims and their families from pressures to prematurely dissipate their recoveries."[7] Because the predatory practices of factoring companies "so directly subvert the Congressional policy underlying structured

---

[7] 145 Cong. Rec. S5283 (daily ed. May 13, 1999) (statement of Sen. Chafee).

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

settlements and raise such serious concerns for the injured victims," bills were proposed in the Senate and the House to penalize companies that engage in such transactions.[8]

38.     From the early 1980s until late 2012, Symetra was in the business of issuing SSAs to satisfy periodic payment obligations created under settlement agreements for the exclusive benefit and protection of personal injury victims. In order to take advantage of the favorable tax treatment afforded assignment companies (like SABSCO) under 26 U.S.C. § 130, tort defendants or their liability insurers assigned their settlement obligations to SABSCO, who then purchased SSAs from Symetra. This relationship allowed for tax-free treatment of the periodic payments paid to the settling tort plaintiffs under the SSAs. The payment to SABSCO for the purchase of the SSA was excluded from SABSCO's income. *See* 26 U.S.C. §§ 104(a), 130.

39.     In exchange for the assumption of periodic payment obligations detailed in underlying tort settlement agreements, SABSCO received one cash payment from the tort defendant or their liability insurers. It then used those sums to purchase SSAs from Symetra. The cash routed to Symetra represented damages owed to settling claimants for personal injuries and sickness. This cash was intended to be held and invested by Symetra in trust for the sole and exclusive benefit of the settling plaintiffs and their families.

40.     Many of the underlying settlement agreements called for cost of living increases designed to cover future medical needs and other expenses. SSAs were designed and intended to cover all future payments contemplated by the tort settlement agreements, often for the injury victims' lifetimes.

41.     Because of the long-term nature of SSAs and their use in settlements that require court approval, they are issued almost exclusively by highly rated, well capitalized life insurance companies. Upon information and belief, when Symetra issued the SSA associated with Plaintiff Nadeau and Plaintiff White it was rated A+ by A.M. Best.

---

[8] *Id.* at S5284.

COMPLAINT - 9
(2:20-cv-01866)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

42.     Symetra no longer issues new SSAs but continues to maintain a portfolio of legacy business. The SSAs Symetra maintains require regular payments to annuitants in accordance with fixed and determined periodic payment schedules that arise directly out of settlements that were used to resolve personal injury claims.

### 3.     Symetra Enters the Factoring Business So It Can Enjoy the Tax Benefit Yet Profit When Termination Is in Its Best Interest

43.     Rather than fulfill its duty to make payments to annuitants to protect their long-term economic and medical stability, Symetra came up with a scheme to get out of its unprofitable obligation to provide future periodic payments to injury victims, still keep the tax benefit, and enrich itself in the process.

44.     SSAs are vital to the economic and medical stability of annuitants, and if properly underwritten, they can be profitable to insurance companies, too. In 2000, the Journal of Insurance Medicine published a study in two parts (the "Safeco Study"),[9] which appears to have been funded by Safeco Life and Investments (n/k/a Symetra), analyzing the importance of thorough underwriting and actuarial planning in pricing SSAs. Part 1 of the two-part study lays out how insurance companies underwrite and price SSAs and how insurance companies can benefit from the profitable sale of SSAs in connection with the settlement of personal injury claims.[10]

45.     However, SSAs risk becoming unprofitable for insurance companies if they are not properly underwritten. The Safeco Study addresses the importance of mortality risk with respect to an SSA, finding that: "the mortality risk of settlement annuities [SSAs] is exactly the opposite of that of life insurance—that the annuitant may live too long, rather than die too soon."[11] In other words, if the annuitant of an SSA lives longer than anticipated, it becomes an

---

[9] *See* Craig J. Schmidt & Richard B. Singer, *Structured Settlement Annuities, Part 1: Overview and the Underwriting Process*, 32 J. Ins. Med. 131-36 (2000); Craig J. Schmidt & Richard B. Singer, *Structured Settlement Annuities, Part 2: Mortality Experience 1967-95 and the Estimation of Life Expectancy in the Presence of Excess Mortality*, 32 J. Ins. Med. 137-54 (2000).
[10] Schmidt & Singer, *Safeco Study Part 1*, *supra* note 9, at p. 132.
[11] *Id.* at p. 134.

unprofitable deal for the insurance company that must continue making periodic payments to the annuitant until the day the annuitant dies. The Safeco Study notes that mortality is influenced by both (i) advances in medical science and technology, and (ii) in the quality of medical care available to an annuitant.[12] The study concluded that it would "take many years to determine whether underwriting decisions and actuarial planning" had been successful in terms of profit or loss to an insurance company.[13]

46.     Rather than wait years and risk loss, Symetra developed a plan to ensure that it reaped all the benefits of the tax-free SSA and shed its contractual and fiduciary obligation of continuing to pay annuitants what they were owed if they in fact lived a long life. To do so, SABSCO entered the SSA factoring business.

47.     In 2005, SABSCO and Clearscape, began offering to purchase periodic payments from annuitants of SSAs issued by Symetra.[14] Symetra advertises and promotes this offering as a "funding service product" to the annuitants of its SSAs.[15] SABSCO provides a lump sum in exchange for the annuitant's right to future payments. The service includes "coordinating the court approval process."[16]

48.     In reality, this "funding service product" business is a euphemism for the operation of a factoring company in the business of buying SSA payment streams, just like companies such as J.G. Wentworth,[17] Client First Settlement Funding,[18] and DRB Capital, LLC.[19]

49.     Unlike other factoring companies, however, SABSCO solicits the annuitants of the *very same SSAs* that SABSCO itself purchased using the annuitants' own settlement

---

[12] *Id.* at p. 135.
[13] *Id.* at p. 136.
[14] *See supra* note 4.
[15] *Id.*
[16] *Id.*
[17] J.G. Wentworth, https://www.jgwentworth.com/ (last visited Dec. 15, 2020).
[18] Client First Settlement Funding, http://clientfirstfunding.com/ (last visited Dec. 15, 2020).
[19] DRB Capital, LLC, https://www.drbcapital.com/ (last visited Dec. 15, 2020).

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

proceeds, and that its parent company, Symetra, issued to protect injury victims' settlement awards from dissipation. The following simplified diagram illustrates this process:



50. In entering the factoring business, Symetra took a second bite at the proverbial apple, at annuitants' expense. In essence, Symetra decided the SSAs were not profitable enough for its liking, so Symetra had its own subsidiary bail it out, buying back payments it was obligated to make to its annuitants. It was not enough to simply get out of paying annuitants what they were owed, though—Symetra decided to make a fat profit while doing so, buying back

COMPLAINT - 12
(2:20-cv-01866)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

payments at an enormous discount without disclosing and actively concealing their competing economic interests to Class members.

51.     When an SSA annuitant "sells" his or her future payments to SABSCO, Symetra is no longer obliged to make any future payments. When reserves are no longer needed to cover liabilities associated with SSAs, Symetra is free to use those reserves as it sees fit. At the time it discontinued SSA sales in 2012, Symetra reported $5.7 billion in reserves associated with SSAs purchased by SABSCO and issued by Symetra.[20]

52.     Defendants also profit at the expense of annuitants like Plaintiff White and Plaintiff Nadeau by purchasing their SSA payment streams at inflated discount rates. In its 2001 Annual Report, SAFECO (n/k/a Symetra) acknowledged that: "For structured settlement annuities, future benefits are either fully guaranteed or are contingent on the survivorship of the annuitant. Contingent future benefits are discounted with best-estimate mortality assumptions, which include provisions for ongoing mortality improvement. Guaranteed and contingent future benefits are discounted at rates that grade from an average of 8.07% to ultimate rates that average 7.23%."[21]

53.     Yet SABSCO and/or Clearscape purchases these SSA periodic payment streams back from its very own clients at rates ranging from 9.22%–18.00%, or higher. Higher discount rates mean more profits for Symetra. Of course, Symetra did not disclose this, the fatal conflict of interest, or the disparity in bargaining power to the sellers, like Plaintiff White and Plaintiff Nadeau.

54.     Rather than disclose its conflict of interest or unfair advantage given its access to sensitive information, Symetra leverages it. Symetra advertises its factoring business on the internet, professing to be "life-contingency pros":[22]

---

[20] Symetra Fin. Corp., Annual Report (Form 10-K) (Feb. 26, 2013), at p. 11, https://investors.symetra.com/static-files/422bbcc6-762b-4785-95c5-415014044637.
[21] Safeco Corp., Annual Report (Form 10-K) (Mar. 6, 2002), at p. FS-10, https://www.sec.gov/Archives/edgar/data/86104/000089102002000223/v79351e10-k405.htm.
[22] *Clearscape Funding Corporation – FAQ*, Symetra, https://www.symetra.com/Clearscape/ (last visited Dec. 14, 2020).

COMPLAINT - 13
(2:20-cv-01866)

**WE'RE LIFE-CONTINGENCY PROS**

As a life insurance-affiliated company, we're experts at pricing life-contingent annuities. Our underwriting process helps us get to know you and your needs, so we can quote some of the best life-contingent prices in the industry.

55.    But what SABSCO dresses up as "expertise" is actually its unique access to underwriting information on the annuitant by virtue of its preexisting relationship with the annuitant—information that no other purchaser of annuity payment streams has. This information was turned over to the insurer by those acting on the annuitant's behalf when the annuity was purchased, to enable the annuitant to acquire the largest and most reliable payment stream. SABSCO also knew that the annuitant was vulnerable: it knew that the annuitant's original attorneys had chosen a structured settlement, instead of a lump sum, in the first place for a reason.

56.    When Defendants focus their purchase plans on annuities issued by Symetra, they have several unique information advantages over any other factoring company and over Symetra's own annuitants. Where other factoring companies must expend substantial resources to find SSA annuitants interested in assigning payments, Symetra has a readymade list of sitting ducks. Not only does this harm the annuitants, but it also thwarts fair competition.

57.    Defendants exploit unsophisticated injury victims by concealing the true nature of their predatory and wildly lopsided solicitations under the guise of a preexisting protective relationship. SABSCO approaches annuitants, like Plaintiff White and Plaintiff Nadeau, as current "clients," professing, "[w]orking with us lets you stay with a company you know and trust. We already have your paperwork, so there is a lot less work for you."[23] It directly and repeatedly contacts its annuitants using contact information that they provided for the purposes of the annuity—not for the purposes of receiving misleading solicitations from the issuer.

---

[23] *Clearscape Funding Corporation – FAQ*, Symetra, https://www.symetra.com/Clearscape/FAQ (last visited Dec. 14, 2020).

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

58.     One solicitation reads:

SYMETRA.

October 29, 2007



Contract Number: ⬛⬛⬛⬛⬛

Dear Mr. & Mrs.

Several years ago, Symetra Life Insurance Company issued a "structured settlement annuity" naming you as a payee or beneficiary. You may be receiving annuity payments now or at some point in the future. Symetra Assigned Benefits Service Company ("SABSCO") owns the annuity and is the company legally responsible to make these annuity payments to you.

I'm writing to tell you about a service SABSCO recently began offering in response to a growing need we have seen among recipients of structured settlement payments.

As time passes, many people see a change in circumstances and find that the original structured settlement plan no longer fits their needs. Some face the need for cash now, perhaps to pay for education, buy a home, or to pay off debt. Until recently, people in this situation were not able to access the money used to provide their annuity payments. They simply had to wait to receive the payments according to the original plan, even when that plan was no longer suited to their needs.

**The good news is that recent legislation in many states now allows structured settlement payees to exchange their future annuity payments including Life Contingent payments, for cash when it's needed. SABSCO now offers this service to its customers.** Benefits received as part of a Worker's Compensation award are not eligible for this service.

I would like to answer any questions you may have about this type of exchange, and to explore whether receiving a lump sum payment would better suit the financial needs of your family. You may also reach me directly at (800) 427-1304 (ext. 68068). I am available from 6:30 am to 3:00 pm Monday through Friday Pacific Time. I would be happy to discuss your payment options. I look forward to hearing from you.

Sincerely,

Jesper Hansen
Sales Specialist
Symetra Assigned Benefits Service Company
Jesper.Hansen@Symetra.com

59.     SABSCO's and Symetra's solicitations contain false and misleading statements about (i) why they wish to purchase periodic SSA payments from their annuitants, especially life contingent payments (ii) SABSCO's "service" being the only way to liquidate periodic SSA

payments, and (iii) why a lump sum from SABSCO "would better suit the financial needs of your family." Defendants' solicitations also fail to mention that the annuitant's settlement agreement may contain spendthrift restrictions with Power Language limiting an annuitant's power to assign future periodic payments.

60.     SABSCO and Symetra falsely hold themselves out as acting in the interest of the annuitant, but they do not. Instead:

- Symetra shares highly personal information about the health, medical needs, and financial needs of annuitants with their own affiliate for the sole purpose of profiting from the purchase of their periodic payments.

- SABSCO does not inform its annuitants of its profit motive; specifically, that buying back payments allows its affiliate (Symetra) to free up reserves, and allows them to escape previous, unwise (and unprofitable) business decisions.

- Symetra's factoring transactions with its annuitants apply an artificially high discount rate; other insurance companies that agree to purchase back their own annuitants' future SSA payments do so at a much lower discount rate. By way of example, John Hancock, Berkshire Hathaway, and Allstate permit its annuitants to obtain a lump sum through hardship programs at discount rates that, upon information and belief, range from 6.5%–8.5%.[24]

- Other insurance companies regularly discourage their annuitants from factoring their periodic payments as they are intended to provide long-term protection and tax-free treatment.

---

[24] *See* Andrew S. Hillman, *Structured Settlement Payment Transfers – Competitive Market Forces* (May 2015), http://13.59.206.133/pdf/Competitive%20Market%20Forces%20Article-11-21-16%20Final.pdf.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1

2

### 4.    Symetra Created a System that Used Its Unique Position to Evade and Thwart Power Language

3

4

5

61.    By choosing to put its own records about its insured in the service of its new factoring business, Symetra set up a system that used its inside position to defeat annuitants' contractual rights and sidestep specific prohibitions on the sale of SSAs.

6

7

8

62.    Often, the settlement agreements pursuant to which settling defendants assign their payment obligations to SABSCO include Power Language that explicitly states that the annuitants lack the power to transfer their future SSA payments.

9

10

11

63.    Plaintiff White's settlement agreement included such language. It stated, "[the SSA annuitant] shall not have the power to sell, mortgage, anticipate or encumber these payments, or any part thereof, by assignment or otherwise."

12

13

14

15

16

17

> LIMITATIONS OF CLAIMANT'S RIGHT TO PAYMENTS
> WITHIN THE MEANING OF IRS RULING 79-220
>
> The Claimant shall be a general creditor of the Insurer and shall have no rights of control over the periodic payments. The Claimant shall not be able to ACCELERATE, DEFER, INCREASE OR DECREASE the periodic payments and shall not have the power to sell, mortgage, anticipate or encumber these payments, or any part thereof, by assignment or otherwise. No part of the above periodic payments or any assets of the Insurer are to be subject to execution or any legal process for any obligation of the Claimant.

18

19

20

64.    Plaintiff Nadeau's settlement agreement included virtually identical language, denying Plaintiff Nadeau "the power to sell or mortgage or encumber [the payments], or any part thereof, nor anticipate the same, or any part thereof, by assignment or otherwise."

21

22

23

24

25

> 4.    Plaintiff's Rights to Payments
>
> The Defendant shall not segregate or set aside any of its assets to fund the payments to Plaintiff required herein, it being understood Plaintiff is and shall be a general creditor to the Defendant. Said payments cannot be accelerated, deferred, increased or decreased by the Plaintiff and no part of the payments called for herein or any assets of the Defendant are to be subject to execution or any legal process for any obligations in any manner, nor shall the Plaintiff have the power to sell or mortgage or encumber same, or any part thereof, nor anticipate the same, or any part thereof, by assignment or otherwise.

26

65.     These spendthrift provisions are bargained for restrictions included in settlement agreements to provide an additional layer of protection to vulnerable settling plaintiffs. But when Symetra wants to transfer SSA payments to itself for its own benefit, it does not inform the annuitants that they actually lack the power to engage in factoring transactions. Instead, Symetra and SABSCO knowingly and routinely encourage annuitants to waive their right to counsel in connection with factoring transactions, even when underlying settlement agreements were designed by plaintiff's counsel precisely to prevent dissipation through factoring, contain bargained for spendthrift protections, and contain provisions restricting the annuitants' power to transfer their SSA payments.

66.     Symetra knows that Power Language prevents a seller from obtaining a qualified transfer order, as Symetra has successfully challenged the transfer of SSA payments based on this same Power Language when they wanted to prevent a third-party factoring transaction. *See, e.g.*, *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 599 F. Supp. 2d 809 (S.D. Tex. 2008), *aff'd*, 567 F.3d 754 (5th Cir. 2009).

67.     Having successfully taken the position that Power Language prevents a seller from obtaining a qualified transfer order in multiple judicial proceedings, Defendants are judicially estopped from taking a contrary position in this case.

68.     However, since the insurance company that issued the SSAs to the annuitants solicited by SABSCO is Symetra—SABSCO's corporate parent—there is no possibility that the issuer of the SSA (Symetra) will intervene and disclose to the court that the settlement agreement limits the power of the annuitant to sell his/her periodic payments. SABSCO does not inform the annuitants that this "check and balance" on the factoring transaction is eliminated nor does SABSCO disclose the existence of Power Language to the court. In fact, SABSCO actively conceals same.

69.     Even when Power Language is lacking, the system Symetra created enabled Symetra to systematically use the information it had about its annuitants not for the benefit of the

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

annuitants, but for the benefit of Symetra and at the expense of the annuitant. This information revealed which annuities were costing Symetra the most money, and so would be most profitably wiped out through the purchase from the annuitant of the right to receive future periodic payments.

**B.     Facts Specific to the Named Plaintiffs**

70.     Plaintiff White was born in 1980. When he was ten years old, on May 23, 1990, Plaintiff White was riding a bike in Memphis, Tennessee when he was hit at an intersection by a Cablevision truck. He was seriously injured with a compound fracture to his tibia, internal injuries, and swelling to his brain. He spent months in the hospital.

71.     A tort action was brought on Plaintiff White's behalf against Memphis Cablevision, et al., which was ultimately settled with a commitment by defendants to pay a total of $250,148 to Plaintiff White and to make a series of periodic payments to Plaintiff White for his lifetime.

72.     As a result, Plaintiff White became the annuitant and payee of an SSA, purchased (and owned) by SABSCO, and issued by SAFECO (n/k/a Symetra), which provided for the following payments:

a.     $1,750 per month to be paid through the lifespan of Plaintiff White, but in no event for less than 20 years;

b.     Lump sum payments on the following dates:

- $10,000 on August 1, 1998;

- $14,000 on August 1, 1999;

- $16,000 on August 1, 2000;

- $18,000 on August 1, 2001;

- $20,000 on August 1, 2005;

- $30,000 on August 1, 2010;

- $40,000 on August 1, 2020;

COMPLAINT - 19
(2:20-cv-01866)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

- $50,000 on August 1, 2030; and

- $65,000 on August 1, 2040.

73.     In May 2011, in response to solicitations from Symetra, Plaintiff White signed an agreement with SABSCO to sell (i) 149 life contingent monthly payments of $300 from February 1, 2018 through and including June 1, 2030; and (ii) each and every future life contingent monthly payment in the amount of $1,750 owed to him from July 1, 2030 until his death. The "effective annual interest rate" for this transaction was 15.03% per year. Plaintiff White received just $18,609 from SABSCO as consideration for this factoring transaction.

74.     To illustrate the extent to which SABSCO took advantage of Plaintiff White, consider that Plaintiff White was just 31 years old when SABSCO bought every single one of his remaining periodic payments. According to the Social Security Administration, Plaintiff White's life expectancy is currently 81 years. If Plaintiff White lived that long, Symetra would have needed to pay him approximately $695,000. Instead, SABSCO paid him just $18,609. This factoring transaction allowed Symetra to pay itself its profit on the factoring transaction upfront, and remove any amounts held in reserve to cover the future periodic payments of $695,000. To make matters worse, Symetra knew that purchasing all of Plaintiff White's future SSA payments put him at heightened risk of premature death.[25]

75.     Plaintiff Nadeau was seriously injured when a waste pipe weighing more than fifty tons was dropped several stories from the bottom of a turbine at an industrial construction site. A large piece of the cast iron piping broke off on impact, flew through the air and struck Plaintiff Nadeau at boot level like a cannonball. Had the cast iron hit Plaintiff Nadeau any higher he would not be here today.

76.     A tort action was brought against Detroit Edison Company by Plaintiff Nadeau and his then-wife, Sheri Nadeau in Wayne County Circuit Court, State of Michigan, under Case No. 91-116148-NI, which was ultimately settled with a commitment by the defendant to pay a

---

[25] Schmidt & Singer, *Safeco Study Part 1*, *supra*, at 135.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

cash sum to Plaintiff Nadeau and make a series of periodic payments to Plaintiff Nadeau for his lifetime.

77.    As a result, Plaintiff Nadeau became the annuitant and payee of an SSA, purchased (and owned) by SABSCO, and issued by SAFECO (n/k/a Symetra), which provided for the following payments:

        a.    $430 per month for 30 years certain commencing on December 27, 1995 and continuing to and including November 27, 2025; and

        b.    $1,297.33 paid monthly for life commencing December 27, 2025.

78.    SABSCO purchased Plaintiff Nadeau's periodic payments from him on four occasions. In 2006, SABSCO purchased 75 guaranteed monthly payments of $430.00 each, commencing on October 27, 2006 through and including December 27, 2012. In 2011, SABSCO purchased 48 guaranteed monthly payments of $430.00 each, commencing on January 27, 2013 through and including December 27, 2016. In 2017, SABSCO purchased 72 guaranteed monthly payments of $430.00 each, commencing on July 27, 2017 through and including June 27, 2023. In 2020, SABSCO purchased 29 guaranteed monthly payments of $430.00 each, commencing on July 27, 2023, through and including November 27, 2025, and 36 life-contingent payments, each in the amount of $1,297.33 commencing on December 27, 2025, through and including November 27, 2028.

79.    In this last transaction in 2020, Plaintiff Nadeau was divested of $59,173.88 of future periodic payments. In exchange he received just $20,091.58, which is the equivalent of borrowing the $59,173.88 at 18.00% interest.

80.    SSAs are not like any other insurance product. In fact, while SSAs are issued by insurance companies, they are arguably not insurance at all. SSAs are only used to compensate injury victims in legal settlements. According to the NSSTA, the companies that issue SSAs must comply "with at least seven Sections of the U.S. Tax Code."[26] Since 1985, NSSTA, of

---

[26] *What Are Structured Settlements?*, NSSTA, www.nssta.com/structured-settlements (last visited Dec. 15, 2020).

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

which Symetra was a member until late 2006, has lobbied extensively for legislation "to preserve, promote, protect and defend structured settlements."[27] In a policy statement published on its website, NSSTA states that SSA provide important policy benefits.[28]

- Protection against premature dissipation by injured persons who usually lack the experience to manage the financial responsibilities and risks of investing a large lump sum to cover a substantial, ongoing stream of medical and basic living expenses for a lengthy period.

- Payout tailored to the day-to-day living expenses and the ongoing medical and financial needs of the injured person and his or her family.

- Payment stream is often for the remainder of the injured person's lifetime, so that the injured person does not outlive his or her compensation, and can be extended to the life of a spouse and to support children in the family

- Avoids shift of responsibility for care to taxpayer-financed public assistance programs.

81.     Symetra deprived each of its annuitants of these "key policy benefits" when Symetra betrayed its annuitants by purchasing their future SSA payments in exchange for a sharply discounted lump sum. Symetra gained financially with these "factoring" transactions, and the annuitants (like Plaintiff White and Plaintiff Nadeau) lost their future financial security.

## V.    CLASS ACTION ALLEGATIONS

82.     Plaintiffs brings this case as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves and a nationwide class (the "Class") of persons consisting of all persons who are or were, at any time, annuitants of an SSA that contemplated life contingent payments issued by Symetra and who subsequently sold to a Symetra subsidiary the right to receive payments from that SSA in a factoring transaction.

---

[27] *Congressional Structured Settlements Caucus*, NSSTA (July 2019), https://www.nssta.com/public-policy/caucus.
[28] *Structured Settlements Enable the Newly Injured to Live with Dignity, Independence, and Freedom from Reliance on Government* at p. 4, NSSTA (2017), https://www.nssta.com/sites/default/files/library/2017/2017-01/2017_AAPD_NSSTA_Structured_Settlements_Policy_Statement.pdf.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

83.     The Class includes a nationwide subclass (the "Subclass") defined to include all members of the Class with respect to whom the contract defining the annuity at issue included language explicitly stating that the annuitants lack the power to transfer their future SSA payments.

84.     There are thousands of members of the Class, and the Class is therefore so numerous that joinder of all members is impracticable.

85.     Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

86.     Common questions of law and fact exist as to all members of the Class and the Subclass, which predominate over any questions solely affecting individual members of the Class or the Subclass. Among the questions of law and fact common to the Class are:

a.      Whether Defendants' practice was unfair and/or deceptive;

b.      Whether Defendants had a fiduciary duty to the annuitants of SSAs which Defendant Symetra issued, to protect the interest of those persons in continuing to receive the payments to which they were entitled under the annuities, for the time period provided for in each annuity and as contemplated by the underlying settlement agreements that gave rise to the periodic payment stream in the first place;

c.      Whether, in purchasing payment streams from each member of the proposed Class, Defendants used information which had been provided to Defendants, on behalf of the members of the proposed Class, to enable Defendants to price and issue the annuities and so to meet the annuitants' needs for income over an extended, and defined, period;

d.      Whether, by so utilizing the information provided to them on behalf of each member of the Class, Defendants breached their fiduciary duty to members of the Class;

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

e.      With respect to the Subclass, common questions include whether Power Language bars the sale of payments under an SSA containing such language and whether such a sale, if attempted, is void *ab initio*; and whether Defendants are judicially estopped from denying that Power Language bars the sale of payments under an SSA that contains such language.

87.     Plaintiffs will fairly and adequately represent the Class and the Subclass, protecting the interests of the members of the Class and the Subclass. The Named Plaintiffs have retained competent counsel experienced in class action litigation, and intend to prosecute this action vigorously.

88.     Named Plaintiff White is a member of the Class and he does not have interests antagonistic to, or in conflict with, the interests of the other members of the Class.

89.     Named Plaintiff Nadeau is a member of the Class and he does not have interests antagonistic to, or in conflict with, the interests of the other members of the Class.

90.     Named Plaintiffs' claims are typical of the claims of the members of the Class.

91.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI.      EQUITABLE TOLLING

**A.      Discovery rule**

92.     Plaintiffs and Class members did not discover and could not have discovered through the exercise of reasonable diligence, Defendants' deception concerning the transactions alleged herein.

93.     Precisely because of Defendants' scheme and breach of their fiduciary duty, Plaintiffs and Class members remained in the dark about Defendants' unlawful conduct, without the information that would have caused a reasonable person to suspect that Defendants were engaging in unlawful conduct.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

**B.     Fraudulent concealment**

94.     All applicable statutes of limitations have been tolled by Defendants' knowing, active, and ongoing fraudulent concealment of the facts alleged herein.

95.     This lawsuit is premised in part on the misrepresentations and omissions Defendants made in order to conceal their true interest and the true nature of the transactions from Plaintiffs. Among other things as alleged above, Defendants solicitations to Plaintiffs misrepresented and concealed the improper and unfair nature of the transaction, as well as Defendants' own interests.

**C.     Estoppel**

96.     Defendants were under a continuous duty to disclose to Plaintiffs and Class members the improper and unfair nature of the sales and Defendants' improper motives and conflicts of interest. Yet Defendants actively concealed these important underlying facts.

97.     Defendants are therefore estopped from relying on any statutes of limitations in defense of this action.

## VII.     CLAIMS

### COUNT ONE — VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT

### On behalf of the Class Against All Defendants

98.     Plaintiffs incorporate in this Count paragraphs 1 through 97 as if fully set forth herein.

99.     The Washington Consumer Protection Act ("CPA") is codified at RCW 19.86. The CPA establishes a framework for redressing consumer protection violations that directly or indirectly affect the people of Washington. Defendants are Washington entities, the acts giving rise to the wrong at issue were committed in and emanated from Washington, and the benefit Defendants appropriated from their unfair and deceptive acts were received in Washington. As

COMPLAINT - 25
(2:20-cv-01866)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

the conduct at issue falls within the scope of the CPA, Plaintiff White, Plaintiff Nadeau, and members of the Class can enforce the CPA and recover damages.

100.    A violation of the CPA consists of five elements: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) a public interest impact; (4) injury to plaintiff in his or her business or property; and (5) causation.

101.    Symetra, whose principal place of business is in Washington, is a multinational insurance conglomerate with $55.5 billion in assets and has been in business for more than 60 years.[29] Symetra used its reputation and financial clout to solicit unsophisticated sellers who trusted Symetra. Even though the factoring transactions were "approved" under various state structured settlement protection acts, each factoring transaction involved unfair and deceptive practices by Defendants because Defendants did not disclose that:

        a.      Defendants had a fatal and non-waivable conflict of interest;

        b.      Defendants failed to disclose their competing economic interest to Class members and actively concealed same;

        c.      Defendants profited from all factoring transactions at the expense of the Named Plaintiffs and each member of the proposed Class and Subclass;

        d.      The factoring transaction was not in Plaintiffs' interest;

        e.      Higher payouts were occasionally available from known competitors; and

        f.      SABSCO circumvented the structured settlement protection acts by systematically soliciting waivers of professional advice from sellers like Plaintiff White and Plaintiff Nadeau.

102.    SABSCO's broad effort to buy back its own annuities, at such high discount rates, and leaving those who need the security of long-term payments due to disability without that security, is an issue of public interest. Numerous courts and the legislatures have found that the creation and use of SSAs are in the public interest, as evidenced by their tax-free treatment and

---

[29] *Company Profile*, Symetra, https://investors.symetra.com/corporate-profile (last visited Dec. 15, 2020).

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   various acts to protect annuitants from exploitation Moreover, the likelihood that additional

2   persons will be affected from exactly the same conduct makes the matter one of public interest.

3       103.    Due to Defendants' unfair and deceptive acts or practices, Plaintiff White,

4   Plaintiff Nadeau, and the Class members suffered financial injury, losing their future security

5   and large portions of the present value of their future SSA payments.

6       104.    As a direct and proximate cause of Defendants' unfair and deceptive conduct,

7   Plaintiff White, Plaintiff Nadeau, and the Class members have sustained and continue to sustain

8   injuries and, pursuant to RCW 19.86.090, Plaintiff White, Plaintiff Nadeau, and the Class

9   members are entitled to actual and treble damages in amounts to be determined at trial, attorneys'

10  fees and costs, and all other relief available under the CPA.

### COUNT TWO — VIOLATION OF THE DUTY OF GOOD FAITH AND FAIR DEALING

### On behalf of the Class Against All Defendants

14      105.    Plaintiff incorporates paragraphs 1 through 104 as if fully set forth herein.

15      106.    The duty of good faith and fair dealing applies to every contract and includes the

16  duty to disclose relevant information during contract formation.

17      107.    Failure to disclose relevant information may constitute violation of the duty to act

18  in good faith; affirmative misrepresentations are not required. Thus, *inter alia*, the duty of good

19  faith and fair dealing requires disclosure that a contract may be unenforceable and/or violate law.

20      108.    Plaintiff White entered into the factoring transaction with the expectation of good

21  faith and fair dealing by Defendants.

22      109.    Plaintiff Nadeau entered into the factoring transactions with the expectation of

23  good faith and fair dealing by Defendants.

24      110.    Defendants did not act in a manner consistent with the annuitants' objectively

25  reasonable expectations.

26

COMPLAINT - 27
(2:20-cv-01866)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

111.    Defendants violated the duty of good faith and fair dealing by failing to disclose and actively concealing from Class members that:

a.     Symetra had a fatal conflict of interest;

b.     Symetra stood to gain financially by buying out payments that were not due for many years;

c.     Symetra knew that taking away periodic payments would increase mortality risks for annuitants of SSAs by depriving them of future funds for medical care;

d.     Certain Class members lacked the power to transfer their future SSA payments;

e.     Although the law provides for the issuer of the SSA to object to the transaction, the issuer of the Class members' SSAs (Symetra) was an affiliate of the transferee (SABSCO), and would not object to the transaction no matter how egregious the terms, eliminating the voice of the one party that had the ability to protect the Class members;

f.     Defendants had stopped issuing SSAs because they were unprofitable, and that they were actively seeking to purchase the future payments from annuitants of Symetra SSAs to eliminate the future payments they would otherwise be required to pay on these unprofitable SSAs;

g.     The transactions with Class members reduced Defendants' own future liability to make payments and therefore reduced Defendants' reserve requirements, providing Defendants access to immediate cash;

h.     The discount rate on the factoring transactions with Class members greatly exceeded the discount rates that other insurers offered to annuitants of SSAs;

i.     Class members would have routinely received better offers had they shopped their deals to other factoring companies instead of dealing exclusively with Symetra; and

COMPLAINT - 28
(2:20-cv-01866)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

j.      In all of these ways, Defendants were acting in their own interest, not the Class members' interest.

112.    As result, Plaintiff White, Plaintiff Nadeau, and the Class members are entitled to damages on their breach of covenant of good faith and fair dealing claim in an amount to be proven at trial.

## COUNT THREE — BREACH OF FIDUCIARY DUTY

### On behalf of the Class Against Defendant Symetra Life Insurance Company, f/k/a Safeco Life Insurance Company ("Symetra") as Annuity Issuer

113.    Plaintiffs incorporate in this Count paragraph 1 through 112 as if fully set forth herein.

114.    The elements of breach of fiduciary duty are: (1) the existence of a duty owed, (2) a breach of that duty, (3) resulting injury, and (4) that the injury was proximately caused by the breach.

115.    A fiduciary relationship existed between Symetra and Class members.

116.    Each time that Symetra issued an SSA to fund Class members' periodic payments arising under structured settlement it took on the responsibility to act for and on behalf of Class members for one purpose and one purpose only: to make all of the periodic payments contemplated in underlying settlement agreements that resolved personal injury and sickness claims. Without an underlying structured settlement of a personal injury or sickness claim, there can be no SSA.

117.    Symetra's undertaking with respect to the periodic payment obligations described in the SSA gave rise to a relationship of trust and confidence with respect to all Class members.

118.    In all cases, Class members who were in a position of inferior knowledge and vulnerability placed their reliance and trust in Symetra to protect their lifetime tax-free periodic payments from dissipation.

119.    In the course of lobbying for legislation favoring and promoting the use of SSAs, and in promoting itself and attracting business, Defendant Symetra publicly and voluntarily asserted that its actions would be for the benefit of SSA annuitants, providing lifelong tax-free income and medical care as well as protecting against exploitation.

120.    As a result of these representations, Class members are reasonably justified to believe that their interests were and would be cared for by Symetra.

121.    To design and issue their SSAs, Symetra obtained significant personal information about each Class member. This personal information, including injury details and medical history, and reason for structuring the settlement, was used by Symetra to determine the cost of the SSA and to structure the periodic payments in a way that would provide both income and funds for the future needs, including medical care, of the annuitant.

122.    The ownership and use of one's most personal information for the purpose of designing an SSA that will last for the life of the annuitant and provide for his or her critical needs creates a special relationship where the Class member reasonably believes that Symetra was acting in his or her interest.

123.    An even more special relationship, and corresponding fiduciary duty, exists between Defendants and those SSA annuitants whose annuity agreements contain Power Language.

124.    Defendant Symetra violated this duty by placing its own interests over the interests of the Class members by initiating and completing transactions ("Factoring Transactions") whereby its affiliate, SABSCO, purchased from Class members future payments owed under the very same annuities that Symetra issued for the benefit of the Class members:

      a.    At a discount rate that greatly exceeded the rate available from other purchasers of SSA payments;

      b.    For a lump sum price far less than the present value of the SSA;

c.      At a discount rate that did not reflect the effect of the transaction on Symetra's required reserves; and

d.      At a discount rate that greatly exceeded the rate offered by other insurance companies to buy back their own annuities.

125.    Symetra also violated its fiduciary duty to the Class members by withholding material information about the respective transactions, including that it failed to inform the Class members that:

a.      The transactions would result in a decrease in Symetra's reserve requirements, thus freeing up reserves for Symetra to use for other purposes;

b.      The Class members could receive a much lower discount rate, and thus receive a larger lump sum payment, from SABSCO's factoring company's competitors;

c.      Because the Factoring Transaction would essentially result in SABSCO buying an obligation of its affiliate, Symetra, the risk to Symetra from the transaction would be even lower than it would be to competitors;

d.      The lump sum provided for an even larger expected profit to Symetra than a third-party purchaser would expect at the same discount rate;

e.      For the Power Language Subclass, the fact that, under the original agreements creating the annuities, the Class members lacked the power to transfer future SSA payments; and

f.      For the Power Language Subclass, the fact that, because the Class members lacked the power to sell their SSA payments, the transactions would be, or was likely to be, void *ab initio*, or alternatively, voided by the courts if challenged.

126.    The breach of this duty was the direct and proximate cause of harm to Plaintiff White, Plaintiff Nadeau, and the Class members. As a result, Plaintiff White, Plaintiff Nadeau, and the Class members are entitled to damages in an amount to be proven at trial.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## COUNT FOUR — BREACH OF FIDUCIARY DUTY

### On behalf of the Class Against Defendant Symetra Assigned Benefits Service Company (SABSCO) as Purchaser and Obligor

127.    Plaintiff incorporates in this Count paragraph 1 through 126 as if fully set forth herein.

128.    SABSCO, as obligor of the Class members' annuities, owes a fiduciary duty to the respective members for all of the same reasons set forth in paragraphs 116–23, *supra*. SABSCO, as obligor of the Class members' annuities, violated those fiduciary duties by engaging in the conduct described in paragraphs 125–25 *supra*.

129.    SABSCO, knowing that the Class members were annuitants of SSAs issued by Symetra, sought to purchase the Class members' future payments through factoring transactions.

130.    SABSCO initiated these Factoring Transactions through direct solicitation of the annuitants of Symetra SSAs.

131.    Because Symetra was the issuer of these SSAs, it collected and maintained, and/or had access to the personal information obtained from the respective Class members prior to issuing the SSA.

132.    SABSCO/Symetra represented to the Class members, through standardized solicitation materials and their website, that sale of their future payments to SABSCO would be in the Class member's best interest and encouraged the Class members to rely on their expertise.

133.    Defendant SABSCO violated its fiduciary duty to the Class members by placing its own interest over the interests of the Class members by soliciting, initiating, and completing a Factoring Transaction whereby SABSCO purchased from the respective Class members the same annuities that its affiliate, Symetra had previously issued to benefit the Class members:

      a.    For a lump sum price that was far less than the present value of the SSA;

      b.    For a lump sum price that did not reflect the benefit of the Factoring Transaction on Symetra's required reserves; and

COMPLAINT - 32
(2:20-cv-01866)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

c.      At a discount rate in far excess of the price offered by other insurance companies to buy back their own annuities.

134.     Although SABSCO knew that it, and Symetra, would benefit from the Factoring Transaction in myriad ways, it did not inform that Class members that:

a.      Symetra had a fatal conflict of interest;

b.      Symetra stood to gain financially by buying out payments that were not due for many years;

c.      Symetra knew that taking away periodic payments would increase mortality risks for annuitants of SSAs by depriving them of future funds for medical care;

d.      Under certain of the original agreements creating the annuities for the respective Class members' benefit, the Class members lacked the power to sell their SSA payments;

e.      Because they lacked the power to sell their respective SSA payments, their sales could be voided or deemed void *ab initio* by the courts if challenged;

f.      Symetra benefitted from the transaction because it would result in a decrease in their reserve requirements, thus freeing up reserves for Symetra to use as needed;

g.      Class members could receive a much lower discount rate, and thus receive a larger lump sum payment, from some of Symetra's competitors;

h.      Because SABSCO would be buying back Symetra's paper, the risk to Symetra from the transaction would be even lower than it would be to competitors; and

i.      The lump sum provided for an even larger expected profit to Symetra than a third-party would expect at the same discount rate.

135.     The breach of this duty was the direct and proximate cause of harm to Plaintiff White, Plaintiff Nadeau, and the Class members. As a result, Plaintiff White, Plaintiff Nadeau, and the Class members are entitled to damages in an amount to be proven at trial.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## COUNT FIVE — BREACH OF CONTRACT

### On behalf of the Power Language Subclass against SABSCO

136.     Plaintiff incorporates in this Count paragraph 1 through 135 as if fully set forth herein.

137.     Each member of the Power Language Subclass is party to a settlement agreement ("the Power Language Settlement Agreement") between that Class member and the settling defendant in the case which gave rise to the annuity at issue in this case.

138.     Each Power Language Settlement Agreement included Power Language making it impossible for the stream of payments created by the annuity to be assigned.

139.     When Defendant SABSCO took upon itself the duty to make payments under the annuity issued in connection with the Power Language Settlement Agreement, SABSCO stepped into the shoes of the defendant that was an original party to each Power Language Settlement Agreement. When it did so, SABSCO took upon itself the same rights and obligations under the Power Language Settlement Agreement as the defendant into whose shoes SABSCO had stepped.

140.     SABSCO is therefore fully bound by the Power Language.

141.     SABSCO's purported purchase of the stream of annuity payments generated by Annuities covered by Power Language constitutes a breach of SABSCO's duty under the Power Language Settlement Agreement. As a result, Plaintiff Nadeau and Class Members are entitled to damages in an amount to be proven at trial.

## COUNT SIX — TORTIOUS INTERFERENCE WITH CONTRACT

### On behalf of the Class Against Symetra

142.     Plaintiffs incorporate in this Count paragraph 1 through 141 as if fully set forth herein.

143.     The elements of a claim for tortious interference with contract under Washington state law are: "(1) the existence of a valid contractual relationship or business expectancy; (2) the

COMPLAINT - 34
(2:20-cv-01866)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

defendant's knowledge of and intentional interference with that relationship or expectancy; (3) a breach or termination of that relationship or expectancy induced or caused by the interference; (4) an improper purpose or the use of improper means by the defendant that caused the interference; and (5) resulting damage." *Eugster v. City of Spokane*, 121 Wn. App. 799, 811, 91 P.3d 117 (2004).

144.    As described in detail herein and as further set forth below, all of these elements of a claim for tortious interference with contract are clearly met in this case.

145.    Class members were all parties to underlying settlement agreements ("Underlying Settlement Agreements") with tortfeasors or their liability insurers ("Liable Parties").

146.    Defendants were aware of the Underlying Settlement Agreements that gave rise to all of the SSAs at issue in this case.

147.    In fact, Defendant SABSCO took on all of the negotiated payment obligation set forth in each and every Underlying Settlement Agreement in this case when SABSCO entered into a qualified assignment and release agreement ("Qualified Assignment and Release Agreement")[30] with the Liable Parties.

148.    All of the Qualified Assignment and Release Agreements entered into by SABSCO constitute novations of the Underlying Settlement Agreements themselves with respect to payment obligations, all of which are now payment obligations of SABSCO by virtue of the novation described above.

149.    Defendants knowingly and intentionally interfered with valid contractual relationships described in the relevant Qualified Assignment and Release Agreements signed by SABSCO and in Underlying Settlement Agreements that gave rise to the SSA's in the first instance.

---

[30] A tax benefit is conferred upon SABSCO when it enters into the Qualified Assignment and Release Agreement. 26 U.S.C. § 130. *See supra* ¶¶ 26–32.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

150.     Defendants' conduct in soliciting and inducing Class members to sell their periodic payments back to Symetra caused Class members to breach or terminate their valid contractual relationships or business expectancy that was contemplated by the underlying Settlement Agreements.

151.     Defendants' conduct was improper as the purchase of Class members' periodic payments without disclosing Defendants' fatal conflict of interest and competing economic interest caused Class members to divest themselves of valuable tax-free periodic payments for pennies on the dollar.

152.     Symetra's conduct demonstrated the use of improper means to acquire Class members' periodic payment rights by directing its affiliate, SABSCO to solicit Class members and initiate and complete Factoring Transactions whereby SABSCO purchased from Class members future payments owed under the very same SSAs that Symetra issued for the benefit of the Class members:

a.     At a discount rate that greatly exceeded the rate available from other purchasers of SSA payments;

b.     For a lump sum price far less than the present value of the SSA;

c.     At a discount rate that did not reflect the positive effect of the transaction on Symetra's required reserves; and

d.     At a discount rate that greatly exceeded the rate offered by other insurance companies to buy back their own annuities.

153.     Defendants' conduct was also improper and caused harm to Class members because Symetra and SABSCO withheld material information about the respective transactions, including their deliberate and intentional failure to inform the Class members that:

a.     The transactions would result in a decrease in Symetra's reserve requirements, thus freeing up reserves for Symetra to use for other purposes;

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

b.      The Class members could receive a much lower discount rate, and thus receive a larger lump sum payment, from SABSCO's factoring company competitors;

c.      Because the Factoring Transaction would essentially result in SABSCO buying an obligation of its affiliate, Symetra, the risk to Symetra from the transaction would be even *lower* than it would be to competitors;

d.      The lump sum provided for an even larger expected profit to Symetra than a third-party purchaser would expect at the same discount rate;

e.      For the Power Language Subclass, the fact that, under the original agreements creating the annuities, the Subclass members lacked the power to transfer future SSA payments; and

f.      For the Power Language Subclass, the fact that, because the Subclass members lacked the power to sell their SSA payments, the transactions would be, or was likely to be, void *ab initio*, or alternatively, voided by the courts if challenged.

154.    Defendants' solicitation of Class members to sell and Defendants purchase of Class members' periodic payments was improper as it was done to benefit Defendants' bottom line and not to protect injury victims from becoming wards of the state.

155.    Defendants' conduct in causing Class members to breach their Underlying Settlement Agreements was the proximate cause of economic harm to Plaintiff White, Plaintiff Nadeau, and the Class members. As a result, Plaintiff White, Plaintiff Nadeau, and the Class members are entitled to damages for tortious interference with contract in an amount to be proven at trial.

## COUNT SEVEN — UNJUST ENRICHMENT
### On behalf of the Class Against Symetra as Annuity Issuer

156.    Plaintiffs incorporate in this Count paragraph 1 through 97 as if fully set forth herein.

COMPLAINT - 37
(2:20-cv-01866)

157.    The elements of a claim for unjust enrichment under Washington state law are: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. *Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 810 P.2d 12, *as amended by* 814 P. 2d 699 (1991).

158.    Each and every time that a Class member sold its periodic payments back to SABSCO or Clearscape, substantial benefit or windfall was conferred upon Symetra.

159.    Not only was Symetra able to get off risk for making future payments to Class members but Symetra also earned profits by purchasing payments from Class members at high discount rates.

160.    Symetra was also able to hold less capital in reserve as it no longer had the same long duration payment obligations it originally agreed to take on when it issued the SSAs at issue in this case in the first instance.

161.    In effect, Symetra used Class members' own settlement funds to line its pockets.

162.    Such profiteering by Symetra was never contemplated by the SSAs issued to Class members.

163.    Symetra was fully aware of its profiteering at the expense of Class members. As described herein, Symetra marketed its "cash now" option as a funding service product. *See supra* ¶¶ 47–49, 57–59.

164.    For the Power Language Subclass, Symetra's conduct is particularly egregious and inequitable because under the original Underlying Settlement Agreements that gave rise to the SSAs, the Subclass members lacked the power to transfer future SSA payments.

165.    Accordingly, for the Power Language Subclass, the fact that, because the Subclass members lacked the power to sell their SSA payments, the transactions would be, or were likely to be, void *ab initio*, or alternatively, voided by the courts if challenged.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

166.    Moreover, Symetra knew this was the case as Symetra successfully challenged petitions filed by factoring companies not named SABSCO asserting the very same "power language" as a valid basis to deny a transfer petition. *See supra* ¶ 66.

167.    Defendants' conduct in helping itself to a profit windfall without disclosing its competing economic interest to Class members allowed Symetra to receive an improper benefit at the expense of the Class members. As a result, Plaintiff White, Plaintiff Nadeau, and the Class members are entitled to recoup all of Symetra's ill-gotten gains.

168.    Equity dictates that Class members recoup all of the benefits conferred upon Symetra through the improper conduct alleged herein as Symetra has been unjustly enriched at Class members' expense.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff White, Plaintiff Nadeau, individually and on behalf of all others similarly situated, seek judgment against Defendants, and each of them, as follows:

1.    An order certifying the proposed Class pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3), designating Plaintiffs as named representatives of the Class, and appointing the undersigned attorneys as Class counsel under Fed. R. Civ. P. 23(g);

2.    An order providing the following injunctive relief: an order enjoining Symetra and its subsidiaries from soliciting the purchase of its SSA from Class members.

3.    An award of damages including, but limited to, compensatory damages for Plaintiffs' injuries, including financial damages and any other damages allowed by law, in an amount to be proved at trial;

4.    An award of attorneys' fees and costs, as allowed by law;

5.    An award of pre-judgment and post-judgment interest, as provided by law;

6.    Leave to amend this Complaint and other Plaintiffs' pleadings to conform to the evidence produced at trial; and

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

7.      For such other and further relief as the Court deems just and proper.

## IX.      DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED this 30th day of December, 2020.

KELLER ROHRBACK L.L.P.

_s/ Lynn Lincoln Sarko_
_s/ Gretchen Freeman Cappio_
_s/ Adele A. Daniel_
Lynn Lincoln Sarko, WSBA #16569
Gretchen Freeman Cappio, WSBA #29576
Adele A. Daniel, WSBA #53315
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
adaniel@kellerrohrback.com

Jerome M. Marcus (*pro hac vice forthcoming*)
Jonathan Auerbach (*pro hac vice forthcoming*)
MARCUS & AUERBACH LLC
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA 19477
Tel.: (215) 885-2250
Fax: (888) 875-0469
jmarcus@marcusauerbach.com
auerbach@marcusauerbach.com

Edward Stone (*pro hac vice forthcoming*)
Lisa A. Salmons (*pro hac vice forthcoming*)
EDWARD STONE LAW P.C.
175 West Putnam Avenue, 2nd Floor
Greenwich, CT 06830
Tel.: (203) 504-8425
Fax: (203) 348-8477
eddie@edwardstonelaw.com
lisa@edwardstonelaw.com

*Attorneys for Plaintiffs*

COMPLAINT - 40
(2:20-cv-01866)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384