1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10
11

RENALDO WHITE and RANDOLPH
NADEAU, individually and on behalf of all
others similarly situated,

No. 2:20-cv-01866-MJP

12

Plaintiffs,

**AMENDED COMPLAINT—CLASS
ACTION**

13

v.

**JURY DEMAND**

14
15

SYMETRA ASSIGNED BENEFITS SERVICE
COMPANY and SYMETRA LIFE
INSURANCE COMPANY,

16

Defendants.

17
18
19
20
21
22
23
24
25
26

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................. 1

II.     JURISDICTION AND VENUE .......................................................... 5

III.    PARTIES .............................................................................................. 5

IV.     FACTUAL BACKGROUND ............................................................. 6

        A.      Structured Settlements and the Conduct of Symetra and SABSCO. ................... 6

                1.      The Creation and Regulation of SSAs. ................................... 6

                2.      The Rise of Factoring Companies. ......................................... 11

                3.      Symetra Enters the Factoring Business so It Can Enjoy the
                        Tax Benefit from Issuing Annuities and Also Profit When
                        an Annuity's Termination Is in Symetra's Best Interest. ...................... 13

                4.      Symetra Created a System That Used Its Unique Position to
                        Evade and Thwart Power Language. .......................................... 20

        B.      Facts Specific to the Named Plaintiffs. ............................................. 23

V.      CLASS ACTION ALLEGATIONS .................................................. 26

VI.     EQUITABLE TOLLING .................................................................. 29

        A.      Discovery Rule. ................................................................... 29

        B.      Fraudulent Concealment. ....................................................... 29

        C.      Estoppel. ......................................................................... 29

VII.    CLAIMS FOR RELIEF .................................................................... 30

        COUNT ONE — VIOLATIONS OF THE RACKETEER INFLUENCED
        AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C.
        § 1961, *ET SEQ.* ................................................................... 30

        A.      The Self-Dealing Enterprise. .................................................. 30

        B.      The Conduct. ..................................................................... 32

        C.      Predicate Acts. ................................................................... 34

        D.      Harm to Plaintiffs and Class Members. ....................................... 39

AMENDED COMPLAINT—CLASS ACTION - i
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

COUNT TWO — VIOLATION OF THE WASHINGTON CONSUMER
PROTECTION ACT .................................................................. 40

COUNT THREE — VIOLATION OF THE DUTY OF GOOD FAITH
AND FAIR DEALING ................................................................ 42

COUNT FOUR — BREACH OF FIDUCIARY DUTY ............................... 44

COUNT FIVE — BREACH OF FIDUCIARY DUTY ................................ 47

COUNT SIX — BREACH OF CONTRACT ............................................. 49

COUNT SEVEN — TORTIOUS INTERFERENCE WITH CONTRACT ................. 50

COUNT EIGHT — CIVIL CONSPIRACY ............................................. 53

COUNT NINE — UNJUST ENRICHMENT ........................................... 56

VIII.    PRAYER FOR RELIEF ................................................................ 57

IX.      DEMAND FOR JURY TRIAL ....................................................... 58

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## I.      INTRODUCTION

1.      This case is about the deceptive and misleading business practices of a multi-billion-dollar insurance conglomerate, Defendants Symetra Life Insurance Company ("Symetra") and its affiliate, Symetra Assigned Benefits Service Company ("SABSCO") (collectively, "Defendants"). Defendants made commitments to protect personal injury victims, then used their superior knowledge and unequal bargaining power to prey upon those very same injury victims. Defendants' conduct shows just how predatory a for-profit life insurance company can act when left to its own devices. This case seeks to put an end to Defendants' deceptive and misleading business practices that are causing irreversible harm to tort victims across the nation.

2.      Tort victims with personal injury, wrongful death, or workers' compensation claims sometimes opt to "structure" their settlement with the responsible party, in lieu of receiving one large sum. In a structured settlement, the settlement proceeds take the form of periodic payments, rather than a lump sum. Typically, the responsible party assigns its obligation to pay the periodic payments to a different entity. That entity then purchases a structured settlement annuity ("SSA"), issued by a highly rated insurance company, in order to fund the periodic payment obligations contemplated by the settlement agreement.

3.      SSAs are intended to ensure tort victims' long-term financial well-being. The scheduled periodic payments are tax-free and can be designed to pay for needed medical care and living expenses, often for tort victims' lifetime. Most SSAs provide both certain or "guaranteed" periodic payments which are made to tort victims' beneficiaries or estates in the event of their premature death, as well as additional payments, referred to as "life contingent" payments that commence at the expiration of the guaranteed period and continue for so long as the injury victims are living. According to the National Structured Settlements Trade Association

AMENDED COMPLAINT—CLASS ACTION - 1
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

("NSSTA"), "Structured Settlements Enable Seriously Injured People and Their Families to Live with Economic Security, Dignity, Independence, and Freedom from Reliance on Government."[1]

4.      Symetra is a life insurance company that issues SSAs. For decades, Symetra promoted the use of SSAs to resolve personal injury, wrongful death, and workers compensation claims. It claimed that SSAs would protect tort victims' settlement proceeds from dissipation.

5.      SABSCO is a Symetra affiliate with the same parent company. SABSCO plays two roles in the conduct at issue in this case. First, after a tort victim settles with the responsible party, and opts for a structured settlement, the responsible party or their insurer assigns the settlement obligation to SABSCO.[2] SABSCO then purchases an annuity from its affiliate Symetra to cover that obligation.[3] Second, once the SSA is in place, SABSCO turns around and preys upon the tort victims: it lures them into selling future periodic payments for a highly discounted lump sum without disclosing and actually concealing Defendants' profit motive and fatal conflict of interest.

6.      This case centers on exactly this practice: Defendants' efforts to sabotage and unwind SSAs so they can earn outsized and undisclosed profits at the expense of the very same injury victims they committed to protect.

7.      Plaintiff Renaldo White is one such victim. At age ten, he was grievously injured when he was hit by a truck. He became the recipient, or "annuitant" of a Symetra SSA. SABSCO then solicited White and ultimately got each and every future life-contingent payment of that SSA from him for a steeply discounted lump sum. White was left with no further benefits under his SSA.

8.      Plaintiff Randolph Nadeau is another such victim. He was injured in an accident at a construction site when a piece of cast iron fell off a waste pipe, causing injuries to his back and leg and disabling him for a period of five years. He also became an annuitant of a Symetra

---

[1] *NSSTA Position Paper* at p. 1, NSSTA (Sept. 2019), https://www.nssta.com/sites/default/files/library/2019/2019-09/2019_CAUCUS%233_NSSTA_Position_Paper0919.pdf.
[2] This is required under 26 U.S.C. § 130 to preserve the preferential tax treatment for Symetra and SABSCO.
[3] *Id.*

AMENDED COMPLAINT—CLASS ACTION - 2
(2:20-cv-01866-MJP)

SSA. SABSCO solicited Nadeau and ultimately bought a lifetime of future guaranteed and a host of life contingent payments of that SSA from him for a steeply discounted lump sum.

9.      Plaintiffs White and Nadeau bring this lawsuit against Defendants individually, and on behalf of all other persons who are or were, at any time, annuitants of an SSA issued by Symetra that provided life contingent payments and who subsequently sold their rights to receive payments from those SSAs to a Symetra affiliate.

10.      In purchasing injury victims' future payments at steep discounts, Symetra violates the duty that arose out of its commitment to issue long-term tax-free payment streams to those injury victims for needed medical care and living expenses. To make matters worse, Symetra uses its superior knowledge, reputation, financial clout, experience, and confidential information obtained during the underwriting process to profit at the injury victims' expense.

11.      To enable Symetra to issue and competitively price SSAs, the injury victims, through counsel or an SSA broker, provide Symetra with confidential medical and other protected information.

12.      Symetra uses this confidential information to price its SSAs, and to determine whether to apply a rated age to a particular injury victim, and—if so—what that rated age should be. The rated age indicates what the underwriters at an insurance company believe the victim's life expectancy will be. Symetra inputs information about the injury victims into its proprietary systems to come up with proposed periodic payment schedules that are used to quote settlement terms. Rated-age underwriting is used in connection with life contingent payments. The higher the rated age, the higher the monthly lifetime payment amount. Even though Symetra regularly used rated age underwriting to win business, rated ages cannot be determined from the original structured settlement agreement or the SSA.

13.      Among other things, this case challenges SABSCO's practice of using the confidential information it possesses and its superior bargaining power to escape from the promises it made to injury victims, and to earn undisclosed profits at the injury victims' expense.

AMENDED COMPLAINT—CLASS ACTION - 3
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

14.     Defendants' improper scheme began in 2005, when SABSCO and another Symetra affiliate, Clearscape Funding Corporation ("Clearscape"), began offering to purchase periodic payments from injury victims with SSAs issued by Symetra. Symetra advertises and promotes this offering to the annuitants of its SSAs as a "funding service product."[4] This "funding service product" provides a lump sum in exchange for the annuitant transferring the right to future payments back to SABSCO. The service includes "coordinating the court approval process" of transferring the payments,[5] which is governed by state and federal laws.

15.     In reality, SABSCO's "funding service product" is a euphemism for a "cash now" factoring transaction. Structured settlement factoring companies exist solely to buy future SSA payments in exchange for lump sums. Unlike other factoring companies, however, Defendants leverage the confidential information they obtained in the underwriting process to get out of their obligations. And unlike other factoring companies, Defendants weaponize Symetra's position of "trust" with its annuitants to induce them into selling off their future financial security.

16.     Defendants benefited from these transactions thrice over. First, they offloaded ongoing payment obligations. Second, they pocketed the difference between the lump sum received from the original tortfeasor and the total they paid to the tort victim. Third, even though their factoring activities effectively undid the original structured settlements, Defendants still appropriated the generous federal tax benefits, which were created to encourage insurers to provide the lifetime benefits needed by Plaintiffs White and Nadeau and other tort victims.

17.     Defendants have consummated thousands of predatory factoring transactions with tort victims such as Plaintiffs White and Nadeau, earning hundreds of millions of dollars. At no time did Defendants ever inform any state court, the Internal Revenue Service ("IRS"), any state legislature, or Congress of their scheme to systematically decimate the lifetime tax-free periodic payment streams they swore to protect.

---

[4] Symetra Fin. Corp., Amendment 3 to Form S-1 at p. 118 (Dec. 29, 2009), https://investors.symetra.com/static-files/58dd5283-b1b9-4e2a-95ea-e01dbf0f9f6f.
[5] *Id.*

AMENDED COMPLAINT—CLASS ACTION - 4
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

18.     On the contrary, Defendants knowingly and actively concealed their competing economic interest from all parties, leading tort victims to believe that Defendants were acting in their best interest.

19.     As a result, Plaintiffs White and Nadeau, and other tort victims like them, have been stripped of the very safety and security that the SSA was intended to provide in the first place. When their original claims settled, they could have accepted one lump sum payment. Through their structured settlements, that lump sum was paid to Defendants, to distribute to them over time. Because of Defendants' deceptive conduct, they received just a fraction of the original lump sum and none of the financial security.

20.     This case challenges the Defendants' deceptive and abusive business practices that have stripped injury victims of their financial safety net and undermined public policy

## II.     JURISDICTION AND VENUE

21.     This Court has jurisdiction by operation of 28 U.S.C. § 1331 (federal question jurisdiction) as this case states claims under federal law.

22.     This Court has jurisdiction over the non-federal claims pursuant to 28 U.S.C. § 1367.

23.     This Court also has jurisdiction over the action pursuant to 28 U.S.C. § 1332(d). The parties are diverse for purposes of section 1332(d), as Plaintiff White is a citizen of the State of Tennessee, Plaintiff Nadeau is a citizen of the State of New York, and Defendants Symetra and SABSCO have their principal place of business in the State of Washington. The amount at issue exceeds $5,000,000, and the number of putative class members is greater than one hundred

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as both Symetra and SABSCO maintain their principal place of business in Bellevue, Washington.

## III.     PARTIES

25.     Plaintiff White is an individual who resides in Memphis, Tennessee. Plaintiff White was the annuitant of an SSA issued by Symetra and the payment stream was purchased by

AMENDED COMPLAINT—CLASS ACTION - 5
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SABSCO in an improper and inappropriate factoring transaction. Plaintiff White was not represented by counsel in connection with that factoring transaction.

26.     Plaintiff Nadeau is an individual who resides in Hague, New York. Plaintiff Nadeau was the annuitant of an SSA issued by Symetra and the payment stream was purchased by SABSCO in a series of improper and inappropriate factoring transactions. Plaintiff Nadeau was not represented by counsel in connection with those factoring transactions.

27.     Defendant Symetra is a life insurance company regulated by the State of Iowa, with its principal place of business in the State of Washington. Symetra is a wholly owned subsidiary of Symetra Financial Company, which in turn is a wholly owned subsidiary of Sumitomo Life Insurance Company, an international insurance conglomerate.

28.     Defendant SABSCO, a Washington corporation, is a wholly owned subsidiary of Symetra Financial Company, which in turn is a wholly owned subsidiary of Sumitomo Life Insurance Company, an international insurance conglomerate. Both Defendants have a principal place of business at 777 108th Avenue NE, Suite 1200, Bellevue, WA 98004.

29.     In 2004, the SAFECO Assigned Benefits Service Company, known by the acronym "SABSCO", changed its name to the Symetra Assigned Benefits Service Company, continuing to be known by the acronym "SABSCO." Also in 2004, the Safeco Life Insurance Company changed its name to Symetra Life Insurance Company.

## IV.     FACTUAL BACKGROUND

**A.     Structured Settlements and the Conduct of Symetra and SABSCO.**

**1.     The Creation and Regulation of SSAs.**

30.     SSAs were first developed in the 1970s to provide long-term, periodic payments to tort victims for serious injuries that cause permanent disabilities. Their purpose is to ensure that tort victims receive regular payments to cover living and medical expenses.

31.     Life insurance companies, including Symetra, lobbied Congress extensively to provide for tax-free treatment of SSAs. The insurance companies and their trade association,

AMENDED COMPLAINT—CLASS ACTION - 6
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

NSSTA, argued that SSAs benefit tort victims by protecting periodic payments from dissipation, maximizing benefits, and ensuring long-term financial security to injury victims and their families.

32.     Insurance companies also represented to Congress that providing tax benefits to assignment companies that are wholly owned by the financially secure insurance companies that issue SSAs would further benefit injury victims and protect them from becoming wards of the state.[6]

33.     In 1983, Congress passed the Periodic Payment Settlement Act ("Periodic Payment Act"), Pub. L. No. 97-473, 96 Stat. 2605 (1983), amending the Internal Revenue Code ("IRC") to make clear that the creation and sale of SSAs would be tax-free to the injured party. It also made clear that insurance company affiliates, like SABSCO, could exclude the payment they received from the responsible party from income provided the funds were used to purchase an annuity contract for the sole and exclusive benefit of the settling plaintiff. The following simplified diagram illustrates how the process was designed to work:

---

[6] 127 Cong. Rec. S15005 (daily ed. Dec. 10, 1981) (statement of Sen. Baucus).

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17  34.    In accordance with IRC section 130[7], SABSCO avoids paying income tax on the

18  lump sum it receives, provided it assumes all of the periodic payment obligations of the

19  responsible party, and provided that the periodic payments to the tort victim are tax-free on

20  account of personal injury and sickness pursuant to IRC section 104(a)(2).

21  35.    If IRC section 130 did not exist, SABSCO would have to pay income tax on the

22  payments it accepts from responsible parties. The responsible parties would not be able to deduct

23  the cost of the annuity contract as a business expense, and they would also have to record a

24  contingent liability for future payments on their books.

25
26

---

[7] The IRC is enacted by Congress in Title 26 of the United States Code (26 U.S.C.).

AMENDED COMPLAINT—CLASS ACTION - 8
(2:20-cv-01866-MJP)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

36.     For these reasons, IRC sections 104(a)(2) and 130 fueled enormous growth of primary market for SSAs.

37.     The qualified assignment agreement operates as a novation of the periodic payment obligation contained in the underlying tort settlement agreement.

38.     SABSCO and Symetra performed separate roles necessary to preserve the favorable tax treatment of the SSAs.

39.     The only reason these unique tax benefits were granted by Congress to annuity issuers was to encourage the use of SSAs to address ongoing medical and support needs of tort victims, by ensuring that a reliable stream of income would be available to such persons for the entire period during which such income supplements were needed.

40.     As a condition of allowing tort victims to exclude from income the amounts received under SSAs, the IRS requires that the tort victims have only a right to receive the monthly payments, and not the actual or constructive receipt or the economic benefit of the lump sum amount that was invested to yield that monthly payment. Rev. Rul. 79-220, 1979-2 C.B. 74. In contrast, where the recipient receives ownership of the investment vehicle used to fund periodic payments, the payments are not excludable from income by the recipient. I.R.S. P.L.R. 8204023 (Oct. 27, 1981).

41.     IRC section 130 allows a responsible party to assign the obligation to make future payments to an assignee—in the transaction at issue, SABSCO—which then both has the continuing obligation to make payments to the recipient and owns the Qualified Funding Asset, i.e., the annuity, used to fund those payments. A further feature of the tax code enacted to facilitate SSAs—again based on the representations that it would protect the financial interests of injured parties—is IRC section 72(u). Normally, a corporation owning an annuity is taxed on the annuity earnings when they accrue as opposed to only when they are paid. However, IRC section 72(u)(3)(C) exempts annuities meeting the requirements of section 130 in SSAs.

42.     Collectively, the IRC, Revenue Rulings, and IRS guidance have recognized the favorable tax treatment of SSAs either where the alleged tortfeasor or its insurer has retained the obligation to fund future payments and owned the investment vehicle funding them, or where they have assigned that obligation to an assignee who has owned the investment vehicle.

43.     In the transactions at issue, SABSCO serves the role of an assignee necessary to maintain the tax-qualified status of the SSAs. If a single entity were to issue an annuity to fund future payments directly to a recipient as owner, as opposed to an assignee as owner with the obligation to fund payments to the recipient, the transaction would not meet the requirements of IRC sections 104(a)(2), 130, and 72, nor Revenue Ruling 79-220. The very point of an SSA is that the alleged tortfeasor, its insurer, or their assignee, may obtain an annuity to fund future care needs of the injured party on a tax-exempt basis, but the injured party actually or constructively receiving the fund cannot do so. To achieve these policy goals, the IRC therefore mandates the legal and actual separateness of the entity issuing the annuity and the entity which purchases the annuity, receives payments from the annuity issuer, and is then responsible for issuing periodic payments to the tort victim.

44.     While settling plaintiffs like White and Nadeau are not parties to the assignment from the responsible party to SABSCO, or the annuity contract between SABSCO and Symetra, they are intended third-party beneficiaries of those agreements and the sole named payees in the SSAs.

45.     In enacting the Periodic Payment Act, Congress adopted the arguments that Symetra and other insurance companies and their lobbyists promoted: that SSAs benefit personal injury victims by protecting settlement awards from dissipation, thereby ensuring long-term financial security for injury victims and their families.

46.     The tax exemptions conferred a valuable benefit on both the insurers and the tort victims. By eliminating tax on these payments, Congress made each dollar of annuity purchase price more profitable to the insurer. Congress did so to incentivize the insurer to offer larger,

AMENDED COMPLAINT—CLASS ACTION - 10
(2:20-cv-01866-MJP)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

longer, and more reliable payment streams to annuitants, who were the ultimate object of Congress's intentions and policy goals.

47.     The insurance industry assured Congress that this tax policy would decrease the likelihood that tort victims who were annuitants of SSAs would become public charges or otherwise be left without sufficient assets to meet their financial, medical, and care needs. Ensuring that the payments remained in place for the entire duration of the annuity when purchased was the key to protecting people and meeting their needs over time.

48.     Because this was the goal, SSAs include standard anti-assignment language to prevent the annuitant from assigning payment streams. Some settlement agreements go beyond the standard and contain an even more powerful ban on assignment. This language, referred to hereinafter as "Power Language," states that "[the SSA annuitant] shall not have the power to sell, mortgage, anticipate or encumber these payments, or any part thereof, by assignment or otherwise." *See, e.g.*, *infra* ¶ 80 (excerpt Plaintiff White's settlement agreement).

49.     Power Language is intentionally inserted into settlement agreements for the sole benefit and protection of the injury victims. Power Language is not required by statute.

50.     Defendants in this case have, on multiple occasions, successfully argued in courts across the United States that Power Language bars assignment even when a court might otherwise determine that the assignment was in the annuitant's best interest.

**2.     The Rise of Factoring Companies.**

51.     As SSAs became more prominent, a darker industry developed. Companies known as "factoring companies" began soliciting annuitants of SSAs, offering them immediate lump sum payments in exchange for a transfer of the rights to receive their future SSA payments. Factoring companies generally offer these lump sums at strikingly high discount rates, to the annuitant's detriment.

52.     In 2002, in response to the predatory behavior of factoring companies, Congress enacted IRC section 5891, which imposes a stiff tax penalty for transfers made without court

AMENDED COMPLAINT—CLASS ACTION - 11
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

approval. In enacting IRC section 5891, Congress acknowledged, again, that the Periodic Payment Act "sought to shield victims and their families from pressures to prematurely dissipate their recoveries."[8] Because the predatory practices of factoring companies "so directly subvert the Congressional policy underlying structured settlements and raise such serious concerns for the injured victims," bills were proposed in the Senate and the House to penalize companies that engage in such factoring transactions.[9]

53.     From the early 1980s until late 2012, Symetra was in the business of issuing SSAs to satisfy periodic payment obligations created under settlement agreements for the exclusive benefit and protection of personal injury victims. In order to take advantage of the favorable tax treatment afforded assignment companies (like SABSCO) under IRC section 130, tort defendants or their liability insurers assigned their settlement obligations to SABSCO, who then purchased SSAs from Symetra. This relationship allowed for tax-free treatment of the periodic payments paid to the settling tort plaintiffs under the SSAs. The payment to SABSCO for the purchase of the SSA was excluded from SABSCO's income. *See* IRC §§ 104(a), 130.

54.     In exchange for the assumption of periodic payment obligations detailed in underlying tort settlement agreements, SABSCO received one cash payment from the tort defendant or their liability insurers. It then used those sums to purchase SSAs from Symetra. The cash routed to Symetra represented damages owed to tort victims for personal injuries and sickness. This cash was intended to be held and invested by Symetra in trust for the sole and exclusive benefit of the settling plaintiffs and their families.

55.     Many of the underlying settlement agreements called for cost of living increases designed to cover future medical needs and other expenses. SSAs were designed and intended to cover all future payments contemplated by the settlement agreements, often for the tort victims' lifetimes.

---

[8] 145 Cong. Rec. S5283 (daily ed. May 13, 1999) (statement of Sen. Chafee).
[9] *Id.* at S5284.

56.     Because of the long-term nature of SSAs and their use in settlements that require court approval, they are issued almost exclusively by highly rated, well capitalized life insurance companies. Upon information and belief, when Symetra issued the SSA associated with Plaintiff Nadeau and Plaintiff White it was rated A+ by A.M. Best.

57.     Symetra no longer issues new SSAs but continues to maintain a portfolio of legacy business. The SSAs Symetra maintains require regular payments to annuitants in accordance with fixed and determined periodic payment schedules that arise directly out of settlements that were used to resolve tort claims.

**3.      Symetra Enters the Factoring Business so It Can Enjoy the Tax Benefit from Issuing Annuities and Also Profit When an Annuity's Termination Is in Symetra's Best Interest.**

58.     Rather than fulfill its duty to make payments to annuitants to protect their long-term economic and medical stability, Symetra came up with a scheme to get out of its unprofitable obligation to provide future periodic payments to tort victims, still keep the tax benefit, and enrich itself in the process.

59.     SSAs are vital to the economic and medical stability of annuitants, and if properly underwritten, they can be profitable to insurance companies, too. In 2000, the *Journal of Insurance Medicine* published a study in two parts (the "Safeco Study"),[10] which appears to have been funded by Safeco Life and Investments (n/k/a Symetra), analyzing the importance of thorough underwriting and actuarial planning in pricing SSAs. Part 1 of the two-part study lays out how insurance companies underwrite and price SSAs and how insurance companies can benefit from the profitable sale of SSAs in connection with the settlement of personal injury claims.[11]

---

[10] *See* Craig J. Schmidt & Richard B. Singer, *Structured Settlement Annuities, Part 1: Overview and the Underwriting Process*, 32 J. Ins. Med. 131-36 (2000); Craig J. Schmidt & Richard B. Singer, *Structured Settlement Annuities, Part 2: Mortality Experience 1967-95 and the Estimation of Life Expectancy in the Presence of Excess Mortality*, 32 J. Ins. Med. 137-54 (2000).
[11] Schmidt & Singer, *Safeco Study Part 1*, *supra* note 10, at p. 132.

AMENDED COMPLAINT—CLASS ACTION - 13
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

60.     However, SSAs risk becoming unprofitable for insurance companies if they are not properly underwritten or if market circumstances change after issuance in unexpected ways. The Safeco Study addresses the importance of mortality risk with respect to an SSA, finding that: "the mortality risk of [SSAs] is exactly the opposite of that of life insurance—that the annuitant may live too long, rather than die too soon."[12] In other words, if the annuitant of an SSA lives longer than anticipated, it becomes an unprofitable deal for the insurance company that must continue making periodic payments to the annuitant until the day the annuitant dies. The Safeco Study notes that mortality is influenced by both (i) advances in medical science and technology, and (ii) in the quality of medical care available to an annuitant.[13] The Safeco Study concluded that it would "take many years to determine whether underwriting decisions and actuarial planning" had been successful in terms of profit or loss to an insurance company.[14]

61.     Rather than wait years and risk loss, Symetra developed a plan to ensure that it reaped all the benefits of the tax-free SSA and shed its contractual and fiduciary obligation of continuing to pay annuitants what they were owed if they in fact lived a long life. To do so, SABSCO entered the SSA factoring business.

62.     In 2005, SABSCO and Clearscape began offering to purchase periodic payments from annuitants of SSAs issued by Symetra.[15] Symetra advertises and promotes this offering as a "funding service product" to the annuitants of its SSAs.[16] SABSCO provides a lump sum in exchange for the annuitant's right to future payments. The service includes "coordinating the court approval process."[17]

63.     In reality, this "funding service product" business is a euphemism for the operation of a factoring company in the business of buying SSA payment streams, just like

---

[12] *Id.* at p. 134.
[13] *See id.* at p. 135.
[14] *Id.* at p. 136.
[15] *See supra* note 4.
[16] *Id.*
[17] *Id.*

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

companies such as J.G. Wentworth,[18] Client First Settlement Funding,[19] and DRB Capital, LLC.[20]

64.     Unlike other factoring companies, however, SABSCO solicits the annuitants of the **very same SSAs** that SABSCO itself purchased using the annuitants' own settlement proceeds, and that its affiliate, Symetra, issued to protect injury victims' settlement awards from dissipation.

65.     In entering the factoring business, Symetra took a second bite at the proverbial apple, at annuitants' expense. In essence, Symetra decided the SSAs were not profitable enough for its liking, so Symetra had its own affiliate bail it out, buying back payments it was obligated to make to its annuitants. It was not enough to simply get out of paying annuitants what they were owed, though—Symetra decided to make a fat profit while doing so, buying back payments at an enormous discount without disclosing and instead actively concealing their competing economic interests to injury victims.

66.     Soliciting the transactions, SABSCO repeatedly suggests to vulnerable tort victims that their circumstances and needs have changed—even going as far as to suggest potential "changing needs" that they may have experienced, like starting a business. SABSCO tells tort victims that it will "help" them arrive at a decision that is in their best interest. It suggests to tort victims that they should trust SABSCO, because it already has their paperwork, and because Symetra owns the annuity. SABSCO does not tell tort victims that they are, in effect, renegotiating their original settlement agreement, for a lot less money and financial security. It does not mention to tort victims that the settlement agreement might bar the assignment.

67.     When a tort victim "sells" his or her future payments to SABSCO, Symetra is no longer obliged to make those future payments. When reserves are no longer needed to cover

---

[18] J.G. Wentworth, https://www.jgwentworth.com/ (last visited Apr. 6, 2021).
[19] Client First Settlement Funding, http://clientfirstfunding.com/ (last visited Apr. 6, 2021).
[20] DRB Capital, LLC, https://www.drbcapital.com/ (last visited Apr. 6, 2021).

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   liabilities associated with SSAs, Symetra is free to use those reserves as it sees fit. At the time it

2   discontinued SSA sales in 2012, Symetra reported $5.7 billion in reserves associated with SSAs

3   purchased by SABSCO and issued by Symetra.[21]

4       68.     Defendants also profit at the expense of annuitants like Plaintiffs White and

5   Nadeau by purchasing their SSA payment streams at inflated discount rates. In its 2001 Annual

6   Report, SAFECO (n/k/a Symetra) acknowledged that:

7           For [SSAs], future benefits are either fully guaranteed or are contingent on the

8           survivorship of the annuitant. Contingent future benefits are discounted with best-

9           estimate mortality assumptions, which include provisions for ongoing mortality

10          improvement. Guaranteed and contingent future benefits are discounted at rates

11          that grade from an average of 8.07% to ultimate rates that average 7.23%.[22]

12      69.     Yet SABSCO purchases these SSA periodic payment streams back from tort

13  victims at rates ranging from 9.22%–18.00%, or higher. Higher discount rates mean more profits

14  for Symetra. Of course, Symetra did not disclose the unfair discount rates, the fatal conflict of

15  interest, or the disparity in bargaining power to the tort victims, such as Plaintiffs White and

16  Nadeau.

17      70.     In the challenged factoring transactions, Defendants negotiate with Plaintiffs to

18  lower the payments that Defendants are already obligated to make under 3 & 4 in the diagram

19  above. In every single one of these transactions, the value offered by SABSCO and Symetra is

20  less than what they're obligated to pay on a fair, present-value basis. Precisely because no

21  rational insurer that, unlike an individual tort victim, can value this on a long-run, would ever

22  offer a lump sum payment that exceeds or even equals a fair present value of the future

23  payments, these transactions are characterized by unconscionably excessive discount rates.

24

25  _____

26  [21] Symetra Fin. Corp., Annual Report (Form 10-K) (Feb. 26, 2013), at p. 11, https://investors.symetra.com/static-files/422bbcc6-762b-4785-95c5-415014044637.
    [22] Safeco Corp., Annual Report (Form 10-K) (Mar. 6, 2002), at p. FS-10, https://www.sec.gov/Archives/edgar/data/86104/000089102002000223/v79351e10-k405.htm.

AMENDED COMPLAINT—CLASS ACTION - 16
(2:20-cv-01866-MJP)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

71.     Rather than disclose their conflict of interest or unfair advantage given their access to sensitive information, Defendants leverage it. SABSCO advertises its factoring business on the internet, professing to be "life-contingency pros":[23]

**WE'RE LIFE-CONTINGENCY PROS**
As a life insurance-affiliated company, we're experts at pricing life-contingent annuities. Our underwriting process helps us get to know you and your needs, so we can quote some of the best life-contingent prices in the industry.

72.     But what SABSCO dresses up as "expertise" is actually its unique access to underwriting information on the tort victim by virtue of its preexisting relationship with the tort victim—information that no other purchaser of annuity payment streams has. This information was turned over to the insurer by those acting on the tort victim's behalf when the annuity was purchased, to enable the tort victim to acquire the largest and most reliable payment stream. SABSCO also knew that the tort victim was vulnerable: it knew that the victim's original attorneys had chosen a structured settlement, instead of a lump sum, in the first place for a reason.

73.     Because Defendants solicit Symetra's own annuitants, they have several unique information advantages over any other factoring company and over Symetra's own annuitants. Where other factoring companies must expend substantial resources to find SSA annuitants interested in assigning payments, Symetra has a readymade list of sitting ducks.

74.     Defendants exploit unsophisticated tort victims by concealing the true nature of their predatory and wildly lopsided solicitations under the guise of a preexisting protective relationship. SABSCO solicits tort victims, like Plaintiffs White and Nadeau, as current "clients," professing, "[w]orking with us lets you stay with a company you know and trust. We already have your paperwork, so there is a lot less work for you."[24] It directly and repeatedly contacts its annuitants using contact information that they provided for the purposes of obtaining

---

[23] *SABSCO – FAQ*, Symetra, https://www.symetra.com/SABSCO/ (last visited Apr. 6, 2021).
[24] *SABSCO – FAQ*, Symetra, https://www.symetra.com/SABSCO/FAQ (last visited Apr. 6, 2021).

AMENDED COMPLAINT—CLASS ACTION - 17
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

the steady stream of income provided by the annuity—not for the purposes of receiving misleading solicitations from the issuer designed to eliminate those payments.

75.     One such solicitation reads:

SYMETRA.

October 29, 2007



Contract Number: 

Dear Mr. & Mrs. 

Several years ago, Symetra Life Insurance Company issued a "structured settlement annuity" naming you as a payee or beneficiary. You may be receiving annuity payments now or at some point in the future. Symetra Assigned Benefits Service Company ("SABSCO") owns the annuity and is the company legally responsible to make these annuity payments to you.

I'm writing to tell you about a service SABSCO recently began offering in response to a growing need we have seen among recipients of structured settlement payments.

As time passes, many people see a change in circumstances and find that the original structured settlement plan no longer fits their needs. Some face the need for cash now, perhaps to pay for education, buy a home, or to pay off debt. Until recently, people in this situation were not able to access the money used to provide their annuity payments. They simply had to wait to receive the payments according to the original plan, even when that plan was no longer suited to their needs.

**The good news is that recent legislation in many states now allows structured settlement payees to exchange their future annuity payments including Life Contingent payments, for cash when it's needed. SABSCO now offers this service to its customers.** Benefits received as part of a Worker's Compensation award are not eligible for this service.

I would like to answer any questions you may have about this type of exchange, and to explore whether receiving a lump sum payment would better suit the financial needs of your family. You may also reach me directly at (800) 427-1304 (ext. 68068). I am available from 6:30 am to 3:00 pm Monday through Friday Pacific Time. I would be happy to discuss your payment options. I look forward to hearing from you.

Sincerely,

Jesper Hansen
Sales Specialist
Symetra Assigned Benefits Service Company
Jesper.Hansen@Symetra.com

**KELLER ROHRBACK L.L.P.**

1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

76.     SABSCO's and Symetra's solicitations should never have been sent to Plaintiffs and the Class. They contain false and misleading statements about (i) SABSCO's reasons for offering the service, (ii) the nature of the transaction (i.e. whether it simply allows the tort victim to "access" their money now, perhaps discounted to account for present value); (iii) whose interest SABSCO and Symetra represents, and (iv) why a lump sum from SABSCO "would better suit the financial needs of your family." Defendants' solicitations also fail to mention that the tort victim's settlement agreement may contain spendthrift restrictions with Power Language limiting the tort victim's power to assign future periodic payments.

77.     SABSCO and Symetra falsely hold themselves out as acting in the interest of the annuitant, but they do not actually do so. Instead:

- Symetra shares highly personal information about the health, medical needs, and financial needs of annuitants with their own affiliate for the sole purpose of profiting from the purchase of their periodic payments;

- SABSCO does not inform its annuitants that it is motivated by its own profits, and not the best interest of the annuitant;

- Symetra's factoring transactions with its annuitants apply an artificially high discount rate; other insurance companies that agree to purchase back their own annuitants' future SSA payments do so at a much lower discount rate. By way of example, John Hancock, Berkshire Hathaway, and Allstate permit its annuitants to obtain a lump sum through hardship programs at discount rates that, upon information and belief, range from 6.5%–8.5%;[25] and

- Other insurance companies regularly discourage their annuitants from factoring their periodic payments as they are intended to provide long-term protection and tax-free treatment.

---

[25] *See* Andrew S. Hillman, *Structured Settlement Payment Transfers – Competitive Market Forces* (May 2015), http://13.59.206.133/pdf/Competitive%20Market%20Forces%20Article-11-21-16%20Final.pdf.

AMENDED COMPLAINT—CLASS ACTION - 19
(2:20-cv-01866-MJP)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3000
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

**4.   Symetra Created a System That Used Its Unique Position to Evade and Thwart Power Language.**

78.   By choosing to put its own records about its insured in the service of its new factoring business, Symetra set up a system that used its inside position to defeat annuitants' contractual rights and sidestep specific prohibitions on the sale of SSAs.

79.   Often, the settlement agreements pursuant to which settling parties assign their payment obligations to SABSCO include Power Language that explicitly states that the annuitants lack the power to transfer their future SSA payments.

80.   Plaintiff White's settlement agreement included such language. It stated, "[the SSA annuitant] shall not have the power to sell, mortgage, anticipate or encumber these payments, or any part thereof, by assignment or otherwise."

> LIMITATIONS OF CLAIMANT'S RIGHT TO PAYMENTS
> WITHIN THE MEANING OF IRS RULING 79-220
>
> The Claimant shall be a general creditor of the Insurer and shall have no rights of control over the periodic payments. The Claimant shall not be able to ACCELERATE, DEFER, INCREASE OR DECREASE the periodic payments and shall not have the power to sell, mortgage, anticipate or encumber these payments, or any part thereof, by assignment or otherwise. No part of the above periodic payments or any assets of the Insurer are to be subject to execution or any legal process for any obligation of the Claimant.

81.   Plaintiff Nadeau's settlement agreement included virtually identical language, denying him "the power to sell or mortgage or encumber [the payments], or any part thereof, nor anticipate the same, or any part thereof, by assignment or otherwise."

> **4.   Plaintiff's Rights to Payments**
>
> The Defendant shall not segregate or set aside any of its assets to fund the payments to Plaintiff required herein, it being understood Plaintiff is and shall be a general creditor to the Defendant. Said payments cannot be accelerated, deferred, increased or decreased by the Plaintiff and no part of the payments called for herein or any assets of the Defendant are to be subject to execution or any legal process for any obligations in any manner, nor shall the Plaintiff have the power to sell or mortgage or encumber same, or any part thereof, nor anticipate the same, or any part thereof, by assignment or otherwise.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

82.     These spendthrift provisions are bargained-for restrictions included in settlement agreements to provide an additional layer of protection to vulnerable settling Plaintiffs. But when Symetra wants to transfer SSA payments to itself for its own benefit, it does not inform the annuitants that they actually lack the power to engage in factoring transactions. Instead, Symetra and SABSCO knowingly and routinely encourage annuitants to waive their right to counsel in connection with factoring transactions, even when underlying settlement agreements were designed by plaintiff's counsel precisely to prevent dissipation through factoring, contain bargained for spendthrift protections, and contain provisions restricting the annuitants' power to transfer their SSA payments.

83.     Symetra knows that Power Language prevents a seller from obtaining a qualified transfer order, as Symetra has successfully challenged the transfer of SSA payments based on this same Power Language when they wanted to prevent a third-party factoring transaction. *See, e.g.*, *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 599 F. Supp. 2d 809 (S.D. Tex. 2008), *aff'd*, 567 F.3d 754 (5th Cir. 2009).

84.     Having successfully taken the position that Power Language prevents a seller from obtaining a qualified transfer order in multiple judicial proceedings, Defendants are judicially estopped from taking a contrary position in this case.

85.     Because the insurance company that issued the SSAs to the annuitants solicited by SABSCO is Symetra—SABSCO's corporate affiliate—there is no possibility that the issuer of the SSA (Symetra) will intervene and disclose to the court that the settlement agreement limits the power of the annuitant to sell his/her periodic payments. SABSCO does not inform the annuitants that this "check and balance" on the factoring transaction is eliminated. Nor does SABSCO disclose the existence of Power Language to the court. In fact, SABSCO actively conceals the language.

86.     Even when Power Language is lacking, the system Symetra created enables Symetra to systematically use the information it had about its annuitants not for the benefit of the

annuitants, but for the benefit of Defendants and at the expense of the annuitant. This information revealed to Symetra which annuitants to target and how to do so. It also revealed which annuities were costing Symetra the most money, and so would be most profitably wiped out through the purchase from the annuitant of the right to receive future periodic payments.

87.     SSAs are not like any other insurance product. In fact, while SSAs are issued by insurance companies, they are arguably not insurance at all. SSAs are only used to compensate tort victims in legal settlements. According to the NSSTA, the companies that issue SSAs must comply "with at least seven Sections of the U.S. Tax Code."[26] Since 1985, NSSTA, of which Symetra was a member until late 2006, has lobbied extensively for legislation "to preserve, promote, protect and defend structured settlements."[27] In a policy statement published on its website, NSSTA states that SSAs provide important policy benefits.[28]

- Protection against premature dissipation by injured persons who usually lack the experience to manage the financial responsibilities and risks of investing a large lump sum to cover a substantial, ongoing stream of medical and basic living expenses for a lengthy period.

- Payout tailored to the day-to-day living expenses and the ongoing medical and financial needs of the injured person and his or her family.

- Payment stream is often for the remainder of the injured person's lifetime, so that the injured person does not outlive his or her compensation, and can be extended to the life of a spouse and to support children in the family

- Avoids shift of responsibility for care to taxpayer-financed public assistance programs.

88.     Symetra deprived each of its annuitants of these "key policy benefits" when Symetra betrayed its annuitants by soliciting them for the purpose of purchasing their future SSA

---

[26] *What Are Structured Settlements?*, NSSTA, http://www.nssta.com/structured-settlements (last visited Apr. 6, 2021).
[27] *Congressional Structured Settlements Caucus*, NSSTA (July 2019), https://www.nssta.com/public-policy/caucus.
[28] *See Structured Settlements Enable the Newly Injured to Live with Dignity, Independence, and Freedom from Reliance on Government* at pp. 3-4, NSSTA (Jan. 2017), https://www.nssta.com/sites/default/files/library/2017/2017-01/2017_AAPD_NSSTA_Structured_Settlements_Policy_Statement.pdf.

AMENDED COMPLAINT—CLASS ACTION - 22
(2:20-cv-01866-MJP)

payments in exchange for a sharply discounted lump sum. Symetra gained financially with these factoring transactions, and the annuitants (like Plaintiffs White and Nadeau) lost their future financial security.

**B.      Facts Specific to the Named Plaintiffs.**

**1.      Plaintiff White**

89.      Plaintiff White was born in 1980. When he was ten years old, on May 23, 1990, Plaintiff White was riding a bike in Memphis, Tennessee when he was hit at an intersection by a Cablevision truck. He was seriously injured with a compound fracture to his tibia, internal injuries, and swelling to his brain. He spent months in the hospital.

90.      A tort action was brought on Plaintiff White's behalf against Memphis Cablevision, et al., which was ultimately settled with a commitment by defendants to pay $250,148 to Plaintiff White and to make a series of periodic payments to Plaintiff White for his lifetime.

91.      As a result, Plaintiff White became the annuitant and payee of an SSA, purchased (and owned) by SABSCO, and issued by SAFECO (n/k/a Symetra), which provided for the following payments:

        a.      $1,750 per month to be paid through the lifespan of Plaintiff White, but in no event for less than twenty years;

        b.      Lump sum payments on the following dates:

            •      $10,000 on August 1, 1998;

            •      $14,000 on August 1, 1999;

            •      $16,000 on August 1, 2000;

            •      $18,000 on August 1, 2001;

            •      $20,000 on August 1, 2005;

            •      $30,000 on August 1, 2010;

            •      $40,000 on August 1, 2020;

AMENDED COMPLAINT—CLASS ACTION - 23
(2:20-cv-01866-MJP)

- $50,000 on August 1, 2030; and

- $65,000 on August 1, 2040.

92.     In May 2011, in response to solicitations from Symetra, Plaintiff White signed an agreement with SABSCO to sell (i) 149 life contingent monthly payments of $300 from February 1, 2018 through and including June 1, 2030, and (ii) each and every future life contingent monthly payment in the amount of $1,750 owed to him from July 1, 2030 until his death. The "effective annual interest rate" for this transaction was 15.03% per year. Plaintiff White received just $18,609 from SABSCO as consideration for this factoring transaction.

93.     To illustrate the extent to which SABSCO took advantage of Plaintiff White, consider that Plaintiff White was just 31 years old when SABSCO bought every single one of his remaining periodic payments. According to the Social Security Administration, Plaintiff White's life expectancy is currently 81 years.[29] If Plaintiff White lived that long, Symetra would have needed to pay him approximately $695,000. Instead, SABSCO paid him just $18,609. This factoring transaction allowed Symetra to pay itself its profit on the factoring transaction upfront, and remove any amounts held in reserve to cover the future periodic payments of $695,000. To make matters worse, Symetra knew that purchasing all of Plaintiff White's future SSA payments put him at heightened risk of premature death.[30]

94.     Even though Plaintiff White was represented by competent counsel in his personal injury case against Memphis Cablevision, Symetra made no effort to contact his counsel before buying up all of his tax-free periodic payments at steep discounts. In fact, the only party represented by counsel at any of the transfer proceedings identified above was SABSCO. All of the documents that were used in connection with Plaintiff White's transfer petitions were drafted by and submitted to the Tennessee court by SABSCO's counsel.

---

[29] *Retirement & Survivors Benefits: Life Expectancy Calculator*, Soc. Security Admin., https://www.ssa.gov/OACT/population/longevity.html (last visited Apr. 7, 2021).
[30] Schmidt & Singer, *Safeco Study Part 1*, *supra* note 10, at p. 135.

AMENDED COMPLAINT—CLASS ACTION - 24
(2:20-cv-01866-MJP)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

95.     SABSCO, as petitioner, is responsible in all respects for complying with federal and state laws governing the transfer of structured settlement payment rights, including but not limited to IRC section 5891, and the Tennessee Structured Settlement Protection Act, Tenn. Code Ann. § 47-18-2601, *et seq.*

**2.     Plaintiff Nadeau**

96.     Plaintiff Nadeau was seriously injured when a waste pipe weighing more than fifty tons was dropped several stories from the bottom of a turbine at an industrial construction site. A large piece of the cast iron piping broke off on impact, flew through the air and struck Plaintiff Nadeau at boot level like a cannonball. Had the cast iron hit Plaintiff Nadeau any higher, he would not be here today.

97.     A tort action was brought against Detroit Edison Company by Plaintiff Nadeau and his then-wife, Sheri Nadeau, in Wayne County Circuit Court, State of Michigan, under Case No. 91-116148-NI, which was ultimately settled with a commitment by the defendant to pay a cash sum to Plaintiff Nadeau and make a series of periodic payments to Plaintiff Nadeau for his lifetime.

98.     As a result, Plaintiff Nadeau became the annuitant and payee of an SSA, purchased (and owned) by SABSCO, and issued by SAFECO (n/k/a Symetra), which provided for the following payments:

a.     $430 per month for thirty years certain commencing on December 27, 1995 and continuing to and including November 27, 2025; and

b.     $1,297.33 paid monthly for life commencing December 27, 2025.

99.     SABSCO purchased Plaintiff Nadeau's periodic payments from him on four occasions. In 2006, SABSCO purchased 75 guaranteed monthly payments of $430.00 each, commencing on October 27, 2006 through and including December 27, 2012. In 2011, SABSCO purchased 48 guaranteed monthly payments of $430.00 each, commencing on January 27, 2013 through and including December 27, 2016. In 2017, SABSCO purchased 72 guaranteed monthly

payments of $430.00 each, commencing on July 27, 2017 through and including June 27, 2023. In 2020, SABSCO purchased 29 guaranteed monthly payments of $430.00 each, commencing on July 27, 2023, through and including November 27, 2025, and 36 life-contingent payments, each in the amount of $1,297.33 commencing on December 27, 2025, through and including November 27, 2028.

100.    In this last transaction in 2020, Plaintiff Nadeau was divested of $59,173.88 of future periodic payments. In exchange he received just $20,091.58, which is the equivalent of borrowing the $59,173.88 at 18.00% interest.

101.    Even though Plaintiff Nadeau was represented by competent counsel in his personal injury case against Detroit Edison, Symetra made no effort to contact his counsel before buying up all of his tax-free periodic payments at steep discounts. In fact, the only party represented by counsel at any of the transfer proceedings identified above was SABSCO. All of the documents that were used in connection with his transfer petitions were drafted by and submitted to the New York court by SABSCO's counsel.

102.    SABSCO, as petitioner, is responsible in all respects for complying with federal and state laws governing the transfer of structured settlement payment rights, including but not limited to IRC section 5891 and the New York Structured Settlement Protection Act, N.Y. Gen. Oblig. Law § 5-1701, *et seq.*

## V.    CLASS ACTION ALLEGATIONS

103.    Plaintiffs brings this case as a class action pursuant to Fed. R. of Civ. P. 23(b)(2) and (b)(3) on behalf of themselves and a nationwide class (the "Class") of persons consisting of all persons who are or were, at any time, annuitants of an SSA that contemplated life contingent payments issued by Symetra and who subsequently sold to a Symetra affiliate the right to receive payments from that SSA in a factoring transaction.

104.    The Class includes a nationwide subclass, the void *ab initio* Subclass (hereinafter "Subclass"), defined to include all members of the Class whose contract defining the annuity at

issue included language explicitly stating that the annuitants lack the power to transfer their future SSA payments (thereby making any purported transfer void *ab initio* as a matter of law).

105.    There are thousands of members of the Class, and the Class is therefore so numerous that joinder of all members is impracticable.

106.    There are at a minimum hundreds of members of the Subclass, and the Subclass is therefore so numerous that joinder of all members is impracticable.

107.    Defendants have acted or refused to act on grounds that apply generally to the Class and the Subclass, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

108.    Common questions of law and fact exist as to all members of the Class and the Subclass, which predominate over any questions solely affecting individual members of the Class or the Subclass. Among the questions of law and fact common to the Class are:

a.    Whether Defendants' practice was unfair and/or deceptive;

b.    Whether Defendants had a fiduciary duty to the annuitants of SSAs which Symetra issued, to protect the interest of those persons in continuing to receive the payments to which they were entitled under the annuities, for the time period provided for in each annuity and as contemplated by the underlying settlement agreements that gave rise to the periodic payment stream in the first place;

c.    Whether, in purchasing payment streams from each member of the proposed Class, Defendants used information which had been provided to Defendants, on behalf of the members of the proposed Class, to enable Defendants to price and issue the annuities and so to meet the annuitants' needs for income over an extended, and defined, period;

d.    Whether, by so utilizing the information provided to them on behalf of each member of the Class, Defendants breached their fiduciary duty to members of the Class;

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

e.       With respect to the Subclass, common questions include whether Power Language bars the sale of payments under an SSA containing such language and whether such a sale, if attempted, is void *ab initio*; and whether Defendants are judicially estopped from denying that Power Language bars the sale of payments under an SSA that contains such language;

f.       Whether Defendants' communications to members of the Class and Subclass contained material misrepresentations and/or omissions that advanced a scheme to defraud;

g.       Whether Defendants' actions and relationship with one another satisfies the requirements of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*

109.    Plaintiffs will fairly and adequately represent the Class and the Subclass, protecting the interests of the members of the Class and the Subclass. The Named Plaintiffs have retained competent counsel experienced in class action litigation and intend to prosecute this action vigorously.

110.    Named Plaintiff White is a member of the Class and the Subclass and he does not have interests antagonistic to, or in conflict with, the interests of the other members of the Class or Subclass.

111.    Named Plaintiff Nadeau is a member of the Class and the Subclass and he does not have interests antagonistic to, or in conflict with, the interests of the other members of the Class or Subclass.

112.    Named Plaintiffs' claims are typical of the claims of the members of the Class.

113.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## VI.    EQUITABLE TOLLING

**A.    Discovery Rule.**

114.    Plaintiffs and Class members did not discover and could not have discovered through the exercise of reasonable diligence, Defendants' deception concerning the factoring transactions alleged herein.

115.    Precisely because of Defendants' scheme and breach of their fiduciary duty, Plaintiffs and Class members remained in the dark about Defendants' unlawful conduct, without the information that would have caused a reasonable person to suspect that Defendants were engaging in unlawful conduct.

**B.    Fraudulent Concealment.**

116.    All applicable statutes of limitations have been tolled by Defendants' knowing, active, and ongoing fraudulent concealment of the facts alleged herein.

117.    This lawsuit is premised in part on the misrepresentations and omissions Defendants made in order to conceal their true interest and the true nature of the factoring transactions from Plaintiffs. Among other things as alleged above, Defendants solicitations to Plaintiffs misrepresented and concealed the improper and unfair nature of the factoring transaction, as well as Defendants' own interests.

**C.    Estoppel.**

118.    Defendants were under a continuous duty to disclose to Plaintiffs and Class members the improper and unfair nature of the sales and Defendants' improper motives and conflicts of interest. Yet Defendants actively concealed these important underlying facts.

119.    Defendants are therefore estopped from relying on any statutes of limitations in defense of this action.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

# VII.   CLAIMS FOR RELIEF

## COUNT ONE — VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *ET SEQ.*

### On Behalf of the Class Against All Defendants

120.   Plaintiffs incorporate in this Count paragraphs 1 through 119 as if fully set forth herein.

121.   This claim is brought by Plaintiffs and Class members against Defendants for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1961, *et seq*.

122.   Each Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

123.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

124.   Section 1962(d) makes it unlawful for "any person to conspire to violate" section 1962(c), among other provisions. 18 U.S.C. § 1962(d).

125.   Each Defendant conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) and (d).

## A.   The Self-Dealing Enterprise.

126.   RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

127.   Symetra Financial Corporation, with its subsidiaries Defendant Symetra, Defendant SABSCO, and Clearscape, formed an enterprise (the "Self-Dealing Enterprise").

AMENDED COMPLAINT—CLASS ACTION - 30
(2:20-cv-01866-MJP)

128.     In addition to their legal ties, the members of the Self-Dealing Enterprise, also formed an association-in-fact enterprise. Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

129.     The Self-Dealing Enterprise operated with the common purpose of fraudulently inducing Plaintiffs and Class members to assign future payments under structured settlement agreements to Defendant SABSCO in exchange for a substantially lower lump sum payment than they would have received under the structured settlement. The purpose was achieved when the Self-Dealing enterprise reaped profit from both the transaction creating the annuity obligation and the transaction eliminating that obligation. This Self-Dealing Enterprise exists separately from the otherwise legitimate business operations of Symetra Financial and its subsidiaries, which includes employment benefits, retirement, and individual-life divisions.

130.     The Enterprise comprises entities with both corporate and business relationships. As described in detail above, Defendant SABSCO purchases the SSA from Defendant Symetra to fund the periodic-payment obligation Symetra accepts from responsible parties. Defendant Symetra in turn uses its affiliates, Defendant SABSCO and Clearscape, in order to solicit buy-outs from the annuitants.

131.     Defendants SABSCO and Symetra participate in, and are members of, the Self-Dealing Enterprise. And they exist separate from the Self-Dealing Enterprise. They are legally distinct entities, as they must be to operate and benefit from the scheme.

132.     SABSCO is an assignment company established for the express purpose of accepting periodic payment obligations on behalf of Defendants or their liability insurers in connection with structured settlements of personal injury and sickness claims that are tax-free to the tort victim under IRC section 104(a)(2).

AMENDED COMPLAINT—CLASS ACTION - 31
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3052
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

133.     Provided that the periodic payment obligations that SABSCO assumes are compliant with IRC section 104(a)(2), IRC section 130 allows SABSCO to exclude from income one hundred percent of the annuity premium it receives from the responsible party.

134.     IRC section 130 was enacted by Congress to encourage qualified assignments of periodic payment rights. Without IRC section 130, assignment companies like SABSCO would owe federal income taxes on the premiums they receive to fund periodic payment obligations.

135.     IRC section 130 requires that the periodic payments are "fixed and determinable as to amount and time of payment" and that "such periodic payments cannot be accelerated, deferred, increased or decreased by the recipient of such payments." IRC § 130(c)(2)(A), (B).

136.     These requirements were put in place by Congress to ensure that the settling plaintiff who agrees to accept payment over time via an SSA is not in constructive receipt of the future settlement proceeds or is receiving the current economic benefits of those future settlement proceeds.

137.     The favorable tax treatment of assignment companies like SABSCO is directly tied to the favorable tax treatment afforded tort victims under IRC section 104 which includes allowing for the built-in gains in the SSA that are supposed to go to the tort victim to remain tax-free.

138.     Plaintiffs believe that Self-Dealing Enterprise's conduct as described herein is contrary to Congressional intent and in violation of IRC section 130. The Self-Dealing Enterprise existed for as long as Defendant SABSCO has offered structured settlement buy-outs to Symetra annuitants whose annuities are owned by SABSCO.

**B.     The Conduct.**

139.     As described above, Symetra decided that it would turn the future payments that its affiliate, SABSCO, had contracted to provide into yet another profit center, at the expense of the very annuitants they were charged to financially protect. To do this, it actively solicited and fraudulently induced Plaintiffs and Class members to sell their future payments for lump sums.

AMENDED COMPLAINT—CLASS ACTION - 32
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Finding annuitants was not difficult for Symetra because it already had their contact, personal, and medical information. In Symetra's own words,"[o]ur underwriting process helps us get to know you and your needs[.]"[31] Soliciting the buy-outs, SABSCO even advertised itself as "the company you know and trust."[32] Symetra, it said "has served customers fairly and responsibly for more than 50 years."[33] SABSCO said that it could "assist" Plaintiffs and Class members with "pressure-free transactions."[34] It said it would "help[]" annuitants "arrive at a decision that makes the most sense for you."[35] It framed the factoring transaction as allowing Plaintiffs and Class members to "access your settlement money sooner than payments are scheduled to arrive"[36]—as if annuitants would receive the same money, just earlier, as opposed to the substantially reduced sums they actually received.

140.    SABSCO and Symetra abused this trust in soliciting and entering the buy-outs. SABSCO hid from Plaintiffs and Class members that it and Symetra had a fatal and non-waivable conflict of interest in the transactions; that they were using confidential information about the annuitants, which Defendants possessed because it had been provided to them to induce them to issue the annuity, in order to contact annuitants and decide whether to repurchase the payment obligations, and if so, at what price; that they had competing economic interests and profited from the buy-outs at the expense of Plaintiffs and the Class members; that the factoring transaction was not in Plaintiffs' and Class members' interest; that higher payouts could be available from known competitors; that, for Plaintiffs and members of the Subclass, the transactions were prohibited; and that in entering the transactions, they were circumventing the settlement protection acts by systematically soliciting waivers of professional advice from annuitants.

---

[31] *Supra* note 23.
[32] *Id.*
[33] *Supra* note 24.
[34] *Supra* note 23.
[35] *Id.*
[36] *Supra* note 24.

AMENDED COMPLAINT—CLASS ACTION - 33
(2:20-cv-01866-MJP)

141.    Symetra and SABSCO participated directly in the conduct of the RICO enterprise. SABSCO solicited the factoring transactions while openly relying on the position of its "affiliate," Symetra, as the insurer that services the annuity to garner Plaintiffs' and Class members' trust. Symetra, as SABSCO's affiliate, promoted SABSCO's "funding service products" on its website and on Symetra letterhead.[37] Symetra did not correct and rather promoted SABSCO's misrepresentations about its fair dealings with customers and commitment to "fair treatment."[38] It reaped the savings from SABSCO's factoring transactions.

## C.    Predicate Acts.

142.    To carry out, or attempt to carry out, the objectives of the Self-Dealing Enterprise, Defendants, did knowingly conduct or participate in, directly or indirectly, the affairs of the Self-Dealing Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

143.    The members of the Self-Dealing Enterprise have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

144.    The multiple acts of racketeering activity which the members of the Self-Dealing Enterprise committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

145.    The racketeering activity was made possible by the Self-Dealing Enterprise's regular use of the facilities, services, and employees of the Self-Dealing Enterprise.

146.    The members of the Self-Dealing Enterprise participated in the Self-Dealing Enterprise by using mail, telephone, and the internet to transmit mailings and wires in interstate commerce.

---

[37] *See supra* note 23; ¶ 75.
[38] *Supra* note 24.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

147. The members of the Self-Dealing Enterprise used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of the Self-Dealing Enterprise's objectives through common misrepresentations, concealments, and material omissions.[39]

148. In devising and executing the objectives of the Self-Dealing Enterprise, its members devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and Class members by portraying themselves as operating in the interest of Plaintiffs and Class members, when really they were operated for their own financial gain.

149. For the purpose of furthering its desire to escape from its obligations to make future payments, at the expense of depriving Plaintiffs and Class members of the long term security that those payments provided, the Self-Dealing Enterprise committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance its objectives.

150. In order to induce Plaintiffs and Class members to sell their future payments, SABSCO and Symetra, worked in concert to make them believe that SABSCO would act in their interest. In truth, the buy-outs undermined Plaintiffs' and Class members' long term security, to Symetra's financial gain.

151. SABSCO and Symetra also concealed from Plaintiffs that, in order to decide whether to buy-out Plaintiffs' annuity payment streams, and if so at what price, they were using confidential information that had been provided to Symetra in order to induce them to issue the annuities in the first place.

152. In furtherance of their Self-Dealing Enterprise, SABSCO used Symetra's website and letterhead among other things to rely on Symetra's brand name, to make statements suggesting that Plaintiffs and Class members could trust SABSCO and that the buy-out would serve Plaintiffs' and Class members' best interests. In making these representations, SABSCO

---

[39] *See, e.g., supra* ¶ 75.

AMENDED COMPLAINT—CLASS ACTION - 35
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

and Symetra intended that Plaintiffs and Class members rely on misrepresentations and enter the transactions. These statements by the Defendants are false, and constitute mail and wire fraud, predicate acts under RICO.

153.    As SABSCO and Symetra knew and intended, Plaintiffs and Class members did rely on these misrepresentations in agreeing to sell future payments to SABSCO for pennies on the dollar. The misrepresentations and omissions were material to Plaintiffs' and Class members' decision to enter the transactions and/or accept the cash SABSCO and Symetra offered.

154.    Symetra and SABSCO knew at the time of making these statements that they were untrue and misleading. Symetra acknowledged the unsavory nature of the transactions in its 2011 Annual Report: "Funding services have been viewed unfavorably in the past by consumer advocates and the media . . . . This is particularly the case where we offer funding services to payees of our own structured settlement annuities."[40] Symetra and SABSCO knew that Plaintiffs and Class members are financially vulnerable and susceptible to offers of "cash now"[41] and that an offer of "fair treatment and competitive pricing"[42] could induce someone to sell their future payments to SABSCO.

155.    Each of the foregoing statements and transmissions constitutes a predicate act of wire fraud. Defendants made these transmissions and statements, or caused them to be made, knowing they would be transmitted via wire, with the intent to market their "funding service products" and deceive annuitants into thinking that Defendants would act in their best interest.

156.    Upon information and belief, in this way, SABSCO has off-loaded thousands of its obligations to pay future payments under structured settlement agreements—and, for life-contingent payments in particular, the attendant risks. Although Symetra exited the SSA market in 2012, it continues to service its existing obligations and solicit buy-outs through SABSCO,

---

[40] Symetra Fin. Corp., Annual Report (Form 10-K) (Feb. 29, 2012), at p. 45, https://investors.symetra.com/static-files/3d998171-d6d1-4e92-97dd-98f342e0d641.
[41] *Supra* ¶ 75.
[42] *Supra* note 24.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    and its other affiliate, Clearscape. The Self-Dealing Enterprise's efforts to induce these

2    transactions are knowing, intentional, and fraudulent in violation of RICO.

3          157.    The Self-Dealing Enterprise's predicate acts of racketeering, 18 U.S.C. § 1961(1),

4    include, but are not limited to:

5          a.   <u>Mail Fraud:</u> The Self-Dealing Enterprise violated 18 U.S.C. § 1341 by

6                sending or receiving, or by causing to be sent and/or received, fraudulent

7                materials via U.S. mail or commercial interstate carriers for the purpose of

8                deceiving Plaintiffs and Class members regarding its true intention and

9                interests in the factoring transactions; and

10         b.   <u>Wire Fraud:</u> The Self-Dealing Enterprise violated 18 U.S.C. § 1343 by

11               transmitting and/or receiving, or by causing to be transmitted and/or

12               received, fraudulent materials by wire for the purpose of deceiving

13               Plaintiffs and Class members regarding its true intention and interests in

14               the factoring transactions.

15         158.    The Self-Dealing Enterprise falsely and misleadingly used the mail and wires in

16   violation of 18 U.S.C. §§ 1341 and 1343. Illustrative and non-exhaustive examples include the

17   following statements, all of which are false, materially misleading or materially omissive:

18         a.   SABSCO advertised itself as "the company you know and trust."[43]

19         b.   SABSCO said "Symetra has served customers fairly and responsibly for

20   more than 50 years."[44]

21         c.   SABSCO said that it could "assist" Plaintiffs with "pressure-free

21   transactions."[45]

22         d.   SABSCO said it would "help[]" annuitants "arrive at a decision that

23   makes the most sense for [them]."[46]

24

25   _____

     [43] *See supra* note 23.
26   [44] *See supra* note 24.
     [45] *See supra* note 23.
     [46] *Id.*

AMENDED COMPLAINT—CLASS ACTION - 37
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

    e.      SABSCO framed the factoring transaction as allowing Plaintiffs and Class members to "access [their] settlement money sooner than payments are scheduled to arrive."[47]

    f.      SABSCO said it began offering the factoring transactions "in response to a growing need we have seen among recipients of structured settlement payments."[48]

    g.      SABSCO sent thousands of mailings, across state lines to Plaintiffs' and Class members throughout the United States, on Symetra letterhead, to solicit the factoring transactions.[49]

    h.      SABSCO and Symetra transferred payments to Plaintiffs and Class members across state lines to Plaintiffs and Class members throughout the United States, on Symetra letterhead, by mail and wire across state lines.

159.    Some of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the Defendants' books and records. However, Plaintiffs have described the types of predicate acts of mail and/or wire fraud, including the specific types of fraudulent statements upon which, through the mail and wires, the Self-Dealing Enterprise engaged in fraudulent activity in furtherance of its scheme.

160.    The members of the Self-Dealing Enterprise have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the members of the Self-Dealing Enterprise conspired to violate 18 U.S.C. § 1962(c), as described herein. On information and belief, various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants herein, have participated as co-conspirators with the Defendants and the members of the Self-Dealing Enterprise in these offenses and have performed acts in furtherance of the conspiracy to ensure that the transactions become court approved and that Symetra may escape future payment obligations and off-load associated risks.

---

[47] *See supra* note 24.
[48] *See supra* ¶ 75.
[49] *See, e.g., id.*

AMENDED COMPLAINT—CLASS ACTION - 38
(2:20-cv-01866-MJP)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

161.    To achieve their common goals, the members of the Self-Dealing Enterprise hid from Plaintiffs and Class members: (1) the fraudulence of the statements made to induce the transactions; (2) the Self-Dealing Enterprises' financial interest in the transactions; and (3) the true nature and objective of the relationship between the members of the Self-Dealing Enterprise.

162.    Each member of the Self-Dealing Enterprise, with knowledge and intent, agreed to the overall objectives of the schemes and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the members of the Self-Dealing Enterprise had to agree to conceal their fraudulent scheme.

163.    As described above, the members of the Self-Dealing Enterprise engaged in a pattern of related and continuous predicate acts for years, even after Symetra exited the structured settlement market. On information and belief, Symetra issued thousands of solicitations to annuitants containing misrepresentations and intentional omissions.

164.    The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events. SABSCO preyed on thousands of Symetra annuitants, to the Self-Dealing Enterprises' financial gain, and their conduct continues to this day and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

**D.      Harm to Plaintiffs and Class Members.**

165.    Plaintiffs and Class members are "person[s]," as that term is defined in 18 U.S.C. § 1961(3) and have standing to sue as it was and is injured in its property as a result of the Defendants' wrongful conduct.

166.    Plaintiffs and Class members have suffered injury to their property by reason of Defendants' RICO violations. Defendants' RICO violations caused Plaintiffs to enter into transactions in which they gave up future annuity payments for substantially reduced lump sums. As such, they suffered financial injury, losing any financial security the payments secured and large portions of the present value of their future SSA payments.

AMENDED COMPLAINT—CLASS ACTION - 39
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

167.    Plaintiffs were direct victims, and indeed the target of, Defendants' misconduct. Defendants off-loaded risk and financial obligations at the expense of Plaintiffs' financial interests and security.

168.    Defendants' RICO violations were a "but for" cause of Plaintiffs' and Class members' injuries. Defendants' conduct deceived Plaintiffs into believing that Defendants were acting in Plaintiffs' and Class members' interest and that the factoring transactions were in their best interest. Had Plaintiffs and Class members received independent legal or financial advice, Plaintiffs would not have entered the factoring transactions or would have received an amount substantially better than they obtained.

169.    Defendants' RICO violations led directly to Plaintiffs' injuries. Defendants circumvented the Plaintiffs' prior attorneys, and the agreement they had reached with the prior tortfeasor, to take advantage of Plaintiffs. As described above, they held Plaintiffs hand through the court-approval process, providing form statements and allowing Plaintiffs to proceed without consulting a lawyer.

170.    Accordingly, Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as for injunctive/equitable relief, costs, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

## COUNT TWO — VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT

### On Behalf of the Class Against All Defendants

171.    Plaintiffs incorporate in this Count paragraphs 1 through 170 as if fully set forth herein.

172.    The Washington Consumer Protection Act ("CPA") is codified at RCW 19.86. The CPA establishes a framework for redressing consumer protection violations that directly or

AMENDED COMPLAINT—CLASS ACTION - 40
(2:20-cv-01866-MJP)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

indirectly affect the people of the State of Washington. Defendants are Washington entities, the acts giving rise to the wrong at issue were committed in and emanated from the State of Washington, and the benefit Defendants appropriated from their unfair and deceptive acts were received in the State of Washington. As the conduct at issue falls within the scope of the CPA, Plaintiffs White and Nadeau, and members of the Class can enforce the CPA and recover damages.

173.    A violation of the CPA consists of five elements: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) a public interest impact; (4) injury to plaintiff in his or her business or property; and (5) causation. *See Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986).

174.    Symetra, whose principal place of business is in the State of Washington, is a multinational insurance conglomerate and wholly owned subsidiary of the Sumitomo with $58.9 billion in assets at December 31, 2020.[50] Symetra has been in business for more than 60 years.[51] Symetra used its reputation and financial clout to solicit unsophisticated annuitants who trusted Symetra. Even though the factoring transactions were "approved" under various state structured settlement protection acts based on petitions filed by SABSCO's counsel, each factoring transaction involved unfair and deceptive practices by Defendants because Defendants did not disclose that:

        a.    Defendants had a fatal and non-waivable conflict of interest;

        b.    Defendants failed to disclose their competing economic interest to Class members and actively concealed same;

        c.    Defendants profited from all factoring transactions at the expense of the Plaintiffs and each member of the proposed Class and Subclass;

        d.    The factoring transaction was not in Plaintiffs' interest;

---

[50] *Company Profile*, Symetra, https://investors.symetra.com/corporate-profile (last visited Apr. 6, 2021).
[51] *Id.*

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

e.      Higher payouts were available from known competitors if Plaintiffs or their independent professional advisors shopped deals to Defendants' competitors; and

f.      SABSCO circumvented the structured settlement protection acts by systematically soliciting waivers of professional advice from sellers like Plaintiffs White and Nadeau.

175.    SABSCO's broad effort to buy back its own annuities, at such high discount rates, and leaving those who need the security of long-term payments due to disability without that security, is an issue of public interest. Numerous courts and the legislatures have found that the creation and use of SSAs are in the public interest, as evidenced by their tax-free treatment and various acts to protect annuitants from exploitation. Moreover, the likelihood that additional people will be affected from exactly the same conduct makes the matter one of public interest.

176.    Due to Defendants' unfair and deceptive acts or practices, Plaintiffs White and Nadeau, and Class members suffered financial injury, losing their future security and large portions of the present value of their future SSA payments.

177.    As a direct and proximate result of Defendants' unfair and deceptive conduct, Plaintiffs White and Nadeau, and the Class members have sustained and continue to sustain injuries and, pursuant to RCW 19.86.090, Plaintiffs White and Nadeau, and the Class members are entitled to actual and treble damages in amounts to be determined at trial, attorneys' fees and costs, and all other relief available under the CPA.

## COUNT THREE — VIOLATION OF THE DUTY OF GOOD FAITH AND FAIR DEALING

### On Behalf of the Class Against All Defendants

178.    Plaintiffs incorporate paragraphs 1 through 177 as if fully set forth herein.

179.    The duty of good faith and fair dealing applies to every contract and includes the duty to disclose relevant information during contract formation.

AMENDED COMPLAINT—CLASS ACTION - 42
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

180.    Failure to disclose relevant information may constitute violation of the duty to act in good faith; affirmative misrepresentations are not required. Thus, *inter alia*, the duty of good faith and fair dealing requires disclosure that a contract may be unenforceable and/or violate law.

181.    Plaintiff White entered into the factoring transaction with the expectation of good faith and fair dealing by Defendants.

182.    Plaintiff Nadeau entered into the factoring transactions with the expectation of good faith and fair dealing by Defendants.

183.    Defendants did not act in a manner consistent with the annuitants' objectively reasonable expectations.

184.    Defendants violated the duty of good faith and fair dealing by failing to disclose and actively concealing from Plaintiffs and Class members that:

      a.    Symetra had a fatal conflict of interest;

      b.    Symetra stood to gain financially by buying out payments that were not due for many years;

      c.    Symetra knew that taking away periodic payments would increase mortality risks for annuitants of SSAs by depriving them of future funds for medical care;

      d.    Certain Class members lacked the power to transfer their future SSA payments;

      e.    Although the law provides for the issuer of the SSA to object to the factoring transaction, the issuer of the Class members' SSAs (Symetra) was an affiliate of the transferee (SABSCO), and would not object to the factoring transaction no matter how egregious the terms, eliminating the voice of the one party that had the ability to protect the Class members;

      f.    Defendants had stopped issuing SSAs because they were unprofitable, and that they were actively seeking to purchase the future payments from annuitants of

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Symetra SSAs to eliminate the future payments they would otherwise be required to pay on these unprofitable SSAs;

g.     The factoring transactions with Class members reduced Defendants' own future liability to make payments and therefore reduced Defendants' reserve requirements, providing Defendants access to immediate cash intended for the sole and exclusive benefit of Class members and a windfall unintended by Congress and State legislatures when they enacted legislation designed to protect injury victims from exploitation;

h.     The discount rate on the factoring transactions with Class members greatly exceeded the discount rates that other insurers offered to annuitants of SSAs;

i.     Class members would have routinely received better offers had they shopped their deals to other factoring companies instead of dealing exclusively with Symetra; and

j.     In all of these ways, Defendants were acting in their own interest, not the Class members' interest.

185.   As result, Plaintiffs White and Nadeau, and the Class members are entitled to damages on their breach of covenant of good faith and fair dealing claim in an amount to be proven at trial.

## COUNT FOUR — BREACH OF FIDUCIARY DUTY

### On Behalf of the Class Against Symetra as Annuity Issuer

186.   Plaintiffs incorporate in this Count paragraph 1 through 185 as if fully set forth herein.

187.   The elements of breach of fiduciary duty are: (1) the existence of a duty owed; (2) a breach of that duty; (3) resulting injury; and (4) that the injury was proximately caused by the breach.

188.   A fiduciary relationship existed between Symetra and Class members.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

189.    Each time that Symetra issued an SSA to fund Class members' periodic payments arising under structured settlement it took on the responsibility to act for and on behalf of Class members for one purpose and one purpose only: to make all of the periodic payments contemplated in underlying settlement agreements that resolved personal injury and sickness claims. Without an underlying structured settlement of a personal injury or sickness claim, there can be no SSA.

190.    Symetra's undertaking with respect to the periodic payment obligations described in the SSA gave rise to a relationship of trust and confidence with respect to all Class members.

191.    In all cases, Class members who were in a position of inferior knowledge and vulnerability placed their reliance and trust in Symetra to protect their lifetime tax-free periodic payments from dissipation.

192.    In the course of lobbying for legislation favoring and promoting the use of SSAs, and in promoting itself and attracting business, Symetra publicly and voluntarily asserted that its actions would be for the benefit of SSA annuitants, providing lifelong tax-free income and medical care as well as protecting against exploitation.

193.    As a result of these representations, Class members are reasonably justified to believe that their interests were and would be cared for by Symetra.

194.    To design and issue their SSAs, Symetra obtained significant personal information about each Class member. This personal information, including injury details and medical history, and reason for structuring the settlement, was used by Symetra to determine the cost of the SSA and to structure the periodic payments in a way that would provide both income and funds for the future needs, including medical care, of the annuitant.

195.    The ownership and use of one's most personal information for the purpose of designing an SSA that will last for the life of the annuitant and provide for his or her critical needs creates a special relationship of trust and confidence where the Class member reasonably believes that Symetra is acting in his or her interest.

196.     An even more special relationship of trust and confidence, and corresponding fiduciary duty, exists between Defendants and those SSA annuitants whose annuity agreements contain Power Language.

197.     Symetra violated this duty and exploited its superior knowledge and unequal bargaining power by placing its own interests over the interests of the Class members by initiating and completing factoring transactions whereby its affiliate, SABSCO, purchased from Class members future payments owed under the very same annuities that Symetra issued for the benefit of the Class members:

       a.     At a discount rate that greatly exceeded the rate available from other purchasers of SSA payments;

       b.     For a lump sum price far less than the present value of the SSA;

       c.     At a discount rate that did not reflect the effect of the factoring transaction on Symetra's required reserves; and

       d.     At a discount rate that greatly exceeded the rate offered by other insurance companies to buy back their own annuities.

198.     Symetra also violated its fiduciary duty to the Class members by withholding material information about the respective factoring transactions, including that it failed to inform the Class members that:

       a.     Symetra had a competing economic interest to Class members interest;

       b.     The factoring transactions would result in a decrease in Symetra's reserve requirements, thus freeing up reserves for Symetra to use for other purposes;

       c.     The Class members could receive a much lower discount rate, and thus receive a larger lump sum payment, from SABSCO's factoring company's competitors;

       d.     Because the factoring transaction would essentially result in SABSCO buying an obligation of its affiliate, Symetra, the risk to Symetra from the factoring transaction would be even lower than it would be to competitors;

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

e.      The lump sum provided for an even larger expected profit to Symetra than a third-party purchaser would expect at the same discount rate;

f.      For the Subclass, the fact that, under the original agreements creating the annuities, the Class members lacked the power to transfer future SSA payments; and

g.      For the Subclass, the fact that, because the Class members lacked the power to sell their SSA payments, the factoring transactions would be, or was likely to be, void *ab initio*, or alternatively, voided by the courts if challenged.

199.    The breach of this duty was the direct and proximate cause of harm to Plaintiffs White and Nadeau, and the Class members. As a result, Plaintiffs White and Nadeau, and the Class members are entitled to damages in an amount to be proven at trial.

## COUNT FIVE — BREACH OF FIDUCIARY DUTY

### On Behalf of the Class Against SABSCO as Purchaser and Obligor

200.    Plaintiffs incorporate in this Count paragraph 1 through 199 as if fully set forth herein.

201.    SABSCO, as obligor of the Class members' annuities, owes a fiduciary duty to the respective members for all of the same reasons set forth in paragraphs 191–196, *supra*. SABSCO, as obligor of the Class members' annuities, violated those fiduciary duties by engaging in the conduct described in paragraph 197, *supra*, and throughout the complaint.

202.    SABSCO, knowing that the Class members were annuitants of SSAs issued by Symetra, sought to purchase the Class members' future payments through factoring transactions.

203.    SABSCO initiated these factoring transactions through direct solicitation of the annuitants of Symetra SSAs.

204.    Because Symetra was the issuer of these SSAs, it collected and maintained, and/or had access to the personal information obtained from the respective Class members prior to issuing the SSA.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

205.    SABSCO/Symetra represented to the Class members, through standardized solicitation materials and their website, that sale of their future payments to SABSCO would be in the Class member's best interest and encouraged the Class members to rely on their expertise.

206.    SABSCO violated its fiduciary duty to the Class members by placing its own interest over the interests of the Class members by soliciting, initiating, and completing a factoring transaction whereby SABSCO purchased from the respective Class members the same annuities that its affiliate, Symetra had previously issued to benefit the Class members:

      a.    For a lump sum price that was far less than the present value of the SSA;

      b.    For a lump sum price that did not reflect the benefit of the factoring transaction on Symetra's required reserves; and

      c.    At a discount rate in far excess of the price offered by other insurance companies to buy back their own annuities.

207.    Although SABSCO knew that it, and Symetra, would benefit from the factoring transaction in myriad ways, it did not inform that Class members that:

      a.    Symetra had a competing economic interest to Class members interest;

      b.    Symetra had a fatal conflict of interest;

      c.    Symetra stood to gain financially by buying out payments that were not due for many years;

      d.    Symetra knew that taking away periodic payments would increase mortality risks for annuitants of SSAs by depriving them of future funds for medical care;

      e.    Under certain of the original agreements creating the annuities for the respective Class members' benefit, the Class members lacked the power to sell their SSA payments;

      f.    Because they lacked the power to sell their respective SSA payments, their sales could be voided or deemed void *ab initio* by the courts if challenged;

AMENDED COMPLAINT—CLASS ACTION - 48
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

g.      Symetra benefitted from the factoring transaction because it would result in a decrease in their reserve requirements, thus freeing up reserves for Symetra to use as needed;

h.      Class members could receive a much lower discount rate, and thus receive a larger lump sum payment, from some of Symetra's competitors;

i.      Because SABSCO would be buying back Symetra's paper, the risk to Symetra from the factoring transaction would be even lower than it would be to competitors; and

j.      The lump sum provided for an even larger expected profit to Symetra than a third-party would expect at the same discount rate.

208.   The breach of this duty was the direct and proximate cause of harm to Plaintiffs White and Nadeau, and the Class members. As a result, Plaintiffs White and Nadeau, and the Class members are entitled to damages in an amount to be proven at trial.

## COUNT SIX — BREACH OF CONTRACT

### On Behalf of the Void *ab Initio* Subclass Against SABSCO

209.   Plaintiffs incorporate in this Count paragraph 1 through 208 as if fully set forth herein.

210.   Each member of the Subclass is party to a settlement agreement ("the Power Language Settlement Agreement") between that Class member and a responsible party, which gave rise to the annuity at issue in this case.

211.   Each Power Language Settlement Agreement included Power Language making it impossible for the stream of payments created by the annuity to be assigned.

212.   Power Language is a form of spendthrift protection put into Power Language Settlement Agreements for the benefit and protection of the tort victim and is not required under IRC section 130.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

213.     When SABSCO took upon itself the duty to make payments under the annuity issued in connection with the Power Language Settlement Agreement, SABSCO stepped into the shoes of the defendant that was an original party to each Power Language Settlement Agreement. When it did so, SABSCO took upon itself the same rights and obligations under the Power Language Settlement Agreement as the defendant into whose shoes SABSCO had stepped.

214.     SABSCO is therefore fully bound by the Power Language.

215.     SABSCO's purported purchase of the stream of annuity payments generated by annuities covered by Power Language constitutes a breach of SABSCO's duty under the Power Language Settlement Agreement. As a result, Plaintiffs White and Nadeau, and Class Members are entitled to damages in an amount to be proven at trial.

### COUNT SEVEN — TORTIOUS INTERFERENCE WITH CONTRACT
### On Behalf of the Class Against Symetra

216.     Plaintiffs incorporate in this Count paragraph 1 through 215 as if fully set forth herein.

217.     The elements of a claim for tortious interference with contract under Washington State law are:

> (1) the existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of and intentional interference with that relationship or expectancy; (3) a breach or termination of that relationship or expectancy induced or caused by the interference; (4) an improper purpose or the use of improper means by the defendant that caused the interference; and (5) resulting damage.

*Eugster v. City of Spokane*, 121 Wn. App. 799, 811, 91 P.3d 117 (2004).

218.     As described in detail herein and as further set forth below, all of these elements of a claim for tortious interference with contract are clearly met in this case.

219.     Class members were all parties to underlying settlement agreements ("Underlying Settlement Agreements") with tortfeasors or their liability insurers ("Liable Parties").

AMENDED COMPLAINT—CLASS ACTION - 50
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

220.    Defendants were aware of the Underlying Settlement Agreements that gave rise to all of the SSAs at issue in this case.

221.    In fact, SABSCO took on all of the negotiated payment obligation set forth in each and every Underlying Settlement Agreement in this case when SABSCO entered into a qualified assignment and release agreement ("Qualified Assignment and Release Agreement")[52] with the Liable Parties.

222.    All of the Qualified Assignment and Release Agreements entered into by SABSCO constitute novations of the Underlying Settlement Agreements themselves with respect to payment obligations, all of which are now payment obligations of SABSCO by virtue of the novation described above.

223.    Defendants knowingly and intentionally interfered with valid contractual relationships described in the relevant Qualified Assignment and Release Agreements signed by SABSCO and in Underlying Settlement Agreements that gave rise to the SSAs in the first instance.

224.    Defendants' conduct in soliciting and inducing Class members to sell their periodic payments back to Symetra caused Class members to breach or terminate their valid contractual relationships or business expectancy that was contemplated by the Underlying Settlement Agreements.

225.    Defendants' conduct was improper as the purchase of Class members' periodic payments without disclosing Defendants' fatal conflict of interest and competing economic interest caused Class members to divest themselves of valuable tax-free periodic payments for pennies on the dollar.

226.    Symetra's conduct demonstrated the use of improper means to acquire Class members' periodic payment rights by directing its affiliate, SABSCO to solicit Class members and initiate and complete factoring transactions whereby SABSCO purchased from Class

---

[52] A tax benefit is conferred upon SABSCO when it enters into the Qualified Assignment and Release Agreement. IRC § 130. *See also supra* ¶¶ 33–35.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

members future payments owed under the very same SSAs that Symetra issued for the benefit of the Class members:

       a.    At a discount rate that greatly exceeded the rate available from other purchasers of SSA payments;

       b.    For a lump sum price far less than the present value of the SSA;

       c.    At a discount rate that did not reflect the positive effect of the factoring transaction on Symetra's required reserves; and

       d.    At a discount rate that greatly exceeded the rate offered by other insurance companies to buy back their own annuities.

227.    Defendants' conduct was also improper and caused harm to Class members because Symetra and SABSCO withheld material information about the respective factoring transactions, including their deliberate and intentional failure to inform the Class members that:

       a.    Symetra had a competing economic interest to Class members interest;

       b.    The factoring transactions would result in a decrease in Symetra's reserve requirements, thus freeing up reserves for Symetra to use for other purposes;

       c.    The Class members could receive a much lower discount rate, and thus receive a larger lump sum payment, from SABSCO's factoring company competitors;

       d.    Because the factoring transaction would essentially result in SABSCO buying an obligation of its affiliate, Symetra, the risk to Symetra from the factoring transaction would be even *lower* than it would be to competitors;

       e.    The lump sum provided for an even larger expected profit to Symetra than a third-party purchaser would expect at the same discount rate;

       f.    For the Subclass, the fact that, under the original agreements creating the annuities, the Subclass members lacked the power to transfer future SSA payments; and

**KELLER ROHRBACK L.L.P.**

1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

g.    For the Subclass, the fact that, because the Subclass members lacked the power to sell their SSA payments, the factoring transactions would be, or was likely to be, void *ab initio*, or alternatively, voided by the courts if challenged.

228.    Defendants' solicitation of Class members to sell and Defendants purchase of Class members' periodic payments was improper as it was done to benefit Defendants' bottom line and not to protect injury victims from becoming wards of the state.

229.    Defendants' conduct in causing Class members to breach their Underlying Settlement Agreements was the proximate cause of economic harm to Plaintiffs White and Nadeau, and the Class members. As a result, Plaintiffs White and Nadeau, and the Class members are entitled to damages for tortious interference with contract in an amount to be proven at trial.

## COUNT EIGHT — CIVIL CONSPIRACY
### On Behalf of the Class Against All Defendants

230.    Plaintiffs incorporate in this Count paragraph 1 through 229 as if fully set forth herein.

231.    The elements of a claim for civil conspiracy under Washington state law are: "that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy[,]" together with proximately resulting damage. *All Star Gas, Inc. v. Bechard*, 100 Wn. App. 732, 740, 998 P.2d 367 (2000).

232.    As alleged above, Class members were all parties to Underlying Settlement Agreements with Liable Parties, and Defendants were aware of the Underlying Settlement Agreements that gave rise to all of the SSAs at issue in this case.

233.    SABSCO and Symetra combined and agreed to accomplish the purposes of undermining the benefit to the Class members of the Underlying Settlement Agreements and the intended purposes of the SSAs to provide financial security to the Class members.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

234. Defendants knowingly and intentionally combined to undermine valid contractual relationships described in the relevant Qualified Assignment and Release Agreements signed by SABSCO and in Underlying Settlement Agreements that gave rise to the SSAs in the first instance.

235. Defendants' conduct in soliciting and inducing Class members to sell their periodic payments back to Symetra caused Class members to breach or terminate their valid contractual relationships contemplated by the Underlying Settlement Agreements.

236. Defendants' conduct was done through unlawful means as the purchase of Class members' periodic payments without disclosing Defendants' fatal conflict of interest and competing economic interest caused Class members to divest themselves of valuable tax-free periodic payments for pennies on the dollar.

237. Symetra's conduct demonstrated the use of unlawful means to acquire Class members' periodic payment rights by directing its affiliate, SABSCO, through a course of conduct which was known to and agreed to by Defendants, to solicit Class members and initiate and complete factoring transactions whereby SABSCO purchased from Class members future payments owed under the very same SSAs that Symetra issued for the benefit of the Class members:

      a.      At a discount rate that greatly exceeded the rate available from other purchasers of SSA payments;

      b.      For a lump sum price far less than the present value of the SSA;

      c.      At a discount rate that did not reflect the positive effect of the factoring transaction on Symetra's required reserves; and

      d.      At a discount rate that greatly exceeded the rate offered by other insurance companies to buy back their own annuities.

238. Defendants' conduct was also unlawful and caused harm to Class members because Symetra and SABSCO combined, agreed to, and did withhold material information

about the respective factoring transactions, including their deliberate and intentional failure to inform the Class members that:

        a.      Symetra had a competing economic interest to Class members interest;

        b.      The factoring transactions would result in a decrease in Symetra's reserve requirements, thus freeing up reserves for Symetra to use for other purposes;

        c.      The Class members could receive a much lower discount rate, and thus receive a larger lump sum payment, from SABSCO's factoring company competitors;

        d.      Because the factoring transaction would essentially result in SABSCO buying an obligation of its affiliate, Symetra, the risk to Symetra from the factoring transaction would be even *lower* than it would be to competitors;

        e.      The lump sum provided for an even larger expected profit to Symetra than a third-party purchaser would expect at the same discount rate;

        f.      For the Subclass, the fact that, under the original agreements creating the annuities, the Subclass members lacked the power to transfer future SSA payments, thus including as the object of Defendants' combined and agreed course of action the unlawful purpose of evading Power Language; and

        g.      For the Subclass, the fact that, because the Subclass members lacked the power to sell their SSA payments, the factoring transactions would be, or was likely to be, void *ab initio*, or alternatively, voided by the courts if challenged, further establishing agreement by the Defendants to accomplish an unlawful purpose.

239.    Defendants' conduct in combining and agreeing through unlawful means and in some cases by unlawful purpose to cause Class members to breach their Underlying Settlement Agreements was the proximate cause of economic harm to Plaintiffs White and Nadeau, and the Class members. As a result, Plaintiffs and Nadeau, and the Class members are entitled to damages for civil conspiracy with contract in an amount to be proven at trial.

**COUNT NINE — UNJUST ENRICHMENT**

**On Behalf of the Class Against Symetra as Annuity Issuer**

240.   Plaintiffs incorporate in this Count paragraph 1 through 239 as if fully set forth herein.

241.   The elements of a claim for unjust enrichment under Washington State law are: (1) "[a] benefit conferred upon the defendant by the plaintiff"; (2) "an appreciation or knowledge by the defendant of the benefit"; and (3) "the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc*., 61 Wn. App. 151, 159-60, 810 P.2d 12 (1991).

242.   Each and every time that a Class member sold its periodic payments back to SABSCO or Clearscape, substantial benefit or windfall was conferred upon Symetra.

243.   Not only was Symetra able to get off risk for making future payments to Class members but Symetra also earned profits by purchasing payments from Class members at high discount rates.

244.   Symetra was also able to hold less capital in reserve as it no longer had the same long duration payment obligations it originally agreed to take on when it issued the SSAs at issue in this case in the first instance.

245.   In effect, Symetra used Class members' own settlement funds to line its pockets.

246.   Such profiteering by Symetra was never contemplated by the SSAs issued to Class members.

247.   Symetra was fully aware of its profiteering at the expense of Class members. As described herein, Symetra marketed its "cash now" option as a funding service product.[53]

---

[53] *See supra* ¶¶ 14–15, 62–63.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

248.     For the Subclass, Symetra's conduct is particularly egregious and inequitable because under the original Underlying Settlement Agreements that gave rise to the SSAs, the Subclass members lacked the power to transfer future SSA payments.

249.     Accordingly, for the Subclass, the fact that, because the Subclass members lacked the power to sell their SSA payments, the factoring transactions would be, or were likely to be, void *ab initio*, or alternatively, voided by the courts if challenged.

250.     Moreover, Symetra knew this was the case as Symetra successfully challenged petitions filed by factoring companies not named SABSCO asserting the very same "power language" as a valid basis to deny a transfer petition.[54]

251.     Defendants' conduct in helping itself to a profit windfall without disclosing its competing economic interest to Class members allowed Symetra to receive an improper benefit at the expense of the Class members. As a result, Plaintiffs White and Nadeau, and the Class members are entitled to recoup all of Symetra's ill-gotten gains.

252.     Equity dictates that Class members recoup all of the benefits conferred upon Symetra through the improper conduct alleged herein as Symetra has been unjustly enriched at Class members' expense.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs White and Nadeau, individually and on behalf of all others similarly situated, seek judgment against Defendants, and each of them, as follows:

1.     An order certifying the proposed Class and Subclass pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3), designating Plaintiffs White and Nadeau as named representatives of the Class and the Subclass, and appointing the undersigned attorneys as Class counsel under Fed. R. Civ. P. 23(g);

2.     An order providing the following injunctive relief: an order enjoining Symetra and its affiliates from soliciting the purchase of its SSA from Class members.

---

[54] *See supra* ¶¶ 48–50, 78–86.

AMENDED COMPLAINT—CLASS ACTION - 57
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

3.   An award of damages including, but limited to, compensatory damages for Plaintiffs' injuries, including financial damages and any other damages allowed by law, including treble damages and punitive damages, in an amount to be proved at trial;

4.   An award of attorneys' fees and costs, as allowed by law;

5.   An award of pre-judgment and post-judgment interest, as provided by law;

6.   Leave to amend this Complaint and other Plaintiffs' pleadings to conform to the evidence produced at trial; and

7.   For such other and further relief as the Court deems just and proper.

## IX.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

 DATED this 7th day of April, 2021.

KELLER ROHRBACK L.L.P.


*s/ Lynn Lincoln Sarko*
*s/ Gretchen Freeman Cappio*
*s/ Ian S. Birk*
*s/ Adele A. Daniel*
Lynn Lincoln Sarko, WSBA #16569
Gretchen Freeman Cappio, WSBA #29576
Ian S. Birk, WSBA #31431
Adele A. Daniel, WSBA #53315
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
ibirk@kellerrohrback.com
adaniel@kellerrohrback.com

Alison E. Chase (*pro hac vice*)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
achase@kellerrohrback.com

AMENDED COMPLAINT—CLASS ACTION - 58
(2:20-cv-01866-MJP)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Jerome M. Marcus (*pro hac vice*)
Jonathan Auerbach (*pro hac vice*)
MARCUS & AUERBACH LLC
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA 19477
Tel.: (215) 885-2250
Fax: (888) 875-0469
jmarcus@marcusauerbach.com
auerbach@marcusauerbach.com

Edward Stone (*pro hac vice*)
EDWARD STONE LAW P.C.
175 West Putnam Avenue, 2nd Floor
Greenwich, CT 06830
Tel.: (203) 504-8425
Fax: (203) 348-8477
eddie@edwardstonelaw.com

*Attorneys for Plaintiffs*

AMENDED COMPLAINT—CLASS ACTION - 59
(2:20-cv-01866-MJP)

1

## **CERTIFICATE OF SERVICE**

2

I hereby certify that on April 7, 2021, I electronically transmitted the foregoing document
to the Clerk's Office using the CM/ECF System for filing which will send notification of such to
all CM/ECF registrants.

3

4

5

_s/ Leslie Nims_
Leslie Nims

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

AMENDED COMPLAINT—CLASS ACTION - 60
(2:20-cv-01866-MJP)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384