1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9

10   RENALDO WHITE, RANDOLPH          CASE NO. C20-1866 MJP
     NADEAU, individually and on behalf
11   of all others similarly situated,      ORDER DENYING MOTION TO
                                            DISMISS AND STRIKE CLASS
12                        Plaintiffs,       ALLEGATIONS

13            v.

14   SYMETRA ASSIGNED BENEFITS
     SERVICE COMPANY and SYMETRA
15   LIFE INSURANCE COMPANY,

16                        Defendants.

17

18        This matter is before the Court on Defendants' motion to dismiss and strike class

19   allegations.  Having fully considered the Parties' briefing (Dkt. Nos. 31, 32, 34, 40) and

20   positions at oral argument, (Dkt. No. 43), the Court DENIES the motion.

21                                    **Background**

22        This is a proposed class action by plaintiffs who resolved personal-injury claims through

23   structured settlements which included immediate lump-sum payments and future periodic

24

payments.  They sold their rights to future payments in exchange for immediate lump-sum

payments worth significantly less.  (Dkt. No. 28 ("Amended Complaint").)  Defendants are

Symetra Life Insurance Company (Symetra) and its affiliate, Symetra Assigned Benefits Service

Company (SABSCO).

　　　　　After Plaintiffs settled their personal-injury lawsuits, the defendants assigned their

obligations to make periodic payments to SABSCO, which received a cash payment from the

defendant or their liability insurer.  (Id. at ¶ 54.)  SABSCO purchased a structured settlement

annuity (SSA) from its affiliate Symetra to fund and administer the future payments.  (Id.)  Later

on, Plaintiffs sold their rights to future payments to SABSCO in exchange for immediate lump-

sum payments, at a significant discount.  That required state-court approval in Plaintiffs' home

states of New York and Tennessee.  (Id. at ¶¶ 89–102.)

　　　　　Plaintiffs now allege that Defendants' solicitation of their rights to future payments was

predatory, for several reasons.  It depended on SABSCO's access to confidential information

Plaintiffs provided to Symetra for the purpose of pricing and administering their annuity

payments.  (Id. at ¶¶ 71–77.)  Defendants did not disclose conflicts of interests—in particular, the

profits they would gain by avoiding future payments pursuant to the underlying settlement

agreements.  Plaintiffs also claim Defendants sent misleading solicitations and intentionally

evaded anti-assignment language in the settlements that prohibited the very transfers at issue

here.  (Id. at ¶¶ 71–88.)

### A.    Facts Relating to Named Plaintiffs

　　　　　When Renaldo White was ten years old, he was hit while riding a bike.  (Id. at ¶ 89.)  In

the settlement of his personal-injury lawsuit, the defendants paid a lump sum up front and agreed

to make a series of periodic payments throughout Mr. White's lifetime.  (Id. at 90–91.)  Mr.

White became an annuitant and payee of an SSA, which was purchased by SABSCO and issued by Symetra (then Safeco).  (Id. at ¶ 91.)

The settlement included what Plaintiffs call "power language," which denied Mr. White the right to sell or assign his payment rights.  The relevant provision states:

> The Claimant . . . shall have no rights of control over the period payments.  The Claimant shall not be able to ACCELERATE, DEFER, INCREASE OR DECREASE the periodic payments and shall not have the power to sell, mortgage, anticipate or encumber these payments, or any part thereof, by assignment or otherwise.  No part of the above periodic payments or any assets of the Insurer are to be subject to execution or any legal process for any obligation of the Claimant.

(Id. at ¶ 80.)  Plaintiffs argue the provision is a bargained-for safeguard to protect the settlements of vulnerable tort victims.  The benefits of such language are clear: if the annuitant has no authority to access or transfer the payments, the settlement is safe from creditors.  It also prevents annuitants from unwisely spending settlement proceeds.

Nevertheless, in 2011, Mr. White signed an agreement with SABSCO to sell:

(i) 149 life contingent monthly payments of $300 from February 1, 2018 through and including June 1, 2030, and

(ii) each and every future life contingent monthly payment in the amount of $1,750 owed to him from July 1, 2030 until his death.

The "effective annual interest rate" for this transaction was 15.03% per year. Plaintiff White received just $18,609 from SABSCO as consideration for this factoring transaction.

(Id. at ¶ 92.)

Mr. White was 31 when he sold these payment rights.  His life expectancy is 81 years.  If he lived that long, Symetra would have been required to pay him $695,000.  (Id. at ¶ 93.)

Randolph Nadeau's personal-injury settlement also resulted in a settlement of a lump-sum payment as well as periodic lifetime payments, including "$430 per month for thirty years

1   certain commencing on December 27, 1995 and continuing to and including November 27, 2025;

2   and $1,297.33 paid monthly for life commencing December 27, 2025." (Id. at ¶ 98.)

3        Mr. Nadeau's settlement contained similar "power language":

4        Said payments cannot be accelerated, deferred, increased or decreased by the Plaintiff
         and no part of the payments called for herein or any asserts of the Defendant are to be
5        subject to execution or any legal process for any obligations in any manner, nor shall the
         Plaintiff have the power to sell or mortgage or encumber same, or any part thereof, nor
6        anticipate the same, or any part thereof, by assignment or otherwise.

7   (Id. at ¶ 81.) But Mr. Nadeau also sold his payment rights to SABSCO, on multiple occasions:

8        SABSCO purchased Plaintiff Nadeau's periodic payments from him on four occasions. In
         2006, SABSCO purchased 75 guaranteed monthly payments of $430.00 each,
9        commencing on October 27, 2006 through and including December 27, 2012. In 2011,
         SABSCO purchased 48 guaranteed monthly payments of $430.00 each, commencing on
10       January 27, 2013 through and including December 27, 2016. In 2017, SABSCO
         purchased 72 guaranteed monthly payments of $430.00 each, commencing on July 27,
11       2017 through and including June 27, 2023. In 2020, SABSCO purchased 29 guaranteed
         monthly payments of $430.00 each, commencing on July 27, 2023, through and including
12       November 27, 2025, and 36 life-contingent payments, each in the amount of $1,297.33
         commencing on December 27, 2025, through and including November 27, 2028.

13       In this last transaction in 2020, Plaintiff Nadeau was divested of $59,173.88 of future
14       periodic payments. In exchange he received just $20,091.58, which is the equivalent of
         borrowing the $59,173.88 at 18.00% interest.

15   (Id. at ¶¶ 99–100.)

16                                        **Discussion**

17   I.    **Motion to Dismiss**

18        Defendants move to dismiss under FRCP 12(b)(1) and 12(b)(6) based on the following

19   arguments. (Dkt. No. 31.) First, the Court lacks subject-matter jurisdiction because there is no

20   federal district court review of state-court decisions under 28 U.S.C. § 1257. Second, judicial

21   estoppel bars Plaintiffs claims because they are incompatible with the positions they maintained

22   in the state-court proceedings. They ask the Court to consider state-court records, either because

23   they have been incorporated into the amended complaint by reference or on judicial notice.

24

ORDER DENYING MOTION TO DISMISS AND STRIKE CLASS ALLEGATIONS - 4

Third, Defendants argue that Plaintiffs have failed to allege an injury—an element common to all their claims—because they would owe Defendants money if the transactions were unwound. Fourth, Plaintiffs' claims are time-barred. And fifth, Plaintiffs fail to plead the necessary elements of various claims.

**A.    Whether the Court Lacks Subject-Matter Jurisdiction under Rooker-Feldman**

Defendants argue that the Court lacks subject-matter jurisdiction under the Rooker-Feldman doctrine. The Rooker-Feldman doctrine applies to the "limited circumstances in which [the Supreme Court's] appellate jurisdiction over state-court judgments, 28 U.S.C. § 1257, precludes a United States district court from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority . . . ." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 291 (2005). It is "confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Id. at 284.

Under Defendants' theory, Plaintiffs are state-court losers because they gave up rights to future payments in those proceedings. They are alleging injuries caused by state-court judgments which were rendered before this proceeding because the transactions in which they sold their payment rights required state-court approval. And Plaintiffs are inviting this Court to review state-court judgments because any path to liability requires this Court to find the state courts misapplied state law and set aside the state-court judgments.

It is somewhat awkward for Defendants to argue that Plaintiffs are "state-court losers" when they defend the very same proceedings for finding the transactions were fair and reasonable and in Plaintiffs' best interest. In turn, their argument on judicial estoppel also

1   depends on the premise that Plaintiffs "succeeded" in state court.  Ultimately, the analogy does

2   not quite fit, which is an early indication that applying <u>Rooker</u>-<u>Feldman</u> is inappropriate here.  In

3   fact, the state-court proceedings were not adversarial, so it is difficult to conclude there was a

4   "state-court loser" at all.  While Co-Defendant SABSCO filed petitions asking for the transfers

5   to be approved, Plaintiffs had already signed purchase-and-sale agreements with SABSCO and

6   submitted affidavits in support of the transaction.  No issues were actually litigated, and certainly

7   not the claims here.  Rather, the state courts made certain findings—e.g., that the transfers were

8   in Plaintiffs' best interests—and approved the proposed transfers.  This is not a situation where,

9   for example, Plaintiffs had argued in state court that the transfers were not in their best interests,

10  lost that argument in a contested ruling, and then filed suit asking this Court to make a contrary

11  finding.

12        At oral argument, Defendants argued that some courts have applied <u>Rooker</u>-<u>Feldman</u>

13  even when the underlying state-court proceedings were not adversarial.  <u>See</u> <u>Dockery v.</u>

14  <u>Heretick</u>, 2019 WL 2122988, at *8 (E.D. Pa. May 14, 2019) (collecting cases).  But Defendants

15  ask the Court to interpret these cases with a broad brush that obscures adversarial elements

16  beneath the surface.  In <u>Johnson v. Orr</u>, cited in <u>Dockery</u>, the party against whom the court

17  applied <u>Rooker</u>-<u>Feldman</u> filed a federal-court civil rights action after a state court had denied his

18  petition to compel the county to issue him a tax deed, relief that was foreclosed by a consent

19  order he had entered into with the county after adversarial proceedings.  551 F.3d 564, 566–68

20  (7th Cir. 2008).  The <u>Dockery</u> court also cites <u>Crawford v. Adair</u>, as an example involving a

21  nonadversarial "consent order"—but the consent order was a settlement of an adversarial state-

22  court action.  2008 WL 2952488, at *2 (E.D. Va. July 29, 2008).

23

24

1      The situation at hand is closer to one the Second Circuit recently considered.  In <u>Cho v.</u>

2    <u>City of New York</u>, the Second Circuit held <u>Rooker-Feldman</u> did not apply to a lawsuit "alleging

3    harm flowing from wrongful conduct leading to settlement terms" because the plaintiffs did not

4    "argue that the state courts committed any error in so-ordering the parties' agreements."  910

5    F.3d 639, 647 (2d Cir. 2018).  While the courts here did more than so-order a settlement, they

6    did far less than adjudicate claims in an adversarial proceeding.

7      The Supreme Court has emphasized that the <u>Rooker</u>-<u>Feldman</u> doctrine occupies narrow

8    ground.  <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280, 280–81 (2005).  As has

9    the Ninth Circuit.  <u>Carmona v. Carmona</u>, 603 F.3d 1041, 1050 (9th Cir. 2010) ("In practice, the

10   <u>Rooker</u>-<u>Feldman</u> doctrine is a fairly narrow preclusion doctrine, separate and distinct from res

11   judicata and collateral estoppel.").  Defendants have not given sufficient justification to expand it

12   into new territory.

13     More decisive is the fact that Plaintiffs do not allege their injuries were caused by the

14   state-court judgments.  They do not claim the state courts' findings that the transactions were in

15   their best interest is what caused them harm.  They claim Defendants caused them harm—by

16   misusing their confidential information, failing to disclose conflicts of interest, breaching

17   fiduciary duties, and engaging in other unfair or deceptive conduct which induced Plaintiffs to

18   sell their payment rights for far less than they were worth, even though they had no authority to

19   sell their payment rights at all.  This process may have ended with state-court approval.  But,

20   according to the allegations, Defendants' conduct was the cause of their injuries, not the state-

21   court judgments.  See <u>Sykes v. Mel S. Harris & Assocs. LLC</u>, 780 F.3d 70, 94–95 (2d Cir. 2015)

22   ("claims sounding under the [Fair Debt Collection Practices Act], [the Racketeer Influenced &

23

24

1  Corrupt Organization Act], and state law speak not to the propriety of the state court judgments,

2  but to the fraudulent course of conduct that defendants pursued in obtaining such judgments.").

3  Finally, Plaintiffs are not asking this Court to "review and reject" the state-court

4  judgments.  Plaintiffs here seek damages for the harms and statutory violations alleged, not an

5  order invalidating the state-court proceedings.  See Cordero v. Transamerica Annuity Serv.

6  Corp., 452 F. Supp. 3d 1292, 1300 (S.D. Fla. 2020) (claim not barred by Rooker-Feldman

7  because it "plausibly challenges [annuity issuer's] course of conduct related to the approval of

8  the transfers, which [plaintiff] alleges amounts to fraud.  [Plaintiff] does not challenge the

9  propriety of the state court final orders that authorized them.").

10  In sum, Rooker-Feldman does not apply to this proceeding because Plaintiffs are not

11  state-court losers, they raise claims independent of the state-court proceedings, and they do not

12  ask the Court to review and reject the state-court judgments.  To the extent the state-court

13  proceedings pose barriers to Plaintiffs' claims, those issues are not jurisdictional.  Rooker-

14  Feldman does not prevent a

15  district court from exercising subject-matter jurisdiction simply because a party attempts
   to litigate in federal court a matter previously litigated in state court. If a federal plaintiff
16  presents some independent claim, albeit one that denies a legal conclusion that a state
   court has reached in a case to which he was a party . . . , then there is jurisdiction and
17  state law determines whether the defendant prevails under principles of preclusion.

18  Exxon Mobile Corp., 544 U.S. at 293 (cleaned up).

19  **B.  Whether Plaintiffs' Claims Are Barred by Judicial Estoppel**

20  Defendants argue Plaintiffs' claims are barred by judicial estoppel, which "generally

21  prevents a party from prevailing in one phase of a case on an argument and then relying on a

22  contradictory argument to prevail in another phase." New Hampshire v. Maine, 532 U.S. 742,

23  749 (2001).  The purpose of equitable estoppel is to "protect the integrity of the judicial process,"

24  and it is "invoked by a court at its discretion." Id. at 749–50.

1    This argument depends on another issue, which is whether the Court should consider

2    state-court records Defendants submit in support of their motion.  (See Dkt. No. 32, Declaration

3    of Medora A. Marisseau ("Marisseau Decl.").)  Defendants ask the Court to do so either because

4    the Amended Complaint has incorporated the records by reference or on judicial notice.

5                1.      *Whether the Court should consider the state-court records.*

6        A motion to dismiss under FRCP 12(b)(6) is generally limited to the pleadings.  Lee v.

7    City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001).  In deciding whether a complaint states a

8    plausible claim for relief, the Court starts with "the facts plausibly alleged in the complaint,

9    documents incorporated into the complaint by reference, and matters of which a court may take

10   judicial notice."  In re Alphabet, Inc. Sec. Litig., 1 F.4th 687 (9th Cir. 2021).

11       Incorporation by reference and judicial notice have a role to play at the pleadings stage.

12   But the Ninth Circuit recently cautioned that their improper application can result in premature

13   dismissals of valid claims:

14       The overuse and improper application of judicial notice and the incorporation-by-
         reference doctrine, however, can lead to unintended and harmful results. Defendants face
15       an alluring temptation to pile on numerous documents to their motions to dismiss to
         undermine the complaint, and hopefully dismiss the case at an early stage. Yet the
16       unscrupulous use of extrinsic documents to resolve competing theories against the
         complaint risks premature dismissals of plausible claims that may turn out to be valid
17       after discovery.

18   Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 988 (9th Cir. 2018).

19       There is also a notable difference between considering a document to be incorporated

20   into the complaint by reference and taking judicial notice of facts contained in a document.  A

21   document that is incorporated into the complaint by reference is assumed to be true for the

22   purposes of a motion to dismiss.  On the other hand, any facts that are noticed are viewed in the

23   light most favorable to Plaintiffs.

24

1                        a.      Incorporation by reference.

2          Defendants argue the Amended Complaint incorporates state-court records by reference

3   because it suggests the proceedings involved unfair or deceptive practices by Defendants, were

4   one-sided in that Plaintiffs lacked legal counsel, and did not comply with state laws regarding

5   mandatory disclosures.  (Dkt. No. 31 at 20.)  Put simply, this is not what the doctrine of

6   incorporation by reference entails.

7          Incorporation by reference "is a judicially created doctrine that treats certain documents

8   as though they are part of the complaint itself," the purpose of which is to prevent plaintiffs

9   "from selecting only portions of documents that support their claims, while omitting portions of

10  those very documents that weaken—or doom—their claims."  Khoja v. Orexigen Therapeutics,

11  Inc., 899 F.3d 988, 1002 (9th Cir. 2018).  "However, if the document merely creates a defense to

12  the well-pled allegations in the complaint, then that document did not necessarily form the basis

13  of the complaint.  Otherwise, defendants could use the doctrine to insert their own version of

14  events into the complaint to defeat otherwise cognizable claims."  Id.

15         The Amended Complaint does not reference a single specific state-court record.  In over

16  sixty pages, it makes only limited factual allegations about the state-court proceedings with

17  respect to the two Plaintiffs, such as that SABSCO's counsel drafted and submitted the

18  documents to the state courts.  (See Am. Compl. at ¶¶ 94, 101, 169.)  All other references to the

19  court-approval process are generic and intended to describe facts necessary to understand the

20  regulatory structure at play.  (See id. at ¶¶ 14, 56, 62, 85, 160.)

21         Plaintiffs claims do not rest on the factual allegation that the documents in the state-court

22  proceedings were drafted by and submitted to the court by an attorney for one of the Defendants,

23  and Defendants do not seek to introduce the court records for the purpose of refuting that

24

1    allegation.  Rather, the state-court records are merely a way of disputing factual allegations in the

2    Amended Complaint and creating defenses to Plaintiffs' claims.  See Khoja, 899 F.3d at 1002.

3    Defendants' argument on this point is nowhere close to the "rare instances when assessing the

4    sufficiency of a claim requires that the document at issue be reviewed, even at the pleading

5    stage."  See id. at 1002.  In any case, "the mere mention of the existence of a document is

6    insufficient to incorporate the contents of a document."  Coto Settlement v. Eisenberg, 593 F.3d

7    1031, 1038 (9th Cir. 2010).  Compare Knievel v. ESPN, 393 F.3d 1068 (9th Cir. 2005)

8    (document referenced in complaint was necessary to determining whether statement at issue was

9    "capable of sustaining a defamatory meaning," an element of the defamation claim).  For all of

10   these reasons, the Court finds the state-court records are not incorporated by reference into the

11   Amended Complaint.

12                    b.    Judicial notice.

13        Alternatively, Defendants ask the Court to take judicial notice of the state-court records.

14   "Judicial notice under [Federal Rule of Evidence] 201 permits a court to take notice of an

15   adjudicative fact, if it is "not subject to reasonable dispute."  Khoja, 899 F.3d at 1002. "But a

16   court cannot take judicial notice of disputed facts contained in such public records."  Id. (citing

17   Lee v. City of L.A., 250 F.3d 668, 689 (9th Cir. 2001)).  Whether a document is authentic is only

18   part of the Court's inquiry under FRE 201.  "A court must also consider—and identify—which

19   fact or facts it is noticing . . . . Just because the document itself is susceptible to judicial notice

20   does not mean that every assertion of fact within that document is judicially noticeable for its

21   truth."  Id. at 999.

22        Plaintiffs do not dispute the authenticity of the records.  (Dkt. No. 34 at 22).  In reply,

23   Defendants clarify that they are not offering the state-court records for the truth of the facts they

24

1   contain but for the fact that the statements were made, which Defendants argue should lead to the

2   application of judicial estoppel.  (Dkt. No. 40 at 14.)  At oral argument, counsel for Defendants

3   identified specific facts the Court should notice for the purpose of applying judicial estoppel.

4   These include the following.

5        With respect to Plaintiff Nadeau:

6   - That an order and judgment was entered in New York state court approving a
    structured settlement transfer on March 13, 2020.  (Marisseau Decl., Ex. A.)

7

8   - That the court found the transfer complied with applicable law, (id. at ¶ 1); the
    transfer was in the best interest of Mr. Nadeau, (id. at ¶ 2); the financial terms

9   were fair and reasonable, (id. at ¶ 3); that Mr. Nadeau was advised in writing to
    seek independent professional advice but declined to do so, (id. at ¶ 4); and that
    there were no written objections to the transfer from interested parties, including

10  the annuity issuer, (id. at ¶ 7.).

11  - That an affidavit signed by Mr. Nadeau was annexed to SABSCO's petition
    seeking court approval of the transfer.  (Id., Ex. B at 38.)

12

13  - That Mr. Nadeau stated in the affidavit that he believed the transfer was in his
    best interest.  (Id. at 40.)

14  - That the court's approval involved a hearing which included Mr. Nadeau's
    testimony, (id., Ex. F); and that Mr. Nadeau testified that he declined counsel, (id.

15  at 9–10); and had specific financial needs for the lump-sum payment he would
    receive in the transaction, (id. at 11–15).

16  With respect to Plaintiff White:

17  - An order and judgment was entered in Tennessee state court approving a
    structured settlement transfer on July 28, 2011.  (Id., Ex. C.)

18

19  - That the court found the transfer complied with applicable law, (id. at ¶ 1); the
    transfer was in the best interest of Mr. White, (id. at ¶ 2); the financial terms were

20  fair and reasonable, (id. at ¶ 2); that Mr. White was advised in writing to seek
    independent professional advice but declined to do so, (id. at ¶ 3); and that there

21  were no written objections to the transfer from interested parties, including the
    annuity issuer, (id. at ¶ 6.).

22  - An affidavit signed by Mr. White was annexed to SABSCO's petition seeking

23  court approval of the transfer.  (Id., Ex. D at 19.)

24

- That Mr. White stated in the affidavit that he believed the transfer was in his best interest.  (Id. at 20.)

Because Plaintiffs do not dispute the authenticity of the state-court records, the Court has

discretion and will consider the above facts on judicial notice.

        *2.*     *Whether judicial estoppel applies.*

      Defendants argue that judicial estoppel bars Plaintiffs' claims because their positions here

are incompatible with positions they took in the prior state-court proceedings.  While not

reducible to a general formula, there are several factors which typically inform whether to apply

judicial estoppel:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

New Hampshire v. Maine, 532 U.S. 742, 750–51 (2001) (cleaned up).  These factors are not

"inflexible prerequisites or an exhaustive formula.  Additional considerations may inform the

doctrine's application in specific factual contexts." Id. at 751.  The Ninth Circuit has identified

"chicanery or knowing misrepresentation by the party to be estopped [as one such] factor to be

considered in the judicial estoppel analysis."  Milton H. Greene Archives, Inc. v. Marilyn

Monroe LLC, 692 F.3d 983, 995 (9th Cir. 2012).

      The Supreme Court recognized that judicial estoppel will not necessarily apply if a party

provides a "good explanation" for their change in position.  New Hampshire v. Maine, 532 U.S.

742, 749 (2001).  After reviewing the facts to be noticed in the state-court records and

considering the arguments of both sides, it is clear that judicial estoppel is not appropriate here,

1   particularly under the standard governing a motion to dismiss.  To the extent their

2   representations to the state courts constitute "positions" taken in prior proceedings, they are not

3   "clearly inconsistent" with Plaintiffs' positions in this proceeding, and any inconsistencies do not

4   raise the kinds of concerns judicial estoppel is designed to address.  Plaintiffs' argument, in

5   short, is that Defendants misled or fraudulently induced them into selling their rights to future

6   payments for lump sums worth much less in proceedings in which they had no legal

7   representation, even though bargained-for provisions of their original settlement agreements

8   forbid them from entering into any such transaction.  Plaintiffs' subjective belief that the

9   transactions were in their best interest at the time, because they had immediate financial needs, is

10  not a barrier to their claims because, they argue, that belief was induced by Defendants' conduct.

11  See e.g., Lawson v. Lawson, 2014 WL 6389441, at *4 (D. Nev. Nov. 14, 2014) (no judicial

12  estoppel where party pleaded inconsistent position was result of fraud, inadvertence, or mistake).

13  Construing the facts in favor of Plaintiffs—and taking note that Plaintiffs were unrepresented

14  and that Mr. Nadeau's affidavit states it was prepared by SABSCO's attorneys—their positions

15  here and their representations to the state courts are not "clearly inconsistent," or "so inconsistent

16  that they amount to an affront to the court."  See Milton H. Greene Archives, Inc. v. Marilyn

17  Monroe LLC, 692 F.3d 983, 995 (9th Cir. 2012).  Any inconsistencies are reconcilable or

18  explained by their factual allegations in support of the theory of their case and the claims they

19  have raised.  See New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (a "good explanation"

20  may preclude application of judicial estoppel).

21         There is also no indication of "unfair advantage" in favor of Plaintiffs.  Plaintiffs'

22  statements that the transactions were in their best interest must be viewed in context.  Defendants

23  state it was Plaintiffs who "sought and obtained state-court approval" to transfer their payment

24

1    rights to SABSCO.  (Dkt. No. 31 at 7.)  That is not accurate.  SABSCO petitioned for court

2    approval of the transactions.  (Marisseau Decl., Exs. B (Mr. Nadeau) & D (Mr. White).)  In

3    addition, the signed purchase-and-sale agreements in which Plaintiffs sold their rights to

4    SABSCO were annexed as exhibits to the petitions.  (Id., Ex. B at 19–21, Ex. D at 7–10.)  The

5    deal was already done.  The records do not show it was Plaintiffs who sought out court approval.

6          But the most important fact regarding unfair advantage relates to what SABSCO's

7    attorneys omitted from their petitions to the state courts.  In both petitions, the purchase-and-sale

8    agreements include a provision in which Plaintiffs warrant that they have the power and right to

9    enter into the agreement to sell their payment rights.  (Id., Ex. B at 19, Ex. D at 8.)  The petition

10   for approval of the sale of Mr. Nadeau's payment rights also includes a copy of the underlying

11   settlement agreement, which includes "power language" prohibiting him from selling his future-

12   payment rights.  (Id., Ex. B at 12.)  Although the settlement denies Mr. Nadeau any right to

13   accelerate or sell his payments, the purchase-and-sale agreement contains a provision in which

14   he warrants exactly the opposite.  Of course, the purpose of such a provision is to protect the

15   rights of the purchaser in a transaction, which in this case is SABSCO.

16         In addition, even though the settlement is included with the petition, SABSCO not only

17   omitted any mention of the power language but went a step further to ensure the court's order

18   would not be affected by it.  SABSCO's proposed order, annexed to the petition, includes the

19   following provision:

20         This Order is entered without prejudice to the rights of Symetra Life Insurance Company
           and/or Symetra Assigned Benefits Service Company, and the Court makes no finding
21         regarding the enforceability of any non-assignment provisions contained in the original
           settlement agreement or related documents.
22
23   (Id., Ex. B at 68.)  That provision is in the court's final order as well.  (Id., Ex. A at 5.)  The

24   petition seeking court approval of the sale of Mr. White's payment rights did not even include

1   the original settlement.  (Id., Ex. D.)  This is despite the fact that his settlement contained similar

2   power language prohibiting him from selling his payment rights.  (Am. Compl. at ¶ 80.)

3   Meanwhile, the order approving the transaction involving Mr. White also contained the same

4   provision making no finding regarding the enforceability of any anti-assignment provision in the

5   underlying settlement.  (Marisseau Decl., Ex. C at 4.)  These are material omissions that support

6   Plaintiffs' allegations that Defendants misled them into entering into these transactions, which

7   were later approved by state courts.  They also support Plaintiffs' argument that their claims are

8   based on acts that preceded state-court approval and that Defendants conduct was intentionally

9   deceptive, in light of Defendants' attempts to enforce such anti-assignment language in other

10  proceedings.  See e.g., In re Rapid Sellements Ltd's Application for Approval of Structured

11  Settlement Payment Rights, 133 Wn. App. 350, 367 (2006) ("Symetra contends various

12  contractual anti-assignment provisions render the transfers ineffective"); Rapid Settlements, Ltd.

13  v. Symetra Life Ins. Co., 2007 WL 1576437, at *4 (Cal. Ct. App. June 1, 2007) (same); In re

14  Foreman, 850 N.E.2d 387, 390 (2006) (same).  Applying equitable estoppel against Plaintiffs is

15  unsupported by the facts before the Court under the standard for a motion to dismiss and would

16  be wholly unjustified given the nature of Plaintiffs' claims and the character of the state-court

17  proceedings.

18          C.      **Failure to State a Claim**

19          Defendants raise two objections common to Plaintiffs' claims: that Plaintiffs fail to allege

20  an injury and that most of the claims are time-barred.  They also contest specific elements of

21  individual claims.

22

23

24

1                 *1.    Whether Plaintiffs have alleged an injury*

2    Defendants argue Plaintiffs have failed to allege an injury because they willingly sold

3    their payment rights in exchange for lump sums for which they had individual need.  They argue

4    that Plaintiffs would owe them money if the transactions were reversed.

5          This argument obscures what Plaintiffs sold: reliable streams of income they had no right

6    to give up and which were worth far more than the lump-sum payments they received.  They had

7    a property interest in their future payments, and that interest was diminished, Plaintiffs allege, as

8    a result of Defendants' conduct.  It does not necessarily matter that the transfers were approved

9    by state courts if Plaintiffs were, as they claim, fraudulently induced to enter into the agreements

10   that were then approved.  Therefore, Plaintiffs have alleged an injury.

11                *2.    Whether Plaintiffs' claims are time-barred*

12   Defendants argue most of Plaintiffs' claims are time-barred because they are subject to

13   three-, four-, or six-year statutes of limitations running from the date on which their injuries

14   occurred.  (Dkt. No. 31 at 24–25.)  The complaint was filed on December 30, 2020.  (Dkt. No.

15   1.)  However, Plaintiffs have pleaded equitable tolling.  (Am. Compl. at ¶ 114–119.)

16         "Generally, the applicability of equitable tolling depends on matters outside the

17   pleadings, so it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss (where review is

18   limited to the complaint) if equitable tolling is at issue."  Huynh v. Chase Manhattan Bank, 465

19   F.3d 992, 1003–04 (9th Cir. 2006).  Nevertheless, Plaintiffs bear the burden of pleading facts

20   which would give rise to tolling.  Hinton v. Pac. Enterprises, 5 F.3d 391, 395 (9th Cir. 1993).

21   Given the nature of Plaintiffs' claims—that Defendants made misrepresentations and material

22   omissions to conceal their conflict of interest and the true nature of the transactions—the statutes

23   of limitations would not begin to toll until they knew or had reason to know of the alleged

24

1   wrongdoing.  Because there are insufficient facts to determine that issue, it would be

2   inappropriate to bar Plaintiffs' claims on this basis at this stage.

3           3.   *Claim-specific objections*

4           a.   Civil RICO

5       To recover on a civil RICO claim under 18 U.S.C. § 1962(c), a plaintiff must prove (1)

6   conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as

7   "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the conduct

8   constituting the violation.  See Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d

9   353, 361 (9th Cir. 2005).  A plaintiff must prove the defendant's unlawful conduct was the

10  proximate cause of their injury.  Harmoni International Spice, Inc. v. Hume, 914 F.3d 648, 651

11  (9th Cir. 2019).

12      Elements four and five are at issue here.  Defendants argue Plaintiffs' civil RICO claim

13  fails because Plaintiffs' allegations of mail and wire fraud (predicate acts, under element four) do

14  not include facts sufficient to find an intent to defraud or deceive.  They also argue Plaintiffs lack

15  "RICO standing" because they have not adequately alleged an injury and because any

16  conceivable injury was not proximately caused by Defendants (element five).

17      Alleging a violation of mail fraud requires showing: "(1) the defendants formed a scheme

18  or artifice to defraud; (2) the defendants used the United States mails or caused a use of the

19  United States mails in furtherance of the scheme; and (3) the defendants did so with the specific

20  intent to deceive or defraud."  Miller v. Yokohama Tire Corp., 358 F.3d 616, 620 (9th Cir.

21  2004).  The intent to defraud is "the specific intent to deceive, ordinarily for the purpose of either

22  causing some financial loss to another or bringing about some financial gain to one's self."

23  United States v. Lewis, 67 F.3d 225, 233 (9th Cir. 1995).  But state of mind may be alleged

24

1    generally in pleadings.  Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state

2    with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and

3    other conditions of a person's mind may be alleged generally."); Odom v. Microsoft Corp., 486

4    F.3d 541, 554 (9th Cir. 2007) (state of mind for claim of fraud).

5         Plaintiffs have pleaded the requisite facts under FRCP 9(b).  Plaintiffs allege Defendants

6    sent false or misleading statements to deceive prospective class members into giving up their

7    rights to future payments in exchange for substantially lower lump sums.  (See Am. Compl. at

8    ¶¶ 152–59.)  According to the Amended Complaint, the purpose of the solicitations was not just

9    for Defendants to offload their own financial risk and increase profits; it was to do that by

10   inducing prospective class members to give up their rights to future payments for much less than

11   they were worth.

12        Plaintiffs include a copy of one such solicitation.  (Am. Compl. at ¶ 75.)  They also quote

13   a Symetra website FAQ, which they allege is representative of the solicitations.  (Id. at ¶ 71 n.

14   23, 24.)  The website states, in response to why someone would sell their rights to future

15   payments: "You may need to access your settlement money sooner than payments are scheduled

16   to arrive."  (Id. at ¶ 74 n. 24.)  The FAQ does not mention that someone selling their payment

17   rights will be giving up significant value of those rights; the process is framed as just a way to

18   access settlement money more quickly.  And it certainly does not mention that some annuitants

19   have no authority to sell their payment rights under their original settlement agreements because

20   of anti-assignment provisions.

21        The first part of this question—whether there was an injury sufficient for RICO—does

22   not have to be complicated.  Plaintiffs must allege they have suffered a "concrete financial loss"

23   and that a specific business or property interest was harmed.  Canyon Cty. v. Syngenta Seeds,

24

1    Inc., 519 F.3d 969, 975 (9th Cir. 2008).  Defendants do not dispute that the value of the lump

2    sums Plaintiffs received is less than the value of the payments to which they had rights.  Losing

3    the value of those rights satisfies the "concrete financial loss" requirement.

4            Defendants return to their argument that there is no injury because both Plaintiffs would

5    owe them money if their decisions to sell their payment rights were reversed.  This argument

6    elides the fact that Plaintiffs gave up a clear property interest—their rights to future payments

7    under the underlying settlement agreements.  Some rights were guaranteed and others were life-

8    contingent.  While it is true the sums were not determined, the rights themselves were not

9    speculative, and giving them up for less than they are worth is a concrete financial loss.

10           Regarding proximate cause, Plaintiffs allege they would not have sold their payment

11   rights if they had known of Defendants' conflicts of interest and had been properly advised by

12   financial or legal counsel such that they could see through Defendants' deceptive buyout offers.

13   At this stage, assuming the truth of those facts, Plaintiffs have alleged proximate cause.

14                          b.      Washington Consumer Protection Act

15           The five elements of a CPA claim are:

16           (1) an unfair or deceptive act or practice, (2) that occurs in trade or commerce, (3) a
             public interest, (4) injury to the plaintiff in his or her business or property, and (5) a
17           causal link between the unfair or deceptive act and the injury suffered.

18   Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc., 162 Wash. 2d 59, 73

19   (2007).  Unlike RICO, there is no requirement that a defendant intend to deceive.  "An unfair or

20   deceptive act or practice . . . need only have the capacity to deceive a substantial portion of the

21   public.  A knowing failure to reveal something of material importance is deceptive within the

22   CPA."  Deegan v. Windermere Real Est./Ctr.-Isle, Inc., 197 Wn. App. 875, 885 (2017) (cleaned

23   up).

24

1    The dispute here is over whether Plaintiffs have properly alleged elements one (unfair or

2    deceptive act or practice) and four (injury).  With respect to element one, Plaintiffs allege

3    Defendants had a fatal and nonwaivable conflict of interest; Defendants failed to disclose, and

4    actively concealed, their competing economic interest to class members; Defendants profited at

5    the expense of Plaintiffs and class members; that the transfers were not in Plaintiffs' interest; that

6    Plaintiffs could have received higher payouts from known competitors; and that SABSCO

7    circumvented the structured settlement protection by systematically soliciting waivers of

8    professional advice from Plaintiffs and class members.  (Am. Compl. at 174–75.)

9         Even the few examples included in the complaint and discussed with respect to civil

10   RICO would satisfy the first element as defined by the Washington Court of Appeals in Deegan

11   because they omit matters of "material importance."  They describe the transactions as ways to

12   access settlement funds more quickly, leaving out the steep cost that access will come with, as

13   well as the fact that many annuitants have no authority to access funds or transfer rights in this

14   way under their settlements due to "power language."  Regarding injury, the analysis under civil

15   RICO applies as well: Plaintiffs gave up payment rights in exchange for a substantially reduced

16   lump sum.  The fact that they would owe Defendants money today if the transactions were

17   unwound is irrelevant; losing value of future payment rights is a sufficient injury.

18                      c.    Contract-based claims.

19        Plaintiffs' contract-based claims relate to the anti-assignment provisions in settlement

20   agreements, including "power language."  Plaintiffs argue that SABSCO stepped into the shoes

21   of the original defendant or responsible party when it assumed the duty to make payments under

22   the annuity issued in connection with the settlement agreement.

23        Defendants' contention that Plaintiffs have not identified any specific contractual

24   provision that they violated is unpersuasive.  Plaintiffs excerpted the "power language"

1  provisions from Mr. White and Mr. Nadeau's settlements.  (Am. Compl. at ¶¶ 80–81.)  In

2  addition, they allege the existence of similar agreements that would make a subclass.  These are

3  sufficiently specific allegations.

4       Defendants also argue that the anti-assignment language bound only Plaintiffs and

5  proposed class members, not them.  This issue requires some clarification.  The underlying

6  personal-injury lawsuits of course resulted in settlements between plaintiffs and defendants,

7  under which defendants agreed to pay lump sums and periodic payments.  Defendants in turn

8  entered into "qualified assignment" agreements with SABSCO in which they assigned their

9  obligations to make the ongoing payments to SABSCO.  (Am. Compl. at ¶¶ 53–54.)  The

10  settlements also permitted SABSCO to then purchase an annuity to fund the payments.  (See

11  Marisseau Decl., Ex. B at 12.)

12       Plaintiffs allege the qualified assignment agreements contain anti-assignment language

13  that is required under Section 130(c) of the Internal Revenue Code.  Under that provision, the

14  money the original defendant paid to SABSCO in exchange for taking on the payment obligation

15  is excluded from gross income only if anti-assignment language protects the ongoing payments.

16  26 U.S.C. § 130(c).  Plaintiffs argue they were intended beneficiaries of the anti-assignment

17  language contained in the qualified-assignment agreements between the original defendants and

18  SABSCO.  For these reasons, Plaintiffs have adequately stated their contract-related claims.

19                  d.      Breach of fiduciary duty claims.

20       Defendants argue Plaintiffs have not alleged facts sufficient to conclude that a fiduciary

21  relationship exists for either of Plaintiffs' claims for breach of fiduciary duty.  A fiduciary duty

22  may arise because of the nature of the relationship, e.g., trustee and beneficiary, but it "can also

23  arise in fact regardless of the relationship in law between the parties."  Liebergesell v. Evans, 93

24

1   Wash. 2d 881, 890 (1980).  A fiduciary relationship is one "in which one party occupies such a
2   relation to the other party as to justify the latter in expecting that his interests will be cared for."
3   Id. at 889–90.
4         Plaintiffs allege the existence of a fiduciary relationship in fact: Symetra formed a
5   fiduciary duty with class members when it issued an SSA to fund periodic payments arising out
6   of the settlements.  (Am. Compl. at ¶¶ 188–96.)  The annuity had one purpose, which was to
7   fund the long-term payments of class members.  Plaintiffs also allege Symetra obtained
8   significant personal information about class members, including injury details and medical
9   history, which it used to determine the cost of the SSA and to structure payments in a way to
10  provide income and care for class members.  They also allege Symetra occupied a position of
11  superior knowledge and that class members justifiably placed their trust in Symetra to manage
12  their payments.  With respect to SABSCO, Plaintiffs allege fiduciary duty for essentially the
13  same reasons, because SABSCO took on the legal obligation from the original defendant to
14  make the lifetime payments.
15        The existence of a fiduciary duty is quintessentially an issue of fact.  Construing the facts
16  in favor of Plaintiffs, class members would have justifiably expected that their interests would be
17  cared for by Symetra and SABSCO, as both entities had direct roles in administering ongoing
18  funding and care under the terms of their underlying settlements.
19                         e.      Civil conspiracy.
20        Defendants argue the claim for civil conspiracy should be dismissed because Plaintiffs
21  fail to allege unlawful conduct or unlawful means to accomplish lawful conduct.  (Dkt. No. 31 at
22  29.)  However, Plaintiffs have alleged such conduct.  (Am. Compl. at ¶¶ 234–39.)  They also
23  alleged mail and wire fraud as predicate acts under RICO.
24

f.      Unjust enrichment.

Defendants argue the claim for unjust enrichment should be dismissed because Plaintiffs received what they bargained for—the lump-sum payment—in exchange for their payment rights.  (Dkt. No. 31 at 29.)  But it is the validity of those contractual arrangements that is part of what is at issue here.

*** 

## II.      Motion to Strike Class Allegations

Motions to strike class allegations are rarely granted.  See In re Wal-Mart Stores, Inc. Wage & Hour Litig., 505 F. Supp. 2d 609, 615 (N.D. Cal. 2007).  And the Ninth Circuit has recognized that there are some cases where class certification cannot be determined without discovery.  Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935, 942 (9th Cir. 2009).  "The better and more advisable practice for a District Court to follow is to afford the litigants an opportunity to present evidence as to whether a class action was maintainable."  Id. (internal quotation marks omitted).

Defendants argue the proposed class would be overwhelmed by individualized issues such as the reasons class members agreed to the transfers at issue, the state-court proceedings, applicable state law in multiple states, and the specific terms of underlying settlements and later transactions for lump-sum payments.  However, the proposed class does not necessarily touch on these individualized issues.  Plaintiffs' claims center on alleged violations that preceded state-court approvals.  In particular, Plaintiffs allege Symetra had a duty to its annuitants that it violated by misusing confidential information and using its affiliate SABSCO to induce class members into selling their payment rights to offload its own payment obligations.  At this stage,

the evidentiary record is insufficient to decide class certification on these issues.  Therefore, the Court DENIES Defendants' motion to strike the class allegations.

***

Defendants' motion to dismiss and strike class allegations is DENIED.  The clerk is ordered to provide copies of this order to all counsel.

Dated August 5, 2021.

Marsha J. Pechman
United States Senior District Judge