1

2                    **UNITED STATES DISTRICT COURT**

3                    **WESTERN DISTRICT OF WASHINGTON**

4

5

6   RENALDO WHITE and RANDOLPH NADEAU,           Civil Action No.  2:20-cv-01866
    individually and on behalf of all others similarly
    situated,                                          **DEFENDANTS' RESPONSE IN**
7                                                       **OPPOSITION TO PLAINTIFFS'**
                            Plaintiffs,                 **MOTION FOR CLASS**
8                                                       **CERTIFICATION**
            vs.
9
    SYMETRA ASSIGNED BENEFITS SERVICE
10  COMPANY and SYMETRA LIFE INSURANCE            Noted:  Friday, April 15, 2022
    COMPANY,                                       Judge: Hon. Marsha J. Pechman
11                          Defendants.

12                                                 ***Oral Argument Requested***

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 3

    I.     PLAINTIFFS' EFFORTS TO ESTABLISH MISREPRESENTATIONS AND OMISSIONS REQUIRE PROOF THAT IS HIGHLY INDIVIDUALIZED ............................................................................ 4

    II.    RECORD EVIDENCE DOES NOT SUPPORT PLAINTIFFS' CONCLUSORY CLAIM THAT DEFENDANTS ENGAGED IN DECEPTIVE CONDUCT ....................................................................... 8

ARGUMENT ........................................................................................................... 10

    I.     PLAINTIFFS FAIL TO SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT. ........................................................................... 10

        A.    Individualized Inquiries Will be Required to Determine the Information Conveyed to the Nearly 2000 Members of the Putative Class. ................................................................................ 17

        B.    Plaintiffs Fail to Provide Any Common Proof of Classwide Omissions. .......................................................................... 13

        C.    Plaintiffs Cannot Prove Reliance on a Classwide Basis. ......................... 17

        D.    Plaintiffs Likewise Cannot Prove Causation on a Classwide Basis. ........ 20

        E.    Injury Cannot Be Established Through Common Proof on a Classwide Basis. ................................................................... 23

            1.    Plaintiffs' Theory of Injury is Highly Individualized .................. 23

            2.    Plaintiffs' Expert Report Does Not Make Injury Susceptible to Classwide Proof ................................................ 26

        F.    Myriad Other Individualized Inquiries Would Be Required, Further Defeating Predominance. ................................................. 27

            1.    Plaintiffs Fail to Provide Any Legal of Factual Basis to Impose a Fiduciary Duty on a Classwide Basis ........................... 27

            2.    Efforts to Toll the Statutes of Limitation Are Individualized ....... 29

            3.    Any Claim Based on "Anti-Assignment" Language Would Likewise Require Individualized Inquiries Unfit for Classwide Treatment .................................................... 30

G. Plaintiffs Cannot Show Unjust Enrichment on a Classwide Basis. .......... 33

II. PLAINTIFFS FAIL TO SATISFY RULE 23(b)'S SUPERIORITY REQUIREMENT ................................................................................. 34

CONCLUSION ................................................................................................. 34

**TABLE OF AUTHORITIES**

**Cases**

*321 Henderson Receivables Origination LLC v. Sioteco*, 173 Cal. App. 4th 1059
(Cal. Ct. App. 2009)............................................................................................32, 33

*Abbit v. ING USA Annuity & Life Ins. Co.*, 252 F. Supp. 3d 999 (S.D. Cal. 2017),
aff'd, 774 F. App'x 351 (9th Cir. 2019) ..............................................................28

*Almon v. State Farm Fire & Cas. Co.*, 724 F. Supp. 765 (S.D. Cal. 1989)...................28

*Alvarado v. Microsoft Corp.*, No. C09-189 MJP, 2010 WL 715455 (W.D. Wash.
Feb. 22, 2010) ..........................................................................................................23

*Bailey-Medwell v. Hartford Life & Accident Ins. Co.*, No. C17-1697-MJP, 2018
WL 5264335 (W.D. Wash. Oct. 23, 2018) .............................................................23

*Barraza v. C. R. Bard Inc.*, 322 F.R.D. 369 (D. Ariz. 2017) ........................................32

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)........................................21

*Broadbent v. Internet Direct Response*, No. CV-10-06508-RGK, 2011 WL
13217499 (C.D. Cal. Feb. 2, 2011).........................................................................18

*Brown v. NFL Players Ass'n*, 281 F.R.D. 437 (C.D. Cal. 2012) ....................................27

*Bund v. Safeguard Properties, LLC*, No. C15-1773 MJP, 2016 WL 11530734
(W.D. Wash. Mar. 2, 2016) ......................................................................................11

*CGU Life Ins. Co. of Am. v. Metro. Mortg. & Sec. Co.*, 131 F. Supp. 2d 670 (E.D.
Pa. 2001) ............................................................................................................15, 30

*Colman v. Theranos, Inc.*, 325 F.R.D. 629 (N.D. Cal. 2018) ........................................19

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ............................................................10

*Contos v. Wells Fargo Escrow Co., LLC*, No. C08-838Z, 2010 WL 2679886
(W.D. Wash. July 1, 2010) .......................................................................................29

*Cordero v. Transamerica Annuity Serv. Corp.*, 452 F. Supp. 3d 1292 (S.D. Fla.
2020) ..................................................................................................................28, 30

*Dansby v. Fetzek*, 117 Wash. App. 1077 (Wash. Ct. App. 2003)..................................16

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .......................................26

iii

*Denham v. Cease*, No. 2:14-CV-281-RMP, 2015 WL 94742 (E.D. Wash. Jan. 7, 2015) ...................................................................................................29

*Elec. Recycling Ass'n of Alberta v. Basel Action Network*, No. C18-1601-MJP, 2019 WL 1453575 (W.D. Wash. Apr. 2, 2019)....................................................23

*Empire Health Found. v. CHS/Cmty. Health Sys. Inc.*, 370 F. Supp. 3d 1252 (E.D. Wash. 2019) .........................................................................................33

*Est. of Felts v. Gentworth Life Ins. Co.*, 250 F.R.D. 512 (W.D. Wash. 2008) .............19

*Eugster v. City of Spokane*, 91 P.3d 117 (Wash Ct. App. 2004) ................................21

*Granati v. Stone St. Capital, Inc. (In re Granati)*, 270 B.R. 575 (E.D. Va. 2001) .........9

*Grande v. U.S. Bank Nat'l Ass'n*, No. C19-333 MJP, 2019 WL 3238471 (W.D. Wash. July 18, 2019) ...............................................................................23

*Grochowski v. Daniel N. Gordon, P.C.*, No. C13-343 TSZ, 2015 WL 3407441 (W.D. Wash. May 26, 2015)......................................................................25

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531 (Wash. 1986) .........................................................................................21

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)......................................32

*Hard 2 Find Accessories, Inc. v. Amazon.com, Inc.*, 58 F. Supp. 3d 1166 (W.D. Wash. 2014), *aff'd sub nom. Hard2Find Accessories, Inc. v. Amazon.com, Inc.*, 691 F. App'x 406 (9th Cir. 2017) .........................................................21

*Hinton v. Pac. Enter.*, 5 F.3d 391 (9th Cir. 1993) ...................................................29

*Hoffman v. Zenith Ins. Co.*, 487 F. App'x 365 (9th Cir. 2012).................................17

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig.*, 277 F.R.D. 586 (S.D. Cal. 2009) .......................................................................................20, 21

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig.*, No. 08MD1988 DMS (LSP), 2010 WL 1691451 (S.D. Cal. Apr. 23, 2010), *aff'd sub nom. Buckley v. Countrywide Home Loans Inc.*, 466 F. App'x 647 (9th Cir. 2012)......................18

*In re NCAA I-A Walk-On Football Players Litig.*, No. C04-1254C, 2006 WL 1207915 (W.D. Wash. May 3, 2006)..................................................................22, 34

*In re Nitz*, 739 N.E.2d 93 (Ill. App. Ct. 2000) .......................................................32

*Kennedy v. Jackson Nat. Life Ins. Co.*, No. C 07-0371 CW, 2010 WL 2524360 (N.D. Cal. June 23, 2010) .......................................................................22

*Kelley v. Microsoft Corp.*, 251 F.R.D. 544 (W.D. Wash. 2008), certification withdrawn, No. C07-0475 MJP, 2009 WL 413509 (W.D. Wash. Feb. 18, 2009) ..................................................................................................21

*Kogan v. Allstate Fire & Cas. Ins. Co.*, No. C15-5559 BHS, 2019 WL 2084425 (W.D. Wash. Mar. 15, 2019) ...........................................................32

*Lack v. Mizuho Bank, Ltd.*, No. 2:18-CV-00617-RGK-GJS, 2019 WL 3059261 (C.D. Cal. Apr. 30, 2019)..........................................................................13

*Liebergesell v. Evans*, 613 P.2d 1170 (Wash. 1980) ...........................................27, 28

*Lowden v. T-Mobile USA, Inc.*, No. C05-1482 MJP, 2009 WL 537787 (W.D. Wash. Feb. 18, 2009) ...........................................................................33

*Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950 (S.D. Cal. 2016)...................................25

*Martinelli v. Petland, Inc.*, 274 F.R.D. 658 (D. Ariz. 2011)................................18

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ............10, 17, 19

*Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*, 40 P.3d 1206 (Wash. Ct. App. 2002)........................................................................................23

*Minnick v. Clearwire US, LLC*, 683 F. Supp. 2d 1179 (W.D. Wash. 2010)...............33

*Moussouris v. Microsoft Corp.*, No. C15-1483JLR, 2016 WL 6037978 (W.D. Wash. Oct. 14, 2016) ...........................................................................30

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001), *as amended* (Oct. 16, 2001)...............................................26, 34

*Norcon Builders, LLC v. GMP Homes VG, LLC*, 254 P. 3d 835 (2011) ...................34

*Pierce v. Novastar Mortg., Inc.*, No. C05-5835RJB, 2006 WL 2571984 (W.D. Wash. Sept. 5, 2006)...................................................................................12, 18

*Pope v. Univ. of Wash.*, 852 P.2d 1055 (Wash. 1993)...................................17

*Poulos v. Caesars World, Inc.*, 379 F.3d 654 (9th Cir. 2004) ...........................19

*Rosenberg v. CCS Com., LLC*, No. C17-476 MJP, 2018 WL 3105988 (W.D. Wash. June 25, 2018)..........................................................................15

*Rumbin v. Utica Mut. Ins. Co.*, 254 Conn 259 (Conn. 2000) ...........................9

*Saavedra v. Eli Lilly & Co.*, No. 2:12-cv-9366-SVW, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ...........................................................................23

v

*Sanders v. JGWPT Holdings, Inc.*, No. 14 C 9188, 2016 WL 4009941 (N.D. Ill. July 26, 2016) ................................................................................................15

*Settlement Funding v. Jamestown Life Ins. Co.*, 78 F. Supp. 2d 1349 (N.D. Ga. 1999) .........................................................................................................9

*Shanks v. Jarrow Formulas, Inc.*, No. CV 18-09437 PA, 2019 WL 4398506 (C.D. Cal. Aug. 27, 2019) ..................................................................................20

*Silver v. Pa. Higher Educ. Assistance Agency*, No. 14-CV-00652-PJH, 2020 WL 607054 (N.D. Cal. Feb. 7, 2020) ........................................................12

*Smith v. First Am. Title Ins. Co.*, No. C11-2173 TSZ, 2014 WL 2511621 (W.D. Wash. June 4, 2014) ..................................................................................28

*Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464 (N.D. Cal. 2017) ................................34

*Stratton v. Am. Med. Sec., Inc.*, 266 F.R.D. 340 (D. Ariz. 2009) ................................27

*Su v. Henry Glob. Consulting Grp.*, No. 2:20-cv-02235-ODW, 2022 WL 19392 (C.D. Cal. Jan. 3, 2022) ..................................................................................23

*Taylor v. N.Y. Life Ins. Co.*, No. 19 Civ. 6830 (VM), 2021 WL 467127 (S.D.N.Y. Feb. 9, 2021) ......................................................................................28, 30

*Todd v. Tempur-Sealy Int'l, Inc.*, No. 13-CV-04984-JST, 2016 WL 5746364 (N.D. Cal. Sept. 30, 2016) ............................................................................17

*True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F. 3d 923 (9th Cir. 2018)......................16

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ............................................10

*W. States Wholesale, Inc. v. Synthetic Indus., Inc.*, 206 F.R.D. 271 (C.D. Cal. 2002) .......................................................................................................24

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................11, 19

*Weidenhamer v. Expedia, Inc.*, No. C14-1239RAJ, 2015 WL 7157282 (W.D. Wash. Nov. 13, 2015) ..................................................................................18

*Wetzel v. CertainTeed Corp.*, No. C16-1160JLR, 2019 WL 3976204 (W.D. Wash. Mar. 25, 2019)............................................................................................21

*White v. Symetra Assigned Benefits Serv. Co.*, No. C20-1866 MJP, 2021 WL 3472408 (W.D. Wash. Aug. 5, 2021) ..........................................................21, 24, 27

*Wolin v. Jaguar Land Rover NA LLC*, 617 F.3d 1168 (9th Cir. 2010)........................20

*Young v. Toyota Motor Sales, U.S.A.*, 472 P. 3d 990 (Wash. 2020)............................18

*Zinser v. Accufix Rsch. Inst. Inc.*, 253 F.3d 1180 (9th Cir. 2001)...........................20, 34

**Statutes**

18 U.S.C. § 1962(c) ...................................................................................................23

26 U.S.C. § 130(c)(2)................................................................................................15

26 U.S.C. § 5891......................................................................................................9

N.Y. Gen. Oblig. Law § 5-1705................................................................................8

**Other Authorities**

Restatement (First) of Contracts § 472 (1932) .........................................................28

Fed. R. Civ. P. 23(b) ................................................................................................10, 34

Despite Plaintiffs' efforts to reshape their claims to fit them within the requirements of Rule 23, the "rigorous analysis" required by Ninth Circuit precedent easily demonstrates that individualized issues will overwhelm any common questions, defeating certification. Plaintiffs ask this Court to certify a nationwide class of nearly 2000 payees who sold to SABSCO payments under structured settlement annuities issued by Symetra Life, under the auspices of state law and approved by state courts, claiming payees were uniformly "deceived" despite state-law mandated and state-court approved disclosures. Plaintiffs' theory has no support in the facts or applicable law. The record to date—including discovery documents, deposition testimony, records of calls with payees, and state-court records and hearing transcripts—makes clear that Defendants' communications with each member of the putative class were highly individualized and consisted mainly of one-on-one communications on the exact issues on which Plaintiffs claim members of the putative class were misled. Plaintiffs' conclusory assertion that communications were common is soundly contradicted by voluminous record evidence to the contrary.

In addition to Plaintiffs' failure to offer any common misleading statements or uniform omissions, core elements of Plaintiffs' claims—reliance, fiduciary duty, injury and causation—likewise have no common proof. Determining *why* each member of the putative class decided to sell future annuity payments in exchange for an immediate lump sum and *whether* that transfer ultimately caused a payee harm would require examination not only of what information was disclosed in one-on-one communications with payees, but also payees' decision-making regarding the costs and benefits of the transfer, their specific financial needs at the time, each payee's knowledge about the transfers and Defendants, individual state court proceedings, and

their prior factoring experience, among other payee-specific issues.

In the face of myriad individualized inquiries, Plaintiffs resort to muddling the elements of their claims and leaning heavily on insinuation, in particular the assertion that offering lump sum payments to payees under annuities issued by Symetra Life was somehow inherently wrongful and violated an unspecified "duty" to payees. But Plaintiffs fail to identify any law Defendants violated as to any member of the putative class, let alone any method to establish liability on a classwide basis. Nor could they: Defendants' conduct did not violate any law, and Plaintiffs fail to identify anything Defendants did "wrong" except offer lump sum payments that required approval by state courts if a particular payee's best interests were served.

To the extent Plaintiffs premise their claims (and the claims of the putative subclass) on contractual provisions in the underlying structured settlement agreements between each member of the putative class and third parties, known as "anti-assignment" clauses, Plaintiffs also fail to demonstrate that such claims are susceptible to common proof. To the contrary, individualized inquiries would overwhelm any common questions, including because the "anti-assignment" provisions Plaintiffs claim are uniform in fact vary widely (to the extent they even exist) among members of the putative class. The provisions also must be interpreted under the state law required by the settlement agreements, which also significantly vary from state to state, and further would require consideration of individualized defenses, including waiver and ratification. None of these inquiries are consistent with the predominance requirements of Rule 23.

Nor can Plaintiffs avoid this individualized morass by assuming away the elements of their claims, asserting that Defendants made uniform material misstatements and omissions to the putative class that this Court can assume induced every payee to enter into a harmful transaction and that Defendants' conduct necessarily caused an injury to each member of the

putative class.  The facts are not on Plaintiffs' side.  For example, Plaintiffs' theory that class members uniformly did not understand that Defendants had a profit motive, and presumably would not have factored had they understood that, is refuted by Plaintiff Nadeau's acknowledgement at his deposition that "[o]f course" he knew SABSCO "was likely to profit" from this transfer.  Ex. 18, 107:20-23.[1]  Plaintiffs' argument that injury can be assumed on a classwide basis similarly falls apart in the face of Plaintiff Nadeau's testimony to the state court—and insistence in calls with Defendants—that he needed the immediate lump sum because he was about to lose his income-producing apartment building to tax foreclosure and had no other way to pay his bill. Ex. 21, PL 00000203-204, 210.

Any analysis—and certainly the "rigorous" inquiry required by the Ninth Circuit—will reveal that Plaintiffs' theory of certification based on purportedly uniform misrepresentations and an alleged "presumption" of reliance and causation has no support in the factual record or applicable law.  Plaintiffs must identify evidence, not mere allegations, in support of certification, and they have not done so.  As the individualized facts presented by the two named Plaintiffs make plain, Plaintiffs' conclusory assertions are not backed up by actual facts, and Defendants are entitled to confront each member of the purported class with individualized evidence, including prior statements to state courts when seeking approval of their transfer.  This Court would have to evaluate all of these issues for each of the nearly 2000 members of the putative class, a morass of individualized inquiries incompatible with class treatment.

For these reasons and additional reasons discussed below, Plaintiffs utterly fail to meet their burden of meeting the requirements of Rule 23 and Plaintiffs' Motion should be denied.

**BACKGROUND**

---

[1] All references to "Ex." are to the exhibits attached to the Declaration of Medora Marisseau filed with this motion.

# I. PLAINTIFFS' EFFORTS TO ESTABLISH MISREPRESENTATIONS AND OMISSIONS REQUIRE PROOF THAT IS HIGHLY INDIVIDUALIZED

Over the course of the putative fifteen-year class period, Defendants engaged in highly individualized communications with members of the putative class, largely through one-on-one phone conversations with SABSCO's customer service representatives. The few common communications that exist, make clear that, to commence a potential transfer, a payee needed to call Defendants. *See, e.g.*, Dkt. No. 63-19 at DEF_001420; Dkt. No. 63-20 at DEFESI_018825 ("If you'd like a no-obligation quote, please call me toll free"); Dkt. No. 63-22 (same); Ex. 1 at DEF_000610 (offering to "introduce [payees] to the [factoring] process" and "explore the financial goals of the payee"), at DEF_000614 (using calls to "confirm[] caller's understanding" and "ask[] if they have any further questions"). These subsequent communications necessarily bear on the key questions of what was communicated to each payee, what each payee knew in deciding to request a transfer, what financial need payees had for needing the funds, and whether, in light of all the facts, payees were injured, requiring mini-trials for every putative class member.

**Individualized communications occurred with every putative class member**: Each putative class member necessarily engaged in multiple phone conversations with representatives of SABSCO. To initiate a transaction, payees would have reach out to SABSCO by phone. *See* Ex. 18 at 45:12-25, 46:10-15; Ex. 19 at 34:12-18; Dkt. No. 63-3 at DEF_001616–17 (2005 initial discussion guidelines); Dkt. No. 63-20 at DEFESI_018825. SABSCO's training materials and the facts pertinent to the two named plaintiffs demonstrate that these calls were highly individualized. While training documents describe responses to questions a payee might have and model answers described the risks and benefits of factoring, *see* Dkt. No. 63-3 at DEF_001616-17 (2005 initial discussion guidelines), the calls with Plaintiffs Nadeau and White

illustrate the critical relevance—and unscripted nature—of these required phone communications.

- Plaintiff White spoke to SABSCO and Symetra representatives dozens of times, beginning in 1999. While he testified that he does not recall the substance of these calls, Defendants' records indicate that he asked questions and received information about factoring transactions on multiple occasions. *See* Ex. 5 at SYM_ID_000363 (May 17, 2007 "Renaldo called and asked questions about the process, application, etc."); Ex. 6 at SYM_ID_000366 ("Annt called in to request a cashout or a loan against his contract. Advised him that is not possible, **briefly discussed SSPA, he seemed to know a little bit about it already**.") (emphasis added); *see also* Ex. 7 at SYM_ID_000133 (Dec. 30, 2003: "Annt called in wanting to receive his next lump sum payment due in 2005 early, advised that we are not able to alter the payment streams, briefly discussed SSPA").

- Plaintiff Nadeau likewise spoke to SABSCO and Symetra representatives dozens of times from 2003 to 2020. These calls included a call with a SABSCO representative in 2011 regarding quotes given for Mr. Nadeau's SABSCO annuity; call notes indicate that the SABSCO representative "discussed the pros/cons of using his SABSCO one, but he was unhappy with the quotes anyway." Ex. 8 at SYM_ID_000367.

- In a 2019 call, Nadeau explained he wanted to cash out future payments because he was behind on taxes on his apartment building. Far from "deceiving" him into doing the transfer, the SABSCO representative asked him numerous questions challenging whether he had any other way to obtain the funds, clearly disclosing that Nadeau would be receiving a smaller lump sum by factoring:

  o "Have you looked into any other options to finance this? Like getting a loan or something like that? . . . Is there any reason why you haven't looked into getting a loan? I mean, you could get a loan and just use your payments to pay off the loan as you go along." Ex. 9, SYM_ID 000355:2-10.

  o **"[You would be] losing 39,000 by doing this, you know, it could potentially be cheaper if you were to just take out a loan and then pay it off as you go along.** If you have the income to support the loan of course . . . . Okay. . **. I'm not trying to talk you out of this, but again, it's probably something that a judge, if we're going to ask any questions, likes to ask; I understand you want to just get it done but –have--is there any specific reason why you haven't just called your bank and said 'Hey, can I borrow . . . 14,000 to pay off the taxes**?' . . . So you don't believe that you would qualify for a loan?" *Id*. 355:16-25; 356:1-11(emphasis added).

The individualized communications of the named Plaintiffs demonstrate that the Court cannot simply assume that communications with each class member were uniform.

**Marketing Mailings Were Not Uniform**: Beginning in 2005, Symetra sent various

letters and sometimes brochures to payees to make them aware of the option of factoring with SABSCO. These mailings were typically sent once per quarter to payees who were potentially eligible for a factoring transaction. The form and content of these mailings—and who received them—varied significantly over time. While Plaintiffs criticize Defendants for sending payees mailings regarding the possibility of selling their payments based on the claim that this information was "confidential," Plaintiffs unsurprisingly point to no authority to suggest that sending a quarterly mailing to a payee's address could be improper.[2] Indeed, Plaintiff Nadeau testified that he received mailings from numerous third-party factoring companies. *See* Ex. 18 at 46:1–4. As Plaintiff White agreed, if a payee asked to be removed from the mailing list, no further mailings would be sent. Ex. 19 at 155:19-21; Dkt. No. 63-31 at DEFESI_103518 (internal document stating "Filter out all payees that have asked us not to call . . .").

Plaintiffs' cited evidence also demonstrates that the letters varied over time. Despite Plaintiffs' insistence that these mailings were "aggressive" and "stressed" payees' trust in Symetra, many mailings cited by Plaintiffs make no reference to customers "trusting" Symetra or similar themes. *See* Dkt. No. 63-3 at DEF_001618 (2005 template letter); Dkt. No. 63-18 (2006 letter); *see also* Ex. 23 at PL_00000001 (2020 letter). Plaintiffs offer no evidence demonstrating which mailing(s) (if any) were received by which payees or which templates were actually used. Moreover, several of the templates cited by Plaintiffs emphasized that Symetra Life and SABSCO were affiliated entities by stating that "Symetra Life Insurance Company issued a structured settlement annuity" and that "Symetra Assigned Benefits Service Company (SABSCO) owns the annuity and is the company legally responsible to make these annuity

---

[2] Finding no evidence to support it, Plaintiffs have abandoned their assertion that Defendants improperly used payee's medical or underwriting information. *See, e.g.*, Ex. 24 (Nadeau HIPAA authorization).

payments to you." *See* Dkt. No. 63-18 at DEF_001865.

More broadly, while Plaintiffs cite other *potential* marketing strategies considered by the Company in internal documents—for example, considering the use of "cold-calls" and marketing emails to payees—such strategies were never implemented, and Plaintiffs offer no evidence to suggest otherwise. Ex. 17 at 145:11–15.

**State Court Approval Proceedings Were Highly Individualized**: The state-court approval hearings required for approval of any transfer are another important source of highly relevant and individualized evidence regarding what each member of the putative class had been told and understood. These proceedings varied by state and by judge, and could include additional information provided to a payee about the transfer and their rights from a personal lawyer or the court. Some cases required in-person hearings held by a state court judge to evaluate evidence that the transfer would serve a payee's best interests; these hearings sometimes included direct questions to a payee regarding the payee's understanding of the terms of the transaction, their right to obtain independent legal or financial advice, their financial need and rationale for seeking a transfer. For example, Plaintiff Nadeau's state court approval hearings involved lengthy questions from the court to which Nadeau responded under oath regarding his understanding of the transaction and his need for the funds. *See* Dkt. No. 32-6 at 11:2–21:12. Nadeau declined the state court's repeated questions about getting independent advice, explaining that "I'm sixty-five years old and I've run a couple of businesses and I've got the experience in what I'm asking for," and "after thinking it all over, it's the best thing right now for me to do at my age." *Id*. at 9:1–8, 20:8–12. In addition:

- Nadeau testified he consulted with a lawyer who reviewed the petition and provided advice. Ex. 21 at PL_00000185:12–19, 24-25; 186:1-22. While Nadeau testified at his deposition in this case that he did not recall ever consulting a lawyer, the transcript of his state court proceeding stated otherwise, presenting another example of an individualized inquiry

presented by members of the putative class. Ex. 18 at 81:2–82:22.

- Nadeau testified that he understood SABSCO did not represent his interests, Ex. 21 at PL_00000187:12-25;188:1-5, and that he needed immediate cash to pay back taxes on an apartment building he owned outright but would lose to foreclosure if the tax bill was not immediately paid and had no other way to pay the taxes, *id*. at PL_00000203:18–25, PL_00000210:4–21, PL_00000218:6-18.

- For his 2020 transfer, Mr. Nadeau submitted a sworn, notarized affidavit setting forth the basis for the transfer and testified under oath at an in-person hearing. Nadeau's affidavit stated that the transfer of these future payments was "in his best interest," would "improve [his] quality of life," and would provide him the funds needed to (1) pay off his city tax bill, and (2) replace the roof on his home. Dkt. No. 32-2 at 40; *see* N.Y. Gen. Oblig. Law § 5-1705. Nadeau affirmed that he had "no other options to come up with the money" required to pay his expenses, and that he had "carefully reviewed" and signed a disclosure statement which detailed the terms of the transaction. Dkt. No. 32-2 at 39–40. He also acknowledged that SABSCO was both "the entity presently obligated to make [his] payments" and the entity to which he agreed "to sell and assign" payments. *Id*. at 38.

- The court also reviewed the settlement agreement between Nadeau and the Detroit Edison Company and the transfer agreement with SABSCO in which Nadeau "warrant[ed] that [he] has the power and right to enter into this agreement." *Id*. at 20.

As discussed below, this highly individualized evidence—and similar individualized evidence that exists for other members of the putative class—is directly relevant to each of Plaintiffs' claims and would need to be examined to determine liability for any putative class member.

## II. RECORD EVIDENCE DOES NOT SUPPORT PLAINTIFFS' CONCLUSORY CLAIM THAT DEFENDANTS ENGAGED IN DECEPTIVE CONDUCT

Contrary to Plaintiffs' claims, the record demonstrates that Defendants entered the factoring business to offer their payees an attractive alternative to factoring with a third-party company, which Symetra's research showed could involve discount rates reaching to nearly 30%. *See* Dkt. No. 63-3 at DEF_001600–05; *see also* Ex. 10 at DEFESI_095069. Defendants made this decision after a series of changes to federal tax law concerning the tax treatment of structured settlement annuities. Before 2002, certain third-party companies like JG Wentworth offered payees the opportunity to enter into factoring transactions despite substantial legal

uncertainty that such transactions could jeopardize the favorable treatment of structured settlement annuities for both payees and insurers. Structured settlement agreements generally included a variety of provisions broadly referred to as "anti-assignment" clauses to bar a payee from assigning such payments in a manner that would jeopardize the favorable tax treatment. Numerous insurers, including Symetra, relied on anti-assignment provisions to oppose third-party factoring transactions out of concern that assigning payments would jeopardize the tax protection provided to both payees and annuity issuers.[3]

In 2002, Congress resolved this uncertainty by changing the tax law to preserve the favorable tax treatment for the parties to the structured settlement and structured settlement obligor, even when an structured settlement annuity was factored, (26 U.S.C. § 5891(d)), if a state court judge approved the transaction as (i) complying with the applicable state structured settlement protection act (including mandatory disclosures), and (ii) "in the best interest of the payee, taking into account the welfare and support of the payee's dependents," *id.* § 5891(b)(2).

After resolution of the tax uncertainty, and with payees still seeking to conduct factoring transactions, in 2005 Symetra Life obtained regulatory approval from the Washington Office of the Insurance Commissioner to use a "commutation of factored annuity endorsement" to fund the factoring transactions with their payees in order to offer payees a competitive alternative to third-party factoring companies. *See* Gruber Decl. ¶ 1; *see also* Ex. 11 at DEF_003597; Ex. 12 at DEF_003624, DEF_003640. While the specific pricing offered to any particular class member

_____

[3] These efforts were generally unsuccessful. *See Settlement Funding v. Jamestown Life Ins. Co.*, 78 F. Supp. 2d 1349 (N.D. Ga. 1999) (assignment not prohibited by anti-assignment clause or any statute); *Rumbin v. Utica Mut. Ins. Co.*, 254 Conn 259 (Conn. 2000) (assignment valid and enforceable, despite breach of anti-assignment provision); *Granati v. Stone St. Capital, Inc. (In re Granati)*, 270 B.R. 575 (E.D. Va. 2001) (approving assignment). Moreover, while Plaintiffs criticize Defendants' efforts to invoke anti-assignment provisions on a few occasions in the 2000s, *see* Mot at 12, Plaintiffs' cases all involved a single company which engaged in numerous problematic practices in attempting to solicit payees and avoid the requirements of state law.

varied, overall SABSCO offered favorable discount rates to its payees as compared to those offered by third-party companies like JG Wentworth and Peachtree, which Plaintiffs do not dispute. *See* Dkt. No. 63-14 at DEFESI_008430 (internal SABSCO analysis demonstrating that Defendants offered better pricing than third party factoring companies in 2013); *see also* Ex. 19 at 42:1–19 (White rejected higher value offer from Symetra in favor of lower value offer from JG Wentworth because he had already done business with JG Wentworth). Plaintiffs offer no evidence demonstrating that members of the putative class were pressured or deceived into entering into factoring transactions. *See* Ex. 13 at DEFESI_101535 (noting that salespeople would work with customers to "give customers a better rate than they could find elsewhere").

## ARGUMENT

Plaintiffs have not shown that this action qualifies for "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotations omitted). As the parties seeking certification, Plaintiffs bear the burden of showing that the requirements of Rule 23 are met for *each* of their proposed classes. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). The Supreme Court has emphasized that district courts must engage in a "rigorous analysis" to determine whether Rule 23 is satisfied and, in particular, have a "duty" to take a "close look" at whether "common questions predominate over individual ones." *Comcast Corp.*, 569 U.S. at 34. Common questions are ones where "the same evidence will suffice for each member" and individual questions are ones where the "members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotations omitted). Mere allegations do not suffice.

I.   **PLAINTIFFS FAIL TO SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT**.

Class certification is not appropriate under Rule 23(b)(3) because Plaintiffs cannot show that common questions "predominate over any questions affecting only individual members," as required. Fed. R. Civ. P. 23(b)(3). For each of Plaintiffs' claims, analysis of critical elements—including whether Defendants' statements to members of the purported class were false or misleading, proximate cause and/or reliance, and injury—cannot be established on a classwide basis through common proof. While Plaintiffs' Motion purports to identify "common questions," Plaintiffs fail to demonstrate that any such questions are susceptible to "common answers," as required to meet Plaintiffs' burden. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Bund v. Safeguard Properties, LLC*, No. C15-1773 MJP, 2016 WL 11530734, at *3 (W.D. Wash. Mar. 2, 2016) (class action not appropriate where "classwide proceedings [would] not generate common answers sufficient to resolve the numerous factual issues presented by the claims asserted").

Plaintiffs' claims raise numerous individualized issues, including with respect to the nature of Defendants' alleged misrepresentations, injury and reliance and/or causation, injury, and tolling. Because these individualized issues predominate as to all of Plaintiffs' claims, including those relating to the subclass, this Court should deny class certification.

## A. Individualized Inquiries Will Be Required to Determine the Information Conveyed to the Nearly 2000 Members of the Putative Class

Plaintiffs' Motion premises each cause of action—under RICO, the Washington CPA, for breach of fiduciary duty, unjust enrichment, contractual claims, and civil conspiracy—on the theory that Defendants engaged in a common course of misleading conduct that deceived putative class members into entering into factoring transactions.[4] In particular, Plaintiffs contend

---

[4] RICO Claim, based upon Defendants' alleged "scheme to defraud, and whether [Defendants] carried it out through a pattern of predicate mail fraud," Mot. at 14; *see also* AC ¶ 153; CPA Claim, based on Defendants' alleged failure to "disclose their conflict of interest, that they were motivated by profit, and that they were not acting as advocates

that Defendants duped putative class members by improperly trading on their alleged "trust" in Symetra Life to coerce payees into factoring transactions with SABSCO. *See, e.g.*, Mot. at 7–8, 14 ("solicitations to class members employed form communications with common omissions and misrepresentations"). In support of this theory, Plaintiffs focus on a few cherry-picked form mailings that referenced Defendants' relationship with payees by virtue of Symetra Life's issuance of the underlying annuity, while ignoring others that do not support them.

Plaintiffs' theory also ignores the heavily individualized communications between Defendants and every member of the putative class member before any transfer of payments to SABSCO. *See supra* pages 4–5. Each putative class member engaged in numerous separate communications from Defendants, including one-on-one phone calls after the payee initiated the process, individualized mailings, and documents related to individual court proceedings that included a variety of information regarding the risks and benefits of transfers, a payee's personal circumstances, and the financial terms offered. Courts in this Circuit have made clear that these individualized inquiries are entirely inconsistent with class treatment, as "determining the extent of each potential class member's knowledge . . . and weighing conflicting evidence about conversations," cannot be accomplished through common proof. *Pierce v. Novastar Mortg., Inc.*, No. C05-5835RJB, 2006 WL 2571984, at *8 (W.D. Wash. Sept. 5, 2006); *see also Silver v.*

---

protecting class members' interests," Mot. at 25; *see also* AC ¶ 173–84; Contract Claim, based on Defendants' alleged "fatal conflict of interest," that "Symetra stood to gain financially," that "Certain Class Members lacked the power to transfer their future SSA payments," and that "[i]n all of these ways, Defendants were acting in their own interest, not the Class members' interest," AC ¶ 184; Fiduciary Duty Claims, based on Defendants allegedly "placing its own interests over the interests of the Class members by initiating and contemplating factoring transactions" at unfair discount rates, and by "fail[ing] to inform the Class members that . . . Symetra had a competing economic interest," *see* AC ¶ 197–98; Civil Conspiracy Claims, alleging Defendants "knowingly and intentionally combined to undermine valid contractual relationships," AC ¶ 234, acted "through unlawful means . . . without disclosing Defendants' fatal conflict of interest and competing economic interest," AC ¶ 236, and withheld "material information about the respective factoring transactions," AC ¶ 238; Unjust Enrichment Claim, based on allegation that "Defendants' conduct in helping itself to a profit windfall without disclosing its competing economic interest to Class members allowed Symetra to receive an improper benefit at the expense of Class members," AC ¶ 251.

*Pa. Higher Educ. Assistance Agency*, No. 14-CV-00652-PJH, 2020 WL 607054, at *14 (N.D. Cal. Feb. 7, 2020) ("individualized communications between a potential class member and defendant allow for multiple combinations of statements and conduct," defeating predominance). Individualized inquiries will be required to evaluate the content of these unscripted calls for each member of the putative class, and consideration of these issues—the foundation of Plaintiffs' claim that each payee was uniformly duped by its belief that they could "trust" Defendants—will far outweigh any common questions, defeating the predominance requirement of Rule 23.[5]

**B. Plaintiffs Fail to Provide Any Common Proof of Classwide Omissions**

Plaintiffs' attempt to manufacture common issues by contending information was omitted on a classwide basis fails for the same reason. *See* Mot. at 10 (citing alleged omission to disclose Symetra's profit motive, the relationship between Symetra and SABSCO, and the anti-assignment language). Individualized inquiries will be required to determine whether the allegedly omitted information, which ranges from the commonsensical to the demonstrably disclosed, was omitted at all, much less whether the omission was material to a particular payee. *See Lack v. Mizuho Bank, Ltd.*, No. 2:18-CV-00617-RGK-GJS, 2019 WL 3059261, at *5 (C.D. Cal. Apr. 30, 2019) (individual issues predominated on material omission claim where materiality of omission "could vary among putative class members").

**Alleged Profit Motive**: Plaintiffs ask this Court to assume that no putative class member understood that Defendants—for-profit corporations—purportedly engaged in factoring transactions to make a profit. Plaintiffs point to no authority that a corporation's alleged failure

---

[5] The theory that any mailing duped all payees is not even supported by the named plaintiffs. Plaintiff White chose to factor with third party factoring company JG Wentworth over SABSCO—even though SABSCO gave him a better quote—because he had previously sold payments to Wentworth. Ex. 19 at 41:16–21. Nadeau could identify nothing in the one mailing from SABSCO he produced, as false or misleading. Ex. 18 at 116:20–25.

to disclose a profit motive could be deceptive.  Even so, determining what each payee understood about Defendants' financial motives will require an individualized inquiry.  Plaintiff Nadeau's experience is illustrative:  in connection with a transfer, he acknowledged that he was "aware that SABSCO is likely to profit from this transaction," and "that SABSCO cannot provide me with independent financial advice."  Ex. 22 at SYM_ID_000053.  In his deposition, Mr. Nadeau confirmed that "[o]f course" he knew SABSCO "was likely to profit" from this transfer.  Ex. 18 at 107:20–23.  Plaintiffs offer no way to identify which payees understood the commonsensical point Defendants would seek to profit in pricing the factoring transactions, and an individualized review of the disclosures received by each payee and any court records, along with testimony, would be required.

**SABSCO-Symetra Relationship**: Likewise, Plaintiffs' claim that Defendants purportedly had a conflict of interest as annuity issuer and obligor and purchaser and that such conflict was omitted on a classwide business is refuted by the record, and in any event not susceptible to common proof.  First, Plaintiffs' theory makes no sense: Defendants cannot have both traded on an alleged relationship of trust with payees based on Symetra Life issuing the structured settlement annuity and simultaneously concealed the Symetra-SABSCO relationship.  Second, and in any event, record evidence makes clear that Symetra Life's relationship with SABSCO was repeatedly disclosed in various contexts to putative class members, as Plaintiffs' own exhibits make clear.  Dkt. No. 63-34 at DEFESI_029746 (2014 communication stating "SABSCO is an affiliate of [Symetra], the company that issues your structured settlement payments," and that working with SABSCO means payees "[will] stay with a company you already know"); Dkt. No. 63-35 at DEFESI_102861 (2015 communication stating that SABSCO "is an affiliate of Symetra Life Insurance Company, the company who issues your structured

settlement payments" and that "your payments are already being issued by Symetra"); *see also* Dkt. No. 32-2 at 38 (acknowledging SABSCO was the entity obligated to make the structured settlements they were receiving, and that SABSCO purchased an annuity from Symetra in order to fund its payment obligations); Dkt. No. 32-4 at 19–21 (same); Ex. 19 at 89:7–11, 123:2–6; Ex. 20 at SYM_ID_000029 (authorizing SABSCO and Symetra to disclose information to each other pertaining to annuitant's settlement). Plaintiffs have failed to carry their burden of establishing through record evidence that such an omission exists, much less that proof of a purported "deception" with regard to the relationship between Defendants can "be reduced to a common question of fact." *Rosenberg v. CCS Com., LLC*, No. C17-476 MJP, 2018 WL 3105988, at *5 (W.D. Wash. June 25, 2018).

**Anti-Assignment Language:** Plaintiffs likewise cannot manufacture any classwide omission out of the "power" or "anti-assignment" language, if any, in the underlying structured settlement agreements. First, Plaintiffs cite no authority for their theory, *see, e.g.*, AC ¶ 78, that these provisions would or should have barred any transfers. Nor could they. As described above, these provisions were included in some structured settlement agreements to ensure that the tax-advantage of the transfers was not jeopardized by factoring.[6] Numerous courts have recognized that anti-assignment provisions in structured settlements existed primarily for the protection of the annuity obligor, here SABSCO, to prevent a payee from jeopardizing the tax protections provided to the annuity obligor by a payee's assignment. *See Sanders v. JGWPT Holdings, Inc.*, No. 14 C 9188, 2016 WL 4009941, at *2 (N.D. Ill. July 26, 2016) ("Because of

---

[6] Under the Periodic Payment Settlement Act ("PPSA") of 1982, payments under an SSA could not be "accelerated, deferred, increased, or decreased by the recipient of such payments." *See* 26 U.S.C. § 130(c)(2). Consequently, to protect their tax-free status for both payee and annuity issuer, structured settlement agreements often contained anti-assignment provisions that restricted a payee's ability to assign future payments.

these tax benefits, many structured settlement agreements contain anti-assignment clauses that prohibit the beneficiaries from transferring or assigning their payments."); *CGU Life Ins. Co. of Am. v. Metro. Mortg. & Sec. Co.*, 131 F. Supp. 2d 670, 679 (E.D. Pa. 2001) ("Thus, in this case, the potential for increased tax liability is the risk which the anti-assignment clause was designed to protect against."); *Dansby v. Fetzek*, 117 Wash. App. 1077, *4 (Wash. Ct. App. 2003) (in "all" cited cases, "court enforced the anti-assignment provision when the payor or obligor objected to the assignment"). Plaintiff White's settlement agreement makes clear that any anti-assignment language exists to preserve favorable tax implications, not to provide any rights to payees, with the language located under the heading: "LIMITATIONS OF CLAIMANT'S RIGHT TO PAYMENTS WITHIN THE MEANING OF IRS RULING 79-220." Ex. 26 at PL_00000465; Ex. 27. Plaintiffs' claim that these provisions somehow barred Defendants from deciding to engage in these transactions with each member of the putative class is contradicted by case law.

Second, any anti-assignment language was not concealed from payees, state courts, or anyone else. Where this language exists, it is evident on the settlement agreement's face and thus available to a payee.[7] This issue therefore presents—at most—payee-specific questions regarding the presence of anti-assignment language, the specific language in any such provision, and the extent of a payee's understanding of it and how, if at all, it would have affected the payee's decision to factor payments. *See True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F. 3d 923, 932 (9th Cir. 2018) (denying certification of potential subclass because of individualized nature of communications, and observing "variation in such communications . . . is enough to support denial of class certification under Rule 23(b)(3)"). Indeed, Plaintiffs White

---

[7] Defendants were not parties to any structured settlement agreement, which was between the payees and the entities they sued in their underlying personal injury action, where the language appears. *See, e.g.*, Ex. 26, PL 00000465.

and Nadeau repeatedly confirmed that they were aware of these provisions prior to transferring their payments, and each warranted to the state courts that he "ha[d] the power and right to enter into this agreement." Dkt. No. 32-2 at 20 (Nadeau); Dkt. No. 32-4 at 8 (White), Dkt. No. 32-5 at 6 (White). White specifically acknowledged that he was aware of the anti-assignment language at the time of his transfer, but elected to proceed anyway. *See* Ex. 19 at 170:18–24 ("Q. Okay. Is it your testimony that in 2011 you were aware of the language in the Structured Settlement? A. Yes. Q. Okay. And then you chose to do the deal with Symetra anyway in 2011 despite that knowledge; is that right? A. At that time, yes.").

Third, the anti-assignment language varies significantly where it exists, and is subject to Defendants' individualized defenses with respect to waiver and tolling. *See infra* pages 30–34.

### C. Plaintiffs Cannot Prove Reliance on a Classwide Basis

Just as individualized inquiries would be required to determine the content and extent of a particular member of the putative class' communications with Defendants, individualized inquiries will likewise be required to determine whether each member relied on an allegedly deceptive statement in deciding to engage in a factoring transaction, a necessary element of Plaintiffs' RICO, CPA, and breach of fiduciary duty claims.[8] Here, as the Ninth Circuit has observed, if a putative class member did not rely upon an alleged misrepresentation, "the reliance requirement will spell the difference between the success and failure of the claim." *Mazza,* 666 F.3d at 596. Plaintiffs offer no way to prove reliance on a classwide basis.

---

[8] *See Pope v. Univ. of Wash.*, 852 P.2d 1055, 1063 (Wash. 1993) (affirming summary judgment on breach of fiduciary duty claim where plaintiff failed to raise genuine issue of material fact that defendant used its "position to *induce* reliance"); *Todd v. Tempur-Sealy Int'l, Inc.*, No. 13-CV-04984-JST, 2016 WL 5746364, at *12 (N.D. Cal. Sept. 30, 2016) ("acknowledging Plaintiffs' argument [as to unjust enrichment] that they would not need to prove individualized reliance," but denying class certification because of "the need to individually decide whether class members had been exposed to the alleged misrepresentations would dominate over other commonly shared issues of law or fact").

Plaintiffs' Motion offers several efforts to avoid the individualized inquiries fatal to certification, but none hold water. First, Plaintiffs argue that their RICO and CPA claims do not require Plaintiffs to prove reliance.[9] *See* Mot. at 22–24, 27. But courts routinely deny certification of RICO and CPA claims because of individualized inquiries presented by determining whether each member of the putative class relied on defendants' alleged conduct, especially where—as here—the claims are based on a mixture of individualized misrepresentations and omissions which Plaintiffs contend "induced" each member of the putative class to engage in a factoring transaction with Defendants. *See Pierce*, 2006 WL 2571984, at *10 (denying class certification of CPA claim where certain members of purported class received verbal notice of information not disclosed in writing because "[t]his issue would require extensive inquiries into each plaintiff's independent basis for knowing about the yield spread premium such that a class action is not the superior method of adjudicating this case"); *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig.*, No. 08MD1988 DMS (LSP), 2010 WL 1691451, at *11 (S.D. Cal. Apr. 23, 2010), *aff'd sub nom. Buckley v. Countrywide Home Loans Inc.*, 466 F. App'x 647 (9th Cir. 2012) (denying class certification of CPA claims where "this case will require the trier of fact to understand the entire mix of information— written and oral—known to each borrower before it can determine whether the borrower relied [on] disclosures, and thus, whether Defendants acted unfairly or deceptively under the CPA"); *Martinelli v. Petland, Inc.*, 274 F.R.D. 658, 662 (D. Ariz. 2011) (denying class certification

---

[9] Plaintiffs muddle the analysis of reliance and causation, referring to the elements and case law interchangeably. Mot. at 22–23, 27–28. Where, as here, Plaintiffs' theory of causation depends on reliance—as they claim that Defendants' purportedly deceptive conduct induced members of the putative class into factoring, individualized questions of reliance will defeat certification. *See Hoffman v. Zenith Ins. Co.*, 487 F. App'x 365, 365 (9th Cir. 2012) ("proving reliance is necessary [where] it is integral to Plaintiffs' theory of causation" for RICO claim); *Young v. Toyota Motor Sales, U.S.A.*, 472 P. 3d 990, 996–97 (Wash. 2020) (plaintiffs' "own causation theory as pleaded . . . was reliance and we find no other substantial theory of causation in his arguments . . . Reliance was [plaintiff's] theory and he failed to prove it" under Washington CPA).

because "[e]ach class member would need to prove that he or she received and relied on communications made as part of the RICO fraudulent scheme in order to prove that the scheme proximately caused his or her loss").[10]

Unable to identify any method of proving reliance based on common facts, Plaintiffs ask this court to employ an "inference" or "presumption" of reliance, going so far as to claim that "common sense dictates" that if Defendants had "properly informed class members that they did not have class members' best interests in mind, class members would not have transacted with them." *See* Mot. at 23. Plaintiffs cannot meet their burden at the class certification stage merely by invoking a disputed notion of "common sense." *See Wal-Mart Stores, Inc.*, 564 U.S. at 350 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."). Plaintiffs fail to cite to any authority presuming or inferring reliance on a similar record. To the contrary, courts have explicitly rejected Plaintiffs' theory of presuming or inferring reliance where, as here, individualized inquiries would be required to determine the information disclosed to each payee and evaluate the varying motivations and financial circumstances surrounding their decision to transfer payments for each member of the putative class. *See Mazza*, 666 F.3d at 595 (vacating class certification where "an

---

[10] *See also Broadbent v. Internet Direct Response*, No. CV-10-06508-RGK (FMOx), 2011 WL 13217499, at *5 (C.D. Cal. Feb. 2, 2011) (denying class certification in RICO claim where court could not "infer classwide reliance" claims required inquiry into class members' beliefs about defendants' statements); *Weidenhamer v. Expedia, Inc.*, No. C14-1239RAJ, 2015 WL 7157282, at *13 (W.D. Wash. Nov. 13, 2015) (denying class certification in CPA claim where presumption of reliance is inapplicable and, therefore, "individual issues of reliance—and . . . proximate cause—predominate"); *Poulos v. Caesars World, Inc*., 379 F.3d 654, 666 (9th Cir. 2004) (affirming denial of class certification in civil RICO case in part because "[t]he shortcut of a presumption of reliance typically has been applied in cases involving securities fraud and, even then, the presumption applies only in cases primarily involving 'a failure to disclose'—that is, cases based on omissions as opposed to affirmative misrepresentations"); *Est. of Felts v. Gentworth Life Ins. Co*., 250 F.R.D. 512, 526 (W.D. Wash. 2008) (denying class certification in CPA case since individual trials would better allow class members to "challenge the specific practices that induced his or her purchase [of life-only single premium immediate annuities] and the specific written or oral materials that deceived or mislead [them]").

individualized case must be made for each member showing reliance," because "the misrepresentations at issue here do not justify a presumption of reliance . . . primarily because it is likely that many class members were never exposed to the allegedly misleading advertisements, insofar as advertising of the challenged system was very limited"); *Colman v. Theranos, Inc.*, 325 F.R.D. 629, 634 (N.D. Cal. 2018) (denying class certification where "[f]ive of Plaintiffs' six claims have a reliance element" under Rule 23(b)(3)); *Shanks v. Jarrow Formulas, Inc.*, No. CV 18-09437 PA (AFMx), 2019 WL 4398506, at *7 (C.D. Cal. Aug. 27, 2019) ("there are significant individualized issues related to proof of reliance, and Plaintiff cannot maintain a class action under Rule 23(b)(3)"); *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig.*, 277 F.R.D. 586, 603 n.12 (S.D. Cal. 2009) (no presumption because it "applies only in cases based on omissions as opposed to affirmative misrepresentations") (internal quotation omitted).

Indeed, deposition testimony from Nadeau and White reveal numerous differences in what each understood about the transfers, why they today claim the transfers were improper, and whether they would have factored with a third-party if not with Defendants, inquiries that would be required across all nearly 2000 members of the putative class, defeating predominance.[11]

### D. Plaintiffs Likewise Cannot Prove Causation on a Classwide Basis

Plaintiffs' attempts to avoid the individualized inquiries required to prove causation on a classwide basis fail for similar reasons. As the Ninth Circuit has recognized, individualized causation inquiries are required where, as here, the court would need "proof specific to [an]

---

[11] White admitted he has had all documents related to his SABSCO transfer, and admits he does not now know any new, correct information material to his transfer he didn't know previously; Nadeau did not identify any new facts now known to him, and contends only that the transfer was not in his interest because he later fell into debt. *See infra* n.15 and accompanying text.

individual litigant" to determine the circumstances leading to any purported injury for each putative class member, leading to "inescapable" individualized issues that would predominate over any common questions. *Wolin v. Jaguar Land Rover NA LLC*, 617 F.3d 1168, 1174 (9th Cir. 2010) (predominance not met for subclass); *Zinser v. Accufix Rsch. Inst. Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001) (predominance not met due to individualized causation questions).

Case law confirms that Plaintiffs must prove that the alleged misrepresentations caused their injuries for each of their causes of action. *See, e.g.*, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 653–54 (2008) (causation an element of civil RICO claim); *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 539 (Wash. 1986) (causation an element of CPA claim); *Eugster v. City of Spokane*, 91 P.3d 117, 123 (Wash Ct. App. 2004) (tortious interference requires proof that the defendant caused the interference by improper means or purpose); *Hard 2 Find Accessories, Inc. v. Amazon.com, Inc.*, 58 F. Supp. 3d 1166, 1171 (W.D. Wash. 2014), *aff'd sub nom. Hard2Find Accessories, Inc. v. Amazon.com, Inc.*, 691 F. App'x 406 (9th Cir. 2017) (causation an element of breach of contract claim); *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 559 (W.D. Wash. 2008), certification withdrawn, No. C07-0475 MJP, 2009 WL 413509 (W.D. Wash. Feb. 18, 2009) (unjust enrichment requires trier of fact to "consider whether and how an injustice occurred").[12]  Courts regularly deny certification of claims where, as here, proof of causation is necessarily individualized. *See In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig.*, 277 F.R.D. at 605 (denying certification of RICO

---

[12] Plaintiffs acknowledge causation is required for their breach of fiduciary duty and civil conspiracy claims. *See* AC ¶ 187 (fiduciary duty claims requires that the "injury was proximately caused by the breach"); AC ¶ 231 (civil conspiracy requires "proximately resulting damage").  And because Plaintiffs' good faith and fair dealing contract is functionally derivative of and identical to their contract claim, *see White v. Symetra Assigned Benefits Serv. Co.*, No. C20-1866 MJP, 2021 WL 3472408, at *11 (W.D. Wash. Aug. 5, 2021) ("Plaintiffs' contract-based claims relate to the anti-assignment provisions in settlement agreements, including 'power language.'"), they have failed to establish a causal link between Defendants' conduct and purported harm to putative class members on that basis.

claim where "evidence demonstrates that at least some class members elected to proceed with the loans in question despite the risks complained about in this litigation"); *Wetzel v. CertainTeed Corp.*, No. C16-1160JLR, 2019 WL 3976204, at *18 (W.D. Wash. Mar. 25, 2019) (denying certification where "individualized inquiries into both the causation and injury elements of Plaintiffs' CPA claim will overwhelm" common questions).

Unable to avoid the causation requirement or demonstrate any way to prove causation through common proof, Plaintiffs resort to the feeble argument that causation can be assumed on a classwide basis, citing *Kennedy v. Jackson Nat'l Life Ins. Co.*, to argue that this Court can make a "common sense inference" of causation. Mot. at 23. *Kennedy* is inapposite. There, the court determined that causation could be inferred classwide where the poor performance of an annuity was uniformly omitted from the putative class, reasoning that it was unlikely any class member would have purchased defendants' unsatisfactory investment product had its poor performance been disclosed. No. C 07-0371 CW, 2010 WL 2524360, at *8 (N.D. Cal. June 23, 2010). Here, Plaintiffs cannot point to any fact uniformly concealed from the putative class at all, let alone a fact as material as the poor performance of an investment product being marketed to them. Indeed, *Kennedy* emphasized that the "common sense" inference depended on this uniform and plainly material omission, observing that such an inference would be inappropriate where, as here, "an individualized inquiry [would be required] into which documents each class member received." *Id.*

Plaintiffs next rely on the declaration of their purported damages expert, claiming that Zass' analysis demonstrates that causation can be assumed across class members under Zass' "fair commutation" theory and "expectation" theories of alleged damages. *See* Mot. at 21–22. Zass does not even seriously purport to opine on causation and makes no attempt to connect

Defendants' alleged misconduct with payees' alleged injury—the essence of causation. Nor could he: Zass is an actuary and does not claim to be qualified to determine causation. Dkt. No. 63-1 at 2. Plaintiffs' argument improperly asks this Court to relieve Plaintiffs of their obligation to prove causation and reliance on a classwide basis, and to skip straight to damages. This approach finds no support in the law of this Circuit. *See In re NCAA I-A Walk-On Football Players Litig.*, No. C04-1254C, 2006 WL 1207915, at *8 (W.D. Wash. May 3, 2006) (rejecting classwide damages theory where plaintiffs lacked "specific calculations—along with the inseparable proof of causation" which, in turn, would "present significant individual issues for each class member"); *Saavedra v. Eli Lilly & Co.*, No. 2:12-cv-9366-SVW, 2014 WL 7338930, at *9 (C.D. Cal. Dec. 18, 2014) (denying certification given "concerns regarding common proof of causation and injury are compounded by the problems with Plaintiffs' damages model").

### E. Injury Cannot Be Established Through Common Proof on a Classwide Basis

#### 1. Plaintiffs' Theory of Injury is Highly Individualized

Individualized questions of injury provide an independent basis to deny Plaintiffs' Motion, as mini-trials would be required to determine whether each member of the putative class was injured. Plaintiffs' claims require them to establish that purported class members were harmed, an inquiry that cannot be satisfied by classwide proof. 18 U.S.C. § 1962(c) (injury an element of civil RICO); *Grande v. U.S. Bank Nat'l Ass'n*, No. C19-333 MJP, 2019 WL 3238471, at *5 (W.D. Wash. July 18, 2019) (injury an element of CPA claim); *Bailey-Medwell v. Hartford Life & Accident Ins. Co.*, No. C17-1697-MJP, 2018 WL 5264335, at *3 (W.D. Wash. Oct. 23, 2018) (injury an element of breach of contract); *Elec. Recycling Ass'n of Alberta v. Basel Action Network*, No. C18-1601-MJP, 2019 WL 1453575, at *4 (W.D. Wash. Apr. 2, 2019) (injury an element of tortious interference); *Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*, 40 P.3d 1206, 1217 (Wash. Ct. App. 2002) (injury an element of breach of fiduciary duty); *Su v.*

*Henry Glob. Consulting Grp.*, No. 2:20-cv-02235-ODW (PLAx), 2022 WL 19392, at *4 (C.D. Cal. Jan. 3, 2022) (injury an element of civil conspiracy); *Alvarado v. Microsoft Corp.*, No. C09-189 MJP, 2010 WL 715455, at *4 (W.D. Wash. Feb. 22, 2010) (unjust enrichment requires "retained . . . benefit without providing value") (internal citation omitted).

Plaintiffs appear to contend that the mere fact of engaging in a factoring transaction establishes injury (and that members of the sub-class suffered an additional injury in relation to the anti-assignment language). *See* Mot. at 19, 21 (payees injured "in surrendering their rights to future payments under the agreements"). While Plaintiffs' allegation may have been sufficient at the pleading stage where this Court could accept Plaintiffs' assertions on their face, *White*, 2021 WL 3472408, at *11, the burden for class certification is far higher. Plaintiffs must now demonstrate through common proof that each and every class member was actually harmed as a result of their transfer, notwithstanding that each putative class member affirmed otherwise. *See W. States Wholesale, Inc. v. Synthetic Indus., Inc.*, 206 F.R.D. 271, 277 (C.D. Cal. 2002) (requiring that each class member prove injury as a result of the false advertising).

This Court's analysis of injury would be highly individualized. Among other issues, this Court would need to evaluate the amount of the future payments the payee transferred and the lump sum the payee received, compare a payee's financial circumstances after the transfer to their financial circumstances absent the transfer, analyze a payee's financial needs (including other sources of income, dependents, and financial situation), consider whether the payee would have factored with another company and the likelihood any payee would have received more money from another company, and the expected value of future payments (accounting for life expectancy). Again, named Plaintiffs White and Nadeau demonstrate the individualized inquiries required to determine injury. Plaintiff White previously factored with several different

third-party companies, suggesting he would have again factored his payments with a third-party company if he could not do so with Defendants. White agreed that the transfer was in his "best interests at that time," and the only reason he believes today that the transaction was not actually in his best interest is his (mistaken) belief that his life-contingent payments could have been inherited by his daughter if not sold. Ex. 19 at 146:8–13, 147:13–148:21.

Plaintiff Nadeau claimed that he was harmed by Defendants because he "didn't realize for how long" he was selling his right to receive structured settlement payments, *see* Ex. 18 at 63:6–9, notwithstanding that he received numerous disclosures identifying this very information, and he repeatedly confirmed to state court judges evaluating the transfers that he understood the exact terms of the transactions. Nadeau also acknowledged that certain of his factoring transactions with SABSCO were to pay an urgent tax bill on a rental property that was overdue and foreclosure was imminent. While Nadeau claimed when deposed in this case that he would have found another way to get these funds, he could not identify how he would have done so, and repeatedly told Defendants and testified under oath to the state courts approving the transfers that he had no other option. Ex. 18 at 103:15–22; Ex. 21 at PL_00000204:20–24, PL_00000210:15–21. Nadeau also agreed that if he had not paid the tax bill, he would have lost the property and the monthly rental income, which exceeded the amount of payments sold. *See* Ex. 18 at 103:15–22. In light of this evidence that Nadeau would have suffered greater financial harm if he had not engaged in a factoring transaction, determining whether and to what extent Nadeau was injured will require a fact-finder to gauge the credibility of Mr. Nadeau's current contention that he was harmed against the statements he made to Defendants and the state courts at the time of his transfers, an individualized inquiry that is incompatible with class treatment.

As these examples demonstrate, the payee-by-payee inquiry that will be required relates

not merely to individual differences in calculating damage amounts, but also to the "fact of damages," which is a "threshold question of causation and injury in fact." *Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 970 (S.D. Cal. 2016); *Grochowski v. Daniel N. Gordon, P.C.*, No. C13-343 TSZ, 2015 WL 3407441, at *7 (W.D. Wash. May 26, 2015) (denying class certification where "individual issues concerning injury and causation predominate over any questions of law or fact common to all . . . class members").

## 2. Plaintiffs' Expert Report Does Not Make Injury Susceptible to Classwide Proof

Contrary to Plaintiffs' claims, Zass' expert report[13] does not obviate the need for individualized proof of injury. Zass, an actuary, does not purport to have any qualifications to determine whether a transaction harmed any particular payee, and considers no evidence regarding any particular payee's financial circumstances, understanding of the transaction, underlying financial exigency, or available funding alternatives. Although Zass throws the word "injury" into his report a handful of times, *see* Dkt. No. 63-1 at 5, he does no separate work on that topic; instead, his analysis is entirely about damages and is an effort to establish methodologies for measuring aggregate damages on a classwide basis. The question of injury, however, is very different and cannot be presumed from a purported damages analysis, especially one that simply assumes that every payee who factored during the class period is entitled to recover. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188 (3d Cir. 2001), *as amended* (Oct. 16, 2001) ("even if plaintiffs could present a viable formula for calculating damages . . . defendants could still require individualized proof of

---

[13] Defendants reserve the right to challenge Zass' expert report for failure to satisfy the requirements set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993), and to—at an appropriate time—submit a report from a rebuttal expert.

economic loss").

## F. Myriad Other Individualized Inquiries Would Be Required, Further Defeating Predominance

In addition to the individualized inquiries required to determine the communications between each member of the putative class and Defendants, whether each individual class member relied on these purported misrepresentations, and whether the purported misrepresentations caused any particular class member any injury, Plaintiffs' claims present numerous other individualized issues that weigh further against certification.[14]

### 1. Plaintiffs Fail to Provide Any Legal or Factual Basis to Impose a Fiduciary Duty on a Classwide Basis

Plaintiffs identify no legal basis to impose any fiduciary duty on Symetra or SABSCO on a classwide basis. The only conceivable basis for this Court to conclude that Defendants owed any payee a fiduciary duty would be based on the individualized relationship between Defendants and that specific payee, which Plaintiffs claim was in each instance a relationship of "trust." Adjudicating Plaintiffs' claim for breach of fiduciary duty would therefore require an individualized analysis of each payee's circumstances to determine whether a fiduciary relationship existed (and whether any such duty was breached) based on each putative class member's understanding of his or her relationship with Defendants and surrounding financial circumstances, which this court recognized in its decision on Defendants' motion to dismiss is "quintessentially an issue of fact." *White*, 2021 WL 3472408, at *12; *see Liebergesell v. Evans*, 613 P.2d 1170, 1176 (Wash. 1980) (fiduciary relationship may exist where one "is a trustee, executor, administrator" or an "agent, attorney, [or] trusted business advisor"); *Brown v. NFL*

---

[14] Moreover, as will be argued in Defendants' forthcoming opposition to Plaintiffs' Motion for Summary Judgment on Choice of Law issues, determining the applicable state law for the claims of each putative class member will present additional individualized inquiries.

*Players Ass'n*, 281 F.R.D. 437, 444 (C.D. Cal. 2012) (individual issues predominate where "determining whether an agency relationship actually exists for each class member would require an individualized analysis"); *Stratton v. Am. Med. Sec., Inc.*, 266 F.R.D. 340, 352 (D. Ariz. 2009) (claims that "arise out of the facts of a specific relationship" not well-suited to a class action). Further, not only have Plaintiffs failed to show that any member of the putative class would be able to establish a fiduciary relationship, Plaintiffs' underlying structured settlement agreements each makes clear that payees are a "general creditor." *See* Dkt. No. 32-2 at 12 ("Plaintiff [Nadeau] is and shall be a general creditor . . . "); Ex. 26, PL_00000465. Plaintiffs cite no authority establishing a fiduciary duty based on an arms-length financial transaction governed by contract.

Plaintiffs' attempts to claim that a fiduciary duty can be assumed on a classwide basis based on Symetra Life's role as issuer of the underlying structured settlement annuity, *see* Mot. at 29, has no support in case law. *See, e.g.*, *Almon v. State Farm Fire & Cas. Co.*, 724 F. Supp. 765, 766 (S.D. Cal. 1989) (insured cannot maintain a claim against an insurer for breach of fiduciary duty); *Abbit v. ING USA Annuity & Life Ins. Co.*, 252 F. Supp. 3d 999, 1023 (S.D. Cal. 2017), aff'd, 774 F. App'x 351 (9th Cir. 2019); *Cordero v. Transamerica Annuity Serv. Corp.*, 452 F. Supp. 3d 1292, 1303 (S.D. Fla. 2020); *Taylor v. N.Y. Life Ins. Co.*, No. 19 Civ. 6830 (VM), 2021 WL 467127, at *7 (S.D.N.Y. Feb. 9, 2021) (no fiduciary relationship between payee under structured settlement annuity and insurer because "plaintiffs have not alleged that Defendants provided 'advice and counsel in business matters involving a certain degree of trust'"); *Reisland v. Nenana Heating Servs.*, 1998 U.S. Dist. LEXIS 23764, at *16 (D. Ala. Mar. 31, 1998)(annuity creates debtor/creditor relationship). Plaintiffs failed to plead facts adequate to establish any other basis for a fiduciary relationship, such as those that exist where one "is a

trustee, executor, administrator" or an "agent, attorney, [or] trusted business advisor."

*Liebergesell*, 613 P.2d at 1176 (quoting Restatement of Contracts § 472). The only conceivable way Defendants could owe any member of the putative class a fiduciary duty is based on the facts specific to that particular payee, requiring individualized inquiries that would defeat predominance. *Smith v. First Am. Title Ins. Co.*, No. C11-2173 TSZ, 2014 WL 2511621, at *4 (W.D. Wash. June 4, 2014) (denying class certification where an assessment of whether Defendant violated a "regulation, or any similar or related contractual or fiduciary duties, would require an individualized inquiry . . . [that] must be conducted manually for each transaction").

### 2. Efforts to Toll the Statutes of Limitation Are Individualized

Plaintiffs' putative class purports to include payees with transfers dating back to 2005, requiring individualized inquiries to determine whether tolling applies. Plaintiff bears the burden of alleging facts which would give rise to tolling under each state's law. *Hinton v. Pac. Enter.*, 5 F.3d 391, 395 (9th Cir. 1993). Plaintiffs fail to explain how they can prove that their individual claims can be tolled as to White and Nadeau, let alone how tolling can be proven classwide based on common proof and common law. Moreover, neither named Plaintiff has identified "any new information that was previously unavailable to, or concealed from, [them]," much less new information that would justify tolling. *See Denham v. Cease*, No. 2:14-CV-281-RMP, 2015 WL 94742, at *3 (E.D. Wash. Jan. 7, 2015). Courts routinely deny certification where statute of limitations defenses would require them to determine which state's laws governs for each payee, determine the applicable statute of limitations for each claim, and evaluate payee-specific evidence to determine whether tolling is warranted, inquiries that would dwarf any common questions.[15] *Contos v. Wells Fargo Escrow Co., LLC*, No. C08-838Z, 2010 WL 2679886, at *7

---

[15] For example, White admitted he has all documents related to his periodic payments and prior factoring transactions available to him since 2011 (in a bag in his closet). *See* Ex. 19 at 73:5–25. The only information he

(W.D. Wash. July 1, 2010) (denying certification where individualized factual inquiries required to determine statute of limitations defense, or application of equitable tolling); *see also Moussouris v. Microsoft Corp.*, No. C15-1483JLR, 2016 WL 6037978, at *8 (W.D. Wash. Oct. 14, 2016) ("even if one or more would-be class members can make an individualized showing that justifies equitable tolling of her claims, the requisite individualized inquiry runs counter to FRCP 23 and renders the claims unsuited to [class] adjudication").

### 3.    Any Claim Based on "Anti-Assignment" Language Requires Individualized Inquiries Unfit for Classwide Treatment

Plaintiffs cite no authority for their theory that these provisions would or should have barred any transfers.  To the extent Plaintiffs claim that the existence of language limiting the power of a putative class member to assign payments is relevant to their claims (an argument that is not clear on the face of Plaintiffs' Motion) and to the claims of the putative subclass, any such inquiry would require individualized inquiries incompatible with the requirements of Rule 23.  First, as discussed above, courts have generally recognized that these provisions are intended to protect the obligor from loss of favorable tax treatment.  The obligor (here SABSCO) may waive the provision and consent to assignment.  *See, e.g.*, *CGU Life Ins. Co. of Am.*, 131 F. Supp. 2d at 679 ("insurance companies, like Plaintiffs here, who assume the liability to make periodic payments on account of a personal injury are eligible for favorable tax treatment . . . " and that "the potential for increased tax liability is the risk which the anti-assignment clause was designed to protect against").  Plaintiffs fail to cite to any authority holding an *obligor* liable for alleged breach of this provision.  *See, e.g.*, *Taylor*, 2021 WL 467127, at *7 (dismissing breach of

claims to have learned since completing the transfer is his (incorrect belief) that life-contingent payments could be passed on to a beneficiary if not sold to Defendants. *See id.* at 148:5–17. Similarly, Nadeau did not identify a single fact now known to him that was not known before, and explained only that he later concluded the transfer had not been in his interest after he fell "in great debt at different times." Ex. 18 62:7–12.

contract claim because anti-assignment language did not impose obligation "to investigate, oppose, or otherwise intervene in [payee's] assignment attempts); *Cordero*, 452 F. Supp. 3d at 1303 (dismissing breach of contract claim and rejecting theory that "duty of good faith and fair dealing [can] redefine or otherwise expand an annuity issuer's contractual obligations through the anti-assignment provision").

Second, even if Plaintiffs had a cognizable theory of liability (and they do not), they have not shown it is susceptible to classwide proof. Plaintiffs provide no evidence that these provisions are uniform across members of the putative class, and the record shows they are not. A payee-by-payee review would be required to determine the specific provision applicable to any particular payee, if any. For example, some anti-assignment language did not reference the "power" to assign payments, *see* Ex. 14 at DEFESI_055506 ("None of the Periodic Payments may be accelerated, deferred, increased or decreased and may not be anticipated, sold, assigned, or encumbered."), and anti-assignment language varies widely where it exists:

- White's settlement agreement lists the anti-assignment provision under the caption: "LIMITATIONS OF CLAIMANT'S RIGHT TO PAYMENTS WITHIN THE MEANING OF IRS RULING 79-220," evidencing the intent to interpret the anti-assignment provision as a tax saving provision. Ex. 26 at PL_00000465. See also Ex. 27.

- Nadeau's states: "Said payments cannot be accelerated, deferred, increased or decreased by the Plaintiff and no part of the payments called for herein or any assets of the Defendant are to be subject to execution or any legal process for any obligations in any manner, nor shall the Plaintiff have the power to sell or mortgage or encumber same, or any part thereof, nor anticipate the same, or any part thereof, by assignment or otherwise." AC ¶ 81

- Another agreement specifically states the anti-assignment provision is for the benefit of the insurer: "Insurer shall not segregate or set aside any of its assets to fund the payments to Plaintiff or any payee required under this Agreement, **it being understood that Plaintiff is and shall be a general creditor to Insurer.** Payments cannot be accelerated, deferred, increased or decreased by Plaintiff or any payee. Neither Plaintiff nor any payee may assign, anticipate, pledge or encumber said payments and any attempt to do so **shall not bind insurer.**" *See* Ex. 15 at DEFESI_049730 (governed by Arizona law)(emphasis added).

- Yet another expressly limits any rights of the payee against Symetra Life (fka Safeco Life) to

that of a "general creditor": 'The obligations of Safeco Life Insurance Company to make the periodic payments to Claimants as set forth in paragraph 6 above are unfunded and unsecured obligations to pay money in the future. **Claimants acknowledge and agree that (i) their rights against Safeco Life Insurance Company are those of a general creditor**; . . . and (iv) Claimants have no right to accelerate, defer, increase or decrease any payment required to be made to them, or either of them , by the above named company . . . ." *See* Ex. 16 at DEFESI_086691–92 (governed under California law)(emphasis added).

Third, the Court would also need to interpret such provisions using applicable state law, which is typically set forth in the settlement agreement. State laws vary materially regarding the enforceability of such provisions. For example, in California, contractual anti-assignment provisions are generally ineffective. *See 321 Henderson Receivables Origination LLC v. Sioteco*, 173 Cal. App. 4th 1059, 1076 (Cal. Ct. App. 2009) (anti-assignment provisions do not bar court-approved structured settlement payment transfers where "no interested parties object to the transfer . . . rights, the anti-assignment provisions in the annuity contract, settlement agreement or other related contracts"). Illinois law, in contrast, instructs that anti-assignment clauses in structured settlement agreements are for the benefit of the payee and obligor and waiver by the payee must be expressly evidenced. *In re Nitz*, 739 N.E.2d 93, 103 (Ill. App. Ct. 2000). More fundamentally, Plaintiffs point to no authority supporting the notion that such language could be used to invalidate a transfer previously approved by a state court, or that Defendants withheld any particular language from the state courts approving the transfer.

Finally, Defendants will have individualized defenses including waiver and ratification to the application of the anti-assignment language, requiring payee-specific mini-trials incompatible with class treatment. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it'"); *see also Kogan v. Allstate Fire & Cas. Ins. Co.*, No. C15-5559 BHS, 2019 WL 2084425, at *7 (W.D.

Wash. Mar. 15, 2019) (individualized defenses inconsistent with class treatment); *Barraza v. C. R. Bard Inc.*, 322 F.R.D. 369, 390 (D. Ariz. 2017) (denying certification where "affirmative defenses [were] likely to apply differently to the class members than to the named Plaintiffs"). White and Nadeau confirmed that they were aware of these provisions prior to transferring their payments to Defendants and warranted to the state courts that he "ha[d] the power and right to enter into this agreement." Dkt. No. 32-2 at 19 (Nadeau); Dkt. No. 32-4 at 17 (White); Dkt. No. 32-5 at 5 (White). As these facts show, Defendants would be entitled to conduct individualized inquiries for each member of the putative class (and subclass) to determine whether defenses of waiver and ratification apply, requiring analysis of contractual provisions, varying state laws, and what the payee (and the state court) understood about the effect of such provisions on the requested transfer. *See 321 Henderson Receivables Origination LLC*, 173 Cal. App. 4th at 1072.

## G. Plaintiffs Cannot Show Unjust Enrichment on a Classwide Basis

Plaintiffs' unjust enrichment claim likewise cannot survive the "rigorous analysis" required by Rule 23. First, applicable law is clear that "parties to a valid, binding contract may not claim unjust enrichment on the same matters governed by that contract." *Empire Health Found. v. CHS/Cmty. Health Sys. Inc.*, 370 F. Supp. 3d 1252, 1264 (E.D. Wash. 2019); *see also Lowden v. T-Mobile USA, Inc.*, No. C05-1482 MJP, 2009 WL 537787, at *3 (W.D. Wash. Feb. 18, 2009) ("[w]here parties have an express contract, they 'may not disregard the same and bring an action on an implied contract relating to the same matter, in contravention of the express contract'"). Plaintiffs' relationship with Defendants was governed by contract, and they therefore cannot sustain an unjust enrichment claim—either as a class, or individually. *See, e.g., Minnick v. Clearwire US, LLC*, 683 F. Supp. 2d 1179, 1186–87 (W.D. Wash. 2010) ("a plaintiff who is a party to a valid express contract is bound by the provisions of that contract and may not bring a claim for unjust enrichment for issues arising under the contract's subject matter").

Even if Plaintiffs' unjust enrichment claim was legally viable (and it is not), Plaintiffs cannot show "unjust circumstances" on a classwide basis, as individualized inquiries would be required to determine whether, for any particular payee, the transfer was unfair or harmful. *See Norcon Builders, LLC v. GMP Homes VG, LLC*, 254 P. 3d 835, 844 (2011) ("it is critical that the enrichment be unjust both under the circumstances and as between the two parties to the transaction"). This inquiry is inherently individualized, further defeating predominance.

## II.     PLAINTIFFS FAIL TO MEET RULE 23(b)'S SUPERIORITY REQUIREMENT

Plaintiffs fail to demonstrate that a class action is "superior to other available methods for fairly and efficiently adjudicating" this case because the individualized inquiries described above present insurmountable manageability problems. Fed. R. Civ. P. 23(b)(3); *Newton*, 259 F.3d at 192. Where, as here, "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Zinser v. Accufix Rsch. Inst. Inc.*, 253 F.3d at 1192; *see also Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 484 (N.D. Cal. 2017) ("[C]lass action treatment is not superior to case-by-case lawsuits because any classwide trial would be derailed by individualized inquiries").

Nor is this a case where individual recoveries would be so small as to effectively bar any individual plaintiff from recovering; to the contrary, to the extent any member of the putative class has a valid claim, he or she can bring such a claim and adjudicate the specific circumstances pertinent to Defendants' specific conduct. *See In re NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915, at *14 (class treatment not superior where individual recovery "likely would be substantial enough to encourage individual plaintiff suits . . . and the cost of subsequent litigation would be insubstantial for future plaintiffs").

### CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion for Class Certification.

Dated: March 29, 2022

By: /s/ Medora A. Marisseau
Medora A. Marisseau, WSBA# 23114
KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: 206-223-1313
Facsimile: 206-682-7100
Email: MMarisseau@karrtuttle.com

Maeve L. O'Connor (appearance *pro hac vice*)
Susan Reagan Gittes (appearance *pro hac vice*)
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000

# CERTIFICATE OF SERVICE

I, Luci Brock, affirm and state that I am employed by Karr Tuttle Campbell in King County, in the State of Washington. I am over the age of 18 and not a party to the within action. My business address is: 701 Fifth Ave., Suite 3300, Seattle, WA 98104. On this day, I caused a true and correct copy of the foregoing document to filed with the Court and to be served on the parties listed below in the manner indicated.

| | |
|---|---|
| Lynn Lincoln Sarko, WSBA #16569<br>Gretchen Freeman Cappio, WSBA #29576<br>Adele A. Daniel, WSBA #53315<br>Alison E. Chase, *pro hac vice*<br>KELLER ROHRBACK, LLP<br>1201 Third Avenue, Suite 3200<br>Seattle, WA 98101-3052<br>Tel.: (206) 623-1900<br>Fax: (206) 623-3384<br>lsarko@kellerrohrback.com<br>gcappio@kellerrohrback.com<br>adaniel@kellerrohrback.com<br>achase@kellerrohrback.com<br>*Attorneys for Plaintiffs* | ☒ Via U.S. Mail<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail<br>☐ Via Overnight Mail<br>☒ CM/ECF via court's website |
| Jerome M. Marcus<br>Jonathan Auerbach<br>MARCUS & AUERBACH LLC<br>1121 N. Bethlehem Pike, Suite 60-242<br>Spring House, PA 19477<br>Tel.: (215) 885-2250<br>Fax: (888) 875-0469<br>jmarcus@marcusauerbach.com<br>auerbach@marcusauerbach.com<br>*Attorneys for Plaintiffs* | ☒ Via U.S. Mail<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail<br>☐ Via Overnight Mail<br>☒ CM/ECF via court's website |
| Edward Stone<br>Lisa A. Salmons<br>EDWARD STONE LAW P.C.<br>175 West Putnam Avenue, 2nd Floor<br>Greenwich, CT 06830<br>Tel.: (203) 504-8425<br>Fax: (203) 348-8477<br>eddie@edwardstonelaw.com<br>lisa@edwardstonelaw.com<br>*Attorneys for Plaintiffs* | ☒ Via U.S. Mail<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail<br>☐ Via Overnight Mail<br>☒ CM/ECF via court's website |

| | |
|---|---|
| Maeve L. O'Connor, *pro hac vice* | ☐ Via U.S. Mail |
| Susan Reagan Gittes, *pro hac vice* | ☐ Via Hand Delivery |
| Debevoise & Plimpton LLP | ☒ Via Electronic Mail |
| 919 Third Avenue | ☐ Via Overnight Mail |
| New York, NY 10022 | ☒ CM/ECF via court's website |

Maeve L. O'Connor, *pro hac vice*
Susan Reagan Gittes, *pro hac vice*
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Telephone: 212-909-6000
moconnor@debevoise.com
srgittes@debevoise.com
*Attorneys for Defendants*

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct, to the best of my knowledge.

Executed on this 29th day of March, 2022, at Seattle, Washington.

s/Luci Brock
Luci Brock
Litigation Legal Assistant

#5149319 v1 / 42726-394