1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9

10

RENALDO WHITE and RANDOLPH
NADEAU, individually and on behalf
of all others similarly situated,

CASE NO. 20-1866 MJP

11

12

Plaintiffs,

ORDER ON PLAINTIFFS'
MOTION FOR CLASS
CERTIFICATION

13

v.

14

SYMETRA ASSIGNED BENEFITS
SERVICE COMPANY; SYMETRA
LIFE INSURANCE COMPANY,

15

16

Defendants.

17

18        This matter comes before the Court on Plaintiffs' Motion for Class Certification. (Dkt.

19   No. 62.) Having review the Motion, the Opposition (Dkt. No. 79), the Reply (Dkt. No. 90), the

20   Surreply (Dkt. No. 100), and all supporting materials, and having held oral argument on the

21   Motion on July 13, 2022, the Court GRANTS in part and DENIES in part the Motion.

22   //

23   //

24

# BACKGROUND

This case involves Defendant Symetra Assigned Benefits Service Company's ("SABSCO") and Defendant Symetra Life Insurance Company's ("Symetra") purchase of future payments under structured settlement annuities ("SSAs") they administered. Plaintiffs are two individuals who settled personal-injury lawsuits for lump sum and periodic payments. The tortfeasors in those settlements assigned their obligations to make periodic payments to SABSCO. SABSCO then purchased an SSA from its affiliate Symetra to fund and administer the future payments. Plaintiffs later sold their rights to future payments to SABSCO in exchange for immediate lump sum payments at a significant discount.

Plaintiffs allege Defendants' solicitation of their rights to the future payments under the SSAs was predatory and the result of an illegal business scheme designed to induce annuitants into selling their future payments at a steep discount. Plaintiffs pursue the following claims: (1) Violations of the Racketeer Influenced and Corrupt Organizations Act; (2) Violations of the Washington Consumer Protection Act; (3) Violation of the duty of good faith and fair dealing; (4) Breach of fiduciary duty against Symetra; (5) Breach of fiduciary duty against SABSCO; (6) Breach of contract; (7) Tortious interference with contract; (8) Civil conspiracy; and (9) Unjust enrichment. Plaintiffs bring this action individually and on behalf of others who similarly sold their right to future payments to Defendants.

## A.  Facts Relevant to Class Certification

The Court briefly reviews some background on SSAs and the business practices at issue in this action.

SSAs arose as a way to ensure tort victims received money regularly in order to care for their long-term needs. (Pls. Mot. for Class Cert. at 2 (Dkt. No. 62).) Rather than receive one

large, lump-sum payment, tort victims could opt to receive a structured settlement that took the form of period payments. (<u>Id.</u>) Through a structured settlement, the tortfeasor assigns their payment obligations to an assignment company. (<u>Id.</u>) Structured settlement agreements often include an anti-assignment clause stating that annuitants lack the power to transfer their future SSA payments (also called "power language"). (Amended Complaint ¶ 79 (Dkt. No. 28).) Assignment companies would then purchase an annuity from a highly rated life insurance company to fulfill the ongoing payment obligations. (Pls. Mot. for Class Cert. at 2.) When payments were contingent on the length of a tort victim's life, the companies collected medical information. (<u>Id.</u>) Congress later passed the Periodic Payment Settlement Act which made the creation and sale of SSAs tax-free to the annuitants. The Act also allows assignment companies to avoid paying income tax so long as it assumes all of the periodic payment obligations of the responsible party, and provided the periodic payments made to the annuitant are tax free. (Am. Compl. ¶ 34.)

Defendant Symetra issued SSAs from 1984 until 2005. Defendant SABSCO operated as an assignment company. In the early 2000s Symetra funded a study analyzing the future profitability of SSAs. (Pls. Mot. for Class Cert at 3.) The study concluded that SSAs could become unprofitable for insurance companies, but it would take many years to determine. (<u>Id.</u>) In 2005, Defendants started engaging in factoring transactions, which are transactions that provide annuitants an immediate lump sum payment in exchange for the annuitants' future payments. (<u>Id.</u> at 3-4.) These transactions are disapproved of in the SSA industry because the lump sum is typically heavily discounted from the total value of the future payments. (<u>See</u> <u>id.</u> at 10-12.) Defendants' new factoring business utilized SABSCO as the company providing the monthly payments to annuitants to create "funding services" that were solicited to annuitants. (<u>Id.</u> at 4.)

These "funding services" were really an offer to buy annuitants' right to receive future payments under their SSAs. (Declaration of Alison Chase, Ex. 3 at DEF_001600 (Dkt. No. 63).) When an annuitant agreed to sell future payments, Defendants provided a discounted rate of the future benefits. (Id.) Once an annuitant sells the future payments, Symetra is no longer obligated to make those future payments. (Am. Compl. ¶ 67.) By offering to purchase the future payments at a steeply discounted rate, Defendants profit by keeping the remaining amount of the SSA, which they retain tax free. (Id.) Defendants began marketing this service to annuitants for whom they were already administering SSAs. Plaintiffs allege that Defendants utilized the information they already had on annuitants to target their factoring solicitations. (Pls. Mot. for Class Cert. at. 6.) Further, Plaintiffs claim that Defendants preyed upon annuitants' trust in Defendants as the issuer of their annuities, without disclosing their profit-motive and conflict of interest.

**B.     Facts Relevant to the Named Plaintiffs**

Plaintiffs resolved personal-injury claims through structured settlements which included lump-sum payments and future periodic payments. (Am. Compl. ¶¶ 7-8.) Plaintiff Renaldo White was injured after being hit by a truck at age ten. (Id. at ¶ 7.) As a result, White received a settlement designed to be paid out over the course of his lifetime. (Id. at ¶ 90.) White's settlement agreement states that he shall not have the power to sell, mortgage, anticipate or encumber any of these payments. (Id. at ¶ 80.) In order to receive periodic payments, White became the recipient or "annuitant" of an SSA, purchased and owned by SABSCO, and issued by SAFECO (n/k/a Symetra), which provided the periodic payments. (Id. at ¶ 91.) White later sold his right to monthly payments worth $695,000 to SABSCO in exchange for $18,609 in a lump sum amount. (Id. at ¶¶ 92-93.)

1  Plaintiff Randolph Nadeau suffered a serious workplace injury. (Am. Compl. at ¶ 96.) He

2  brought an action against his company, which ultimately settled with an agreement that Nadeau

3  would receive a cash sum and a series of periodic payments for the course of his life. (Id. at ¶

4  97.) Nadeau's settlement agreement also contained language almost identical to White's denying

5  him the ability to sell or assign his future payments. (Id. at ¶ 81.) Due to Nadeau's settlement, he

6  became the annuitant of an SSA purchased and owned by SABSCO and issued by SAFECO

7  (k/n/a Symetra), which provided him monthly payments. (Id. at ¶ 98.) Nadeau sold his right to

8  future payments to SABSCO on four occasions. (Id. at ¶ 99.) Each instance resulted in Nadeau

9  receiving substantially less than he would have had he continued to receive the monthly

10  payments.

11  **C.     Proposed Class Definitions**

12  Plaintiffs seek to certify the following class and subclass:

13  **<u>Nationwide Class</u>**

14  "All persons who are or were, at any time, annuitants of an SSA that contemplated life
   contingent payments issued by Symetra and who subsequently sold to a Symetra affiliate
15  the right to receive payments from that SSA in a factoring transaction."

16  **<u>Void Ab Initio Subclass</u>**

17  "All members of the Class whose contract defining the annuity at issue included language
   explicitly stating that the annuitants lack the power to transfer their future SSA
18  payments."

19  **ANALYSIS**

20  **A.     Class Certification Standard**

21  Courts must undertake a "rigorous analysis" of all the Rule 23 factors to determine

22  whether to certify a class. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011). The

23  plaintiff must first meet all four requirements in Rule 23(a): numerosity, commonality, typicality,

24

1    and adequacy of representation. See Leyva v. Medline Indus., 716 F.3d 510, 512 (9th Cir. 2013);

2    Fed. R. Civ. P. 23(a). The plaintiff must also satisfy one of the Rule 23(b) factors. Here,

3    Plaintiffs seek certification under the "predominance" standard of Rule 23(b)(3). To obtain

4    certification of a class action for money damages under Rule 23(b)(3), a putative class must

5    establish that "the questions of law or fact common to class members predominate over any

6    questions affecting only individual members." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568

7    U.S. 455, 460.

8           Plaintiffs must demonstrate predominance and superiority under Rule 23(b)(3) by a

9    preponderance of the evidence. See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods

10   LLC, 993 F.3d 774, 784 (9th Cir. 2021). "Establishing predominance, therefore, goes beyond

11   determining whether the evidence would be admissible in an individual action" and "[i]nstead, a

12   'rigorous analysis' of predominance requires 'judging the persuasiveness of the evidence

13   presented' for and against certification.'" Id. at 785-86 (quoting Ellis v. Costco Wholesale Corp.,

14   657 F.3d 970, 982 (9th Cir. 2011). And in ruling on the motion for class certification "[c]ourts

15   must resolve all factual and legal disputes relevant to class certification, even if doing so

16   overlaps with the merits." Id. at 784 (citing Wal-Mart, 564 U.S. at 351).

17   **B.      Rule 23(a)(1): Numerosity**

18          Numerosity exists when "the class is so numerous that joinder of all members is impractical."

19   Fed. R. Civ. P. 23(a)(1). "The numerosity requirement requires examination of the specific facts

20   of each case and imposes no absolute limitations." Gen. Tel. Co. of the Nw. v. Equal Emp.

21   Opportunity Comm'n, 446 U.S. 318, 330 (1980).

22          Plaintiffs have shown—and Defendants do not contest—that numerosity is satisfied.

23   Plaintiffs identify at least 1,961 members of the nationwide class based on Defendants'

24

1   interrogatory responses. (Chase Dec. Ex. 52.) Plaintiffs also assert that subclass members

2   number in the hundreds. (Am. Compl. ¶ 106.) The Court finds numerosity requirement of Rule

3   23(a)(1) is met and that joinder is impractical. See A. B. v. Hawaii State Dep't of Educ., 30 F.4th

4   828, 836–37 (9th Cir. 2022) (finding a prospective class of 300 members to satisfy

5   numerosity); Ikonen v. Hartz Mountain Corp., 122 F.R.D. 258, 262 (S.D. Cal. 1988) (noting that

6   "classes of 40 or more are numerous enough").

**C.      Rule 23(a)(3): Typicality**

8        To demonstrate typicality, Plaintiffs must show that the named plaintiffs' claims are typical

9   of the class. Fed. R. Civ. P. 23(a)(3). "The test of typicality 'is whether other members have the

10   same or similar injury, whether the action is based on conduct, which is not unique to the named

11   plaintiffs, and whether other class members have been injured by the same course of conduct."

12   Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). "Typicality

13   refers to the nature of the claim or defense of the class representative, and not to the specific

14   facts from which it arose or the relief sought." Id. (internal citation and quotation omitted). "The

15   requirement is permissive, such that "representative claims are 'typical' if they are reasonably

16   coextensive with those of absent class members; they need not be substantially identical." Just

17   Film, Inc. v. Buono, 847 F.3d 1108, 1116 (9th Cir. 2017) (quoting Parsons v. Ryan, 754 F.3d

18   657, 685 (9th Cir. 2014)). "The purpose of the typicality requirement is to assure that the interest

19   of the named representative aligns with the interests of the class." Hanon, 976 F.2d at 508.

20        Named Plaintiffs' claims are typical of the class and subclass, and Defendants do not contest

21   this element of Rule 23. Plaintiffs allege that they suffered harm from Defendants' allegedly self-

22   serving and deceptive factoring business that had a common scheme that similarly deceived

23   members of the class and subclass. Plaintiffs have demonstrated that their claims and the

1   evidentiary support are typical for other class members' claims. The Court finds typicality

2   satisfied.

3   **D.      Rule 23(a)(4): Adequacy of Representation**

4          "The final hurdle imposed by Rule 23(a) is that 'the representative parties will fairly and

5   adequately protect the interests of the class.'" Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020

6   (9th Cir. 1998) (quoting Fed. R. Civ. P. 23(a)(4)), overruled on other grounds by Wal-Mart, 564

7   U.S. 338. Adequacy of representation requires that "[f]irst, the named representatives must

8   appear able to prosecute the action vigorously through qualified counsel, and second, the

9   representatives must not have antagonistic or conflicting interests with the unnamed members of

10  the class." Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978). And the

11  Court must also assess the following requirements of Rule 23(g) to determine the adequacy of

12  class counsel:

13          (i) the work counsel has done in identifying or investigating potential claims in the
            action;

14

15          (ii) counsel's experience in handling class actions, other complex litigation, and the types
            of claims asserted in the action;

16          (iii) counsel's knowledge of the applicable law; and

17          (iv) the resources that counsel will commit to representing the class.

18  Fed. R. Civ. P. 23(g)(1)(A). The Court may also consider "any other matter pertinent to

19  counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P.

20  23(g)(1)(B). And class counsel must "fairly and adequately represent the interests of the class."

21  Fed. R. Civ. P. 23(g)(4).

22          The Court finds that Plaintiffs are adequate class representatives committed to

23  representing the classes' interests and able to prosecute the action through counsel. Defendants

24  do not contest this. Both Plaintiffs have been deposed, assisted with written discovery, confer

1   regularly with counsel, and have provided documents to counsel. (Chase Dec. Exs. 53-54.) The

2   Court also finds that Plaintiffs' counsel are adequate class counsel who will fairly and adequately

3   represent the interest of the class. Plaintiffs' counsel investigated and developed the facts

4   underlying the claims in this case and presented them in a detailed complaint and amended

5   complaint. Counsel has invested significant resources in prosecuting this action to date, including

6   written discovery, depositions, and brief-writing. Counsel have retained and presented the

7   opinions of a damages expert and appears to have sufficient resources to commit to representing

8   the class through the completion of this matter. Counsel has also provided documentation

9   demonstrating their prior experience handling class actions and cases involving claims similar to

10  the ones at issue here. (Chase Dec. Exs. 55, 56, 57); Fed. R. Civ. P. 23(g)(1)(A)(i) and (ii).) The

11  Court is therefore satisfied that both Plaintiffs and their counsel are adequate.

12  **E.      Rule 23(a)(2) Commonality and Rule 23(b)(3) Predominance**

13          Rule 23 contains two related and somewhat overlapping provisions: commonality and

14  predominance. As to commonality, Rule 23(a)(2) requires that there be "questions of law or fact

15  common to the class." "Commonality requires the plaintiff to demonstrate that the class members

16  have suffered the same injury." Wal-Mart, 564 U.S. at 349–50 (citation and quotations omitted).

17  To satisfy commonality, the claims must depend on a common contention "that is capable of

18  class wide resolution." Id. at 350. "What matters to class certification . . . is not the raising of

19  common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to

20  generate common answers apt to drive the resolution of the litigation." Id. (citation and quotation

21  omitted). "Dissimilarities within the proposed class are what have the potential to impede the

22  generation of common answers." Id. (citation and quotation omitted). Defendants do not contest

23  the commonality of any of Plaintiffs' claims.

24

1       As to predominance, Rule 23(b)(3) requires not just that some common questions exist,

2   but that they predominate over individual ones. The "predominance inquiry tests whether

3   proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Amchem</u>

4   <u>Products, Inc. v. Windsor</u>, 521 U.S. 591, 623 (1997). "This calls upon courts to give careful

5   scrutiny to the relation between common and individual questions in a case." <u>Tyson Foods, Inc.</u>

6   <u>v. Bouaphakeo</u>, 577 U.S. 442, 453 (2016). "An individual question is one where members of a

7   proposed class will need to present evidence that varies from member to member, while a

8   common question is one where the same evidence will suffice for each member to make a prima

9   facie showing [or] the issue is susceptible to generalized, class-wide proof." <u>Id.</u> (citation and

10   quotations omitted). "The Rule 23(b)(3) predominance inquiry asks the court to make a global

11   determination of whether common questions prevail over individualized ones." <u>Torres v. Mercer</u>

12   <u>Canyons Inc.</u>, 835 F.3d 1125, 1134 (9th Cir. 2016).

13       Because commonality and predominance overlap, the Court considers these elements

14   together. <u>See, e.g.</u>, <u>Valentino v. Carter–Wallace, Inc.</u>, 97 F.3d 1227, 1234 (9th Cir. 1996)

15   ("Implicit in the satisfaction of the predominance test is the notion that the adjudication of

16   common issues will help achieve judicial economy."). And, below, the Court reviews

17   commonality and predominance in the context of the individual claims Plaintiffs pursue.

18      **1.**    **RICO Claim**

19          **a.**    **Section 1962 – RICO Elements**

20     Plaintiffs adequately demonstrate that common questions predominate over individual ones

21   in the context of their RICO claim. Plaintiffs allege RICO violations under 18 U.S.C. § 1962(c)

22   and (d). (Am. Compl. at 30.) The essential elements of a § 1962(c) claim are (1) conduct (2) of

23   an enterprise (3) through a pattern of (4) racketeering activity. <u>Sanford v. MemberWorks,</u>

24

Inc., 625 F.3d 550, 557 (9th Cir. 2010). The term "racketeering activity" is defined to include a host of predicate acts, including "any act which is indictable under. . . section 1341 (relating to mail fraud) . . ." and § 1343 (wire fraud). Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 647 (2008); 18 U.S.C. § 1961(1). Mail or wire fraud occurs when a person intentionally forms a scheme to defraud and uses the mail or wire in furtherance of that scheme. See Miller v. Yokohama Tire Corp., 358 F.3d 616, 620 (9th Cir. 2004).

"'Enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). There are three characteristics which define a RICO enterprise: (1) common or shared purpose between the individuals associated with it; (2) it must be an ongoing, functioning organization; and (3) there is an ascertainable structure distinct from the conduct of the racketeering activity. See United States v. Turkette, 452 U.S. 576, 583 (1981). "'Pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

Plaintiffs convincingly argue that they will satisfy the elements of § 1962(c) through common proof where individual issues do not predominate. First, Plaintiffs allege that Symetra Financial Corporation, with its subsidiaries Defendant Symetra, Defendant SABSCO, and Clearscape, formed a "self-dealing" enterprise that operated with the common purpose to fraudulently induce Plaintiffs and class members to assign their future SSA payments to Defendant SABSCO in exchange for substantially less than they would have received under the initial SSA. (Am. Compl. at 30-31; Chase Dec. Ex. 3.) Proof that the enterprise is an ongoing,

1  functioning organization, and that the members of the enterprise are distinct from the

2  racketeering activity focuses exclusively on Defendants and will be the same for all class

3  members. Second, Plaintiffs allege that the enterprise's conduct that fraudulently induced class

4  members included sending letters, cards, thank you notes, either via post or emails, along follow-

5  up phone calls with annuitants, all with the aim of leveraging a preestablished relationship to

6  induce class members into selling their SSA payments in exchange for a lump sum. (Am. Compl.

7  at 34-35; Pls. Mot. for Class Cert. at 7; Chase Dec. Exs. 19-23.) By focusing on Defendants'

8  conduct, Plaintiffs have shown that the elements of their § 1962(c) RICO claim will be subject to

9  common proof. Third, Plaintiffs can demonstrate a pattern of racketeering activity through

10  common evidence that Defendants were sending quarterly direct mailings and or emails, as well

11  as newsletters, to all eligible annuitants. (Pls. Mot. for Class Cert. at 7, Chase Dec. Ex. 6.)

12  Finally, it is undisputed that Defendants used mail and wire facilities to carry out this conduct.

13  The Court finds Plaintiffs have demonstrated that the elements to their 1962 RICO claim will be

14  shown through common proof, which suffices to show predominance.

15         **b.**     **Section 1964 – Causation**

16       In evaluating the causation requirement of a RICO claim, the Court must ask whether the

17  alleged violation led directly to plaintiffs' injuries. "[A] civil RICO plaintiff must show: (1) that

18  his alleged harm qualifies as injury to his business or property; and (2) that his harm was by

19  reason of the RICO violation, which requires the plaintiff to establish proximate causation." Just

20  Film, 847 F.3d at 1118–19.

21       A plaintiff must show that the defendant's alleged misconduct proximately caused the

22  injury. See Poulos v. Caesars World, Inc., 379 F.3d 654, 664 (9th Cir. 2004) (citing Holmes v.

23  Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992); see also Bridge, 553 U.S. at 654

24

1   ("Proximate cause, we explained, is a flexible concept that does not lend itself to a black-letter

2   rule that will dictate the result in every case. . . When a court evaluates a RICO claim for

3   proximate causation, the central question it must ask is whether the alleged violation led directly

4   to the plaintiff's injuries.) (internal citation and quotation omitted). In some cases, reliance may

5   be "a milepost on the road to causation." <u>Poulos</u>, 379 F.3d at 664 (quotation and citation

6   omitted.)

7          Plaintiffs make three arguments in support of reliance. First, Plaintiffs argue that reliance

8   is not required. Second, Plaintiffs argue that reliance can be presumed. Third, Plaintiffs assert

9   that a common sense inference of reliance should apply to the claims asserted. The Court reviews

10  each of these arguments, finding merit only in the final theory.

11         **Reliance Required**

12         Plaintiffs' contention that a civil RICO claim predicated on mail fraud does not require a

13  showing of reliance is untenable. Plaintiffs rely predominantly on <u>Bridge</u>, 553 U.S. 639 (2008),

14  to argue that reliance is not an element of causation under RICO. That argument lacks merit. In

15  <u>Bridge</u>, the Supreme Court was asked to determine whether RICO contains an element of first-

16  party reliance similar to common law fraud. <u>Id.</u> at 650. The Supreme Court held that first-party

17  reliance is not required. It reasoned that such a holding would run afoul of existing caselaw,

18  which has permitted an injured plaintiff to recover for a fraudulent misrepresentation, even

19  where it was a third party, and not the plaintiff, that relied on the misrepresentation. <u>Id.</u> at 656.

20  But in so holding, the Court clarified that "none of this is to say that a RICO plaintiff who alleges

21  injury 'by reason of' a pattern of mail fraud can prevail without showing that <u>someone</u> relied on

22  the defendant's misrepresentations." <u>Id.</u> at 658. (emphasis in original). The Court reasoned that in

23  all likelihood the plaintiff will not be able to establish even but-for causation if no one relied on

24

1    the misrepresentation. Id. at 658-59. In other words, the Court clarified that reliance is an

2    element of the claim, though it need not be first-party reliance. The Court did not, as Plaintiffs

3    suggest, reject reliance outright.

4           Plaintiffs' invocation of Painters & Allied Trades Dist. Council 82 Health Care Fund v.

5    Takeda Pharms. Co. Ltd., 943 F.3d 1243, 1259-60 (9th Cir. 2019) is similarly misplaced. In

6    Painters, the Ninth Circuit likewise held that the plaintiffs satisfied RICO's proximate cause

7    requirement by demonstrating that a third party relied on the misrepresentations and omissions,

8    which, in turn, directly injured plaintiffs. This is the same scenario presented in Bridge, and it

9    does not convince the Court that reliance is no longer an element of the RICO claim.

10          **Presumption of Reliance Inapt**

11          Plaintiffs also ask the Court to find a presumption of reliance. The Courts declines to do

12   so. A presumption of reliance "typically has been applied in cases involving securities fraud and,

13   even then, the presumption applies only in cases primarily involving 'a failure to disclose'—that

14   is, cases based on omissions as opposed to affirmative misrepresentations." Poulos, 379 F.3d at

15   666; see also Binder v. Gillespie, 184 F.3d 1059, 1064 (9th Cir. 1999) (holding, in context of

16   alleged violation of SEC Rule 10b–5, that a presumption of reliance "should be confined to cases

17   that primarily allege omissions"). However, "mixed claims," meaning claims involving

18   misrepresentations and omissions, are not entitled to a presumption of reliance unless the fraud is

19   primarily based on omissions. Poulos, 379 F.3d at 666. Plaintiffs have alleged both

20   misrepresentations and omissions and do not primarily rely on omissions. (See Pls. Mot. for

21   Class Cert. at 14 ("Defendants' solicitation of class members employed form communications

22   with common omissions and misrepresentations."); Am. Complaint ¶ 152 (alleging that

23   Defendants made statements intended to make Plaintiffs and class members rely on them to enter

24

1    into the transactions).) Because Plaintiffs allege "mixed claims" the Court finds Plaintiffs are not

2    entitled to a presumption of reliance.

3    <u>**Common Sense Inference of Reliance**</u>

4        Lastly, Plaintiffs argue that a common-sense inference of reliance should be applied to

5    the facts of this case. The Court agrees. There is no clear standard for when a common sense

6    inference of reliance may be invoked. In <u>Poulos</u>, the Ninth Circuit recognized that reliance can

7    be shown where it provides the "common sense" or "logical explanation" for plaintiffs or the

8    class's behaviour, although it declined to reach that conclusion on the facts before it. 379 F.3d at

9    667-68. In <u>Poulos</u>, plaintiffs alleged that the defendants schemed to defraud casino patrons by

10    engaging in "a course of fraudulent and misleading acts and omissions intended to induce people

11    to play their video poker and electronic slot machines based on a false belief concerning how

12    those machines actually operate, as well as the extent to which there is actually an opportunity to

13    win on any given play." <u>Poulos</u>, 379 F.3d at 659. The plaintiffs argued that reliance could be

14    inferred because the only logical explanation for class members utilizing the gambling machines

15    was their reliance on the misrepresentations and omissions regarding their chances to win. <u>Id.</u> at

16    667. The Ninth Circuit rejected this argument, noting that there is no single, logical explanation

17    for gambling and that the knowledge and expectations players bring to the machines differs

18    greatly from player to player. <u>Id.</u> at 668. The court therefore concluded that a common sense

19    inference would not suffice to prove causation.

20        The Second, Fifth, Tenth, and Eleventh Circuits have applied a common sense inference

21    of reliance when it follows logically from that nature of the alleged scheme. In <u>In re U.S.</u>

22    <u>Foodservice Inc. Pricing Litig.</u>, the Second Circuit affirmed a class of customers who were

23    allegedly overbilled by a food distributer. 729 F.3d 108, 120 (2d Cir. 2013). The court reasoned

24

1    that "customers who pay the amount specified in an inflated invoice would not have done so

2    absent reliance upon the invoice's implicit representation that the invoice amount was honestly

3    owed." Id. Similarly, in Klay v. Humana, Inc., the Eleventh Circuit upheld the certification of a

4    class of physicians claiming that health maintenance organizations misrepresented that they

5    would pay them for services, but instead underpaid them. 382 F.3d 1241, 1259-61 (11th Cir.

6    2004). The Court explained that a jury could find a common inference of reliance on the

7    misrepresentations by concluding that plaintiffs "in entering into contracts with defendants relied

8    upon the defendants' representations and assumed they would be paid the amount due." Id. at

9    1259. The Court also reasoned that "while each plaintiff must prove reliance, he or she may do

10   so through common evidence (that is, through legitimate inferences based on the nature of the

11   alleged misrepresentations at issue)." Id. at 1258.

12          In CGC Holding Co., LLC v. Broad & Cassel, the Tenth Circuit approved a common

13   sense inference of reliance to certify a class when a class of borrowers alleged that lender

14   defendants fraudulently induced plaintiffs into paying up-front fees in exchange for loan

15   commitments that the lenders had no intention of providing. 773 F.3d 1076, 1091–92 (10th Cir.

16   2014). In affirming the class certification, the Court explained that class wide payment of a

17   nonrefundable up-front fee lended itself to a generalized inference of reliance on the

18   misrepresentation and omissions regarding defendants' ability or intent to actually fund the

19   promised loan. Id. Lastly, in Torres v. S.G.E. Mgmt., L.L.C., the Fifth Circuit concluded that if

20   plaintiffs could prove defendant's company was a fraudulent pyramid scheme, they were entitled

21   to use a common sense inference of reliance to prove causation. 838 F.3d 629, 643 (5th Cir.

22   2016). The court held that "a jury may reasonable infer that, in deciding to pay to [join the

23

24

1  company], the Plaintiffs relied on [defendant's] implicit representation that it is a legal multi-

2  level marketing program. . ." Id.

3      These cases are distinguishable from Poulos in that the schemes alleged by plaintiffs in

4  each respective case lends themselves to a logical inference of reliance and plaintiffs put forth

5  common, circumstantial evidence that class members relied on the fraud. In contrast, the Ninth

6  Circuit in Poulos found that the scheme alleged by plaintiffs could be explained in many

7  different ways other than defendant's representations about the odds of winning at gambling.

8  And unlike the serious financial transactions at issue in the other Circuit cases, gambling does

9  not always involve serious money and many people gamble for enjoyment and without

10 consideration of ability to win.

11     Plaintiffs also argue that this case is similar to Kennedy v. Jackson Nat. Life Ins. Co., No.

12 C 07-0371 CW, 2010 WL 2524360 (N.D. Cal. June 23, 2010). The Court agrees. Kennedy

13 involved the purchasing of a deferred annuity that plaintiff later learned was worth substantially

14 less. There, the court found that a common sense inference could be found because no reasonable

15 person would have purchased "such an unsatisfactory investment product had [d]efendant

16 disclosed the facts [p]laintiff alleges it either misrepresented or failed to disclose." Id. at *2.

17     The Court finds that a common sense inference of reliance applies to Defendants'

18 misrepresentations and omissions. The Court finds the rationale articulated by the other Circuits

19 persuasive in the context of Defendants' scheme which preyed upon the trust of the Plaintiffs to

20 convince them to enter the factoring transactions. In the mailings that Defendants sent to

21 annuitants, they repeatedly used the phrase "[w]e'll be your advocate." (See Pls. Oral Argument

22 Presentation, Slide 27 (Dkt. No. 118).) Advocate is defined as "a person who supports or speaks

23 in favour of somebody. . ." Merriam-Webster, https://www.merriam-

24

webster.com/dictionary/advocate (last visited July 28, 2022). The word naturally evokes ideas of trust and suggests the person who is holding themself out as an advocate will be placing the other person's interests above their own. Defendants regularly used this phrase in tandem with other phrases designed to instill trust, such as "you have the backing of a company you already know and trust." (Chase Dec. Ex. 20 at DEFESI_018825-26; Ex. 22 at DEFESI_004625-26; Ex. 23 at DEF_001776-77.)

Critically, Defendants leveraged this trust to position themselves in a way that tended to demonstrate that they would indeed be an advocate for annuitants. For example, one of Defendants' marketing campaigns was targeted towards annuitants with debt. (See Chase Dec. Ex. 37.) In their advertising material, Defendants stated that if the annuitant was struggling with debt, SABSCO might be able to help by purchasing the annuitants' future payments for a lump sum that could help alleviate that debt. (Id.) And since it is an affiliate of the same company that issues the structured settlement payments, SABSCO could generally provide a better price than competitors. (Id.) The advertisement went on to say the annuitants did not have to sell the entirety of their future payments, they could sell only what they needed and the SABSCO team could help them determine what that would be. (Id.)  The overall impression of the advertisement is that Defendants were here to help annuitants who were in a jam and to provide guidance, so annuitants were not taken advantage of by other factoring companies.

Defendants developed a number of these marketing schemes targeting common issues likely to arise that would require money; such as the purchase and repair of a vehicle, education, starting a business, home purchase and repair, and growing a family. (Chase Dec. Ex. 8 at DEFESI_142120; Ex. 36.) And Defendants repeatedly claimed to generally be able to offer a better purchase price given the preexisting relationship between the annuitant and Defendants.

1    (See Chase Dec. Exs. 33-39.) Yet, Defendants' own review of cases over a three month period

2    showed they only provided a better price 60% of the time. (Chase Dec. Ex. 8 at

3    DEFESI_142134.) And Defendants' discount rate in the commutation agreements ranged from

4    9%-18% whereas a company similarly situated to Defendants typically offered 6.5%-7%. (See

5    Am. Compl. ¶ 69; Chase Dec. Ex. 1 at 24.) This becomes especially illuminating when put into

6    the context of the named Plaintiffs. White received $18,609 for 149 future monthly payments

7    and all of his future life contingent monthly payments. (Am. Compl. ¶ 92.) Had he not sold,

8    Symetra would have paid him approximately $695,5000 during the course of his life. (Id. at ¶

9    93.) Nadeau sold monthly payments to SABSCO at various times and was ultimately divested of

10   $59,173 in exchange for $20,091, which has a discount rate the equivalent of borrowing at 18%

11   interest. (Id. at ¶ 100.)

12          At the same time, Defendants failed to disclose their conflict of interests and other

13   omissions that would otherwise suggest they were not acting as class members' advocates.

14   Defendants' internal documents demonstrates their main priority was getting annuitants to sell

15   their future payments, not to help annuitants out of a tight financial spot. These methods included

16   cold calling annuitants who had not sold their future payments, weekly follow up on applications

17   to annuitants, sending direct mailings to "every marketable" annuitant, postcards and emails in

18   addition to the direct mailings and an additional marketing piece "that specifically targets

19   [annuitants] with Life Contingent payments remaining." (Chase Dec. Ex. 13.) When all of this is

20   taken together the Court finds a common sense inference of reliance as to Defendants'

21   misrepresentations and omissions.

22          The Court finds the facts presented here are similar to those in Kennedy. There, the court

23   reasoned that "[d]efendant's uniform use of the term 'bonus,' its failure to disclose material

24

1   information, and class members' purchase of annuities that are high cost, illiquid and poorly

2   performing. . ." was evidence of a class wide inference of reliance. 2010 WL 2524360 at *8. The

3   court explained that "a reasonable inference could be drawn that class members would not have

4   purchased [the annuities] had they been fully informed about material facts." Id. The same logic

5   applies here. Common, uniform marketing materials that are misleading and designed to

6   capitalize on a pre-existing relationship give rise to a common sense inference that no individual

7   would factor with a company whose rates are subpar and whose transactions are not in the

8   individual's best interest, unless that individual relied on the representations. Given the inference

9   of reliance will be imparted to the class as a whole, individual issues of reliance will not

10  predominate such that it defeats predominance and commonality.

11      **2.      Civil Conspiracy**

12      To establish a civil conspiracy under Washington law, Plaintiffs' must prove "by clear,

13  cogent and convincing evidence that (1) two or more people combined to accomplish an

14  unlawful purpose or combined to accomplish a lawful purpose by unlawful means; and (2) the

15  conspirators entered into an agreement to accomplish the conspiracy." All Star Gas, Inc., of

16  Washington v. Bechard, 100 Wn. App. 732, 740 (2000). "Mere suspicion or commonality of

17  interests is insufficient to prove a conspiracy." Id.

18      The Court finds that Plaintiffs have demonstrated that their civil conspiracy claim is

19  subject to common proof. Plaintiffs assert that both elements are subject to common proof

20  because the elements focus on Defendants' conduct, not the class members or Defendants'

21  relationship with them. (Pls. Mot. for Class Cert. p. 24.) Plaintiffs allege that Defendants

22  knowingly and intentionally worked together to fraudulently induce class members into selling

23  their period payments back to Symetra (Am. Compl. ¶¶ 230-39.) Specifically, Plaintiffs' point to

24

1    internal documents and business plans produced by Defendants that a fact finder could find

2    support Plaintiffs' claim. (See Chase Dec. Exs. 3, 6.) As such, any evidence put forth by

3    Plaintiffs in furtherance of this claim will be common across the class and meets the criteria for

4    commonality and predominance.

5        **3.    Consumer Protection Act Claim**

6        To prove a Consumer Protection Act ("CPA") claim Plaintiff must demonstrate (1) the

7    Defendants engaged in an unfair or deceptive act or practice; (2) that the act or practice occurred

8    in the conduct of Defendants' trade or commerce; (3) that act or practice affects the public

9    interest; (4) injury to the Plaintiffs in business or property; and (5) Defendants' act or practice

10   proximately caused Plaintiffs' injury. 6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI.

11   310.01 (7th ed.) See Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 784

12   (1986). Because Defendants focus on the unfair and deceptive act and causation elements, the

13   Court reviews them separately below in analyzing predominance and commonality.

14       **a.    Unfair or Deceptive Act**

15       Plaintiffs have identified common proof of Defendants' unfair or deceptive acts.

16   Plaintiffs state the common proof will come from Defendants' solicitations to class members to

17   illustrate these solicitations contained key omissions and these omissions had the capacity to

18   deceive. (Pls. Mot. for Class Cert. at 25.) Plaintiffs also point to Defendants bulk mailings that

19   contained statements like "We'll be your advocate," and "Why work with SABSCO? Customer

20   Advocacy. Fair treatment. Competitive Pricing. Full transparency into the process." (Reply at

21   12.) This language was prevalent among Defendants' marketing materials, its own website, and

22   in templates and call scripts. (Id. at 10, Chase Dec. Ex. 11 at 127-28, 164-80; id. Ex. 22 at

23   DEFESI_130418; 29 at DEFESI_130418; id. Ex. 33; id. Ex 34 at DEFESI_029746.) Plaintiffs

24

1    allege that these misrepresentations also concealed Defendants' misuse of class members'

2    confidential information, along with Defendants' own profit incentives. (Reply at 3, 13.) Because

3    Defendants' marketing plan, along with the solicitations and omissions apply to all class

4    members, the unfair or deceptive act can be shown through class wide proof. As such, the

5    requirements for commonality and predominance are met.

6         Defendants' rebuttal provides little sway. Defendants argue that whether their omissions

7    constituted an unfair or deceptive act requires an individualized inquiry into whether information

8    was omitted and, if so, whether the omissions were material to a particular annuitant. (See Def.

9    Resp. in Opp. at 13.) In support, Defendants rely on a California case for the assertion that

10   individual issues predominate where the materiality of omission could vary among class

11   members. Lack v. Mizuho Bank, Ltd., No. 2:18-cv-00617-RGK-GJS, 2019 WL 3059261. But

12   Lack involved a fraudulent concealment claim with elements distinct from the Washington CPA.

13   In contrast, the Washington Supreme Court recently held the materiality is not a necessary

14   component of an unfair or deceptive act under the CPA. See Young v. Toyota Motor Sales,

15   U.S.A., 196 Wn.2d 310, 318 (2020) ("While we have mentioned materiality in passing, generally

16   in noting that a deceptive framing or omitted fact was sufficiently material to establish the

17   element, we have never found materiality was necessary as a matter of law"). Further,

18   Defendants' argument as to whether key disclosures and information were omitted speaks to the

19   merits of Plaintiffs' CPA claim, not whether common proof exists. See Amgen Inc. v.

20   Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 459, 133 S. Ct. 1184, 1191, 185 L. Ed. 2d

21   308 (2013). Because Defendants arguments fail to raise any question pertaining to predominance

22   and commonality, the Court finds the unfair or deceptive act element of Plaintiffs CPA claim is

23   subject to common proof and that individual issues do not predominate over class wide ones.

24

1

### b.    Causation

2    To show causation "plaintiff must establish that but for the defendant's unfair or

3    deceptive act or practice the plaintiff's injury would not have occurred as a matter of fact. Young,

4    196 Wn.2d at 322 (internal citation and quotation omitted.) The issue of causation is a factual

5    question to be decided by the trier of fact. Deegan v. Windermere Real Est./Ctr.-Isle, Inc., 197

6    Wn. App. 875, 885 (2017). Proximate cause is required to establish causation in a CPA claim.

7    Schnall v. AT & T Wireless Servs., Inc., 171 Wn.2d 260, 278 (2011) (citing WPI 15.01).

8    Proximate cause "means a cause which in a direct sequence [unbroken by any new independent

9    cause,] produces the [injury] [event] complained of and without which such [injury] [event]

10   would not have happened." WPI 15.01. "The comments under WPI 15.01 indicate that this court

11   favors the "'direct sequence'" and "'but for'" definitions of "'proximate cause.'" Indoor

12   Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc., 162 Wn.2d 59, 82 (2007)

13   (quoting 6 WPI 15.01, at 182 cmt. (5th ed. 2005)). Applying WPI 15.01 to the causation analysis

14   for a CPA claim, a plaintiff would have to establish that but for the defendant's unfair or

15   deceptive act or practice the plaintiff's injury would not have occurred. Id.

16   Here, Plaintiffs' proof of causation will be common to the class. Plaintiffs allege that

17   Defendants engaged in business practices that leveraged information and access they had to

18   annuitants to induce annuitants into selling the rights to future payments at a steep discount. (Pls.

19   Mot. for Class Cert. at 5-6.) During oral argument, Plaintiffs specified that their theory of the

20   case is one of omissions. Plaintiffs allege that Defendants omitted material information and facts

21   regarding Defendants' business practices and that they used bulk mailing to further conceal that

22   scheme and how the business operated. Thus, causation can be established through a common

23

24

sequence of Defendants' actions leading to putative class members selling their rights to future payments under their respective SSAs.

Defendants argue generally that Plaintiffs cannot show reliance and causation on a class wide basis as it applies to all claims. To the extent their arguments pertain to Plaintiffs' CPA claim, they are flawed. Defendants argue that CPA claims require reliance, but the Washington Supreme Court expressly rejected reliance as an element. See Indoor Billboard, 162 Wn.2d. at 82 (rejecting the principle that reliance is necessarily an element of CPA claim.) Though reliance is a way to establish a causal link in a case involving affirmative misrepresentations and the injury, it is dependent on what a plaintiffs' theory of the case is. See Young., 196 Wn.2d at 322 (finding plaintiff's causation theory as pleaded was reliance and the court could find no other substantial theory of causation.) Further, reliance has clearly been deemed not to be an element for a claim involving omissions. See Deegan, 197 Wn. App. at 886 (explaining reliance is virtually impossible to show for CPA claims involving omissions). As such, because Plaintiffs' theory involves omissions and conduct focused exclusively on Defendants' internal business plans, the Court finds causation can be shown on a class wide basis, which suffices to show predominance and commonality.

### 4.    Breach of Fiduciary Duty

In order to establish a breach of fiduciary duty, Plaintiffs must show: "(1) the existence of a duty owed [to them]; (2) a breach of that duty; (3) a resulting injury; and (4) that the claimed breach was the proximate cause of the injury." Miller v. U.S. Bank of Washington, N.A., 72 Wn. App. 416, 426 (1994), as corrected (Feb. 22, 1994). Once it is determined that a duty is owed to the plaintiff, the court then determines whether the facts qualify as that duty, and whether there was a breach. Id. "A fiduciary relationship exists where one party 'occupies such a relation to the

other party as to justify the latter in expecting that his interests will be cared for.'" <u>Liebergesell</u>
<u>v. Evans</u>, 93 Wn.2d 881, 889–90 (1980) (quoting Restatement of Contracts § 472(1)(c) (1932)).
A fiduciary relationship might arise as a matter of law, for instance, between an attorney and a
client or a doctor and a patient, for example. <u>Id.</u> at 890. "But a fiduciary relationship can also
arise in fact regardless of the relationship in law between the parties." <u>Id.</u>

The Court is unconvinced by Plaintiffs' argument that the existence of a fiduciary duty
arises from Defendants legal relationship with class members. That relationship, Plaintiffs argue,
coupled with Defendants promises to act as annuitants' advocate gives rise to a fiduciary duty as
a matter of law. But the Court is not aware of any fiduciary duty arising as a matter of law
between an administrator of an SSA and an annuitant. Nor is the Court convinced by Plaintiffs'
argument that a fiduciary duty arose as a matter of fact. In support of this, Plaintiffs assert that
Defendants undertook the same role as annuity issue and obligor, which included the same
obligations for each class member. Additionally, Defendants held themselves out as a company
with the knowledge and experience that annuitants could trust. The Court is not convinced that
these facts are sufficient to establish a fiduciary duty, particularly absent some legal obligation.
And because Plaintiffs could only show a fiduciary duty arising from fact, it would require an
individualized inquiry not suited to a class action. The Court finds that commonality and
predominance are absent for the breach of fiduciary duty claim and DENIES Plaintiffs' request
to certify it for the putative class.

### 5.    Unjust Enrichment

There are three elements to demonstrate unjust enrichment: "[1] a benefit conferred upon
the defendant by the plaintiff, [2] an appreciation or knowledge by the defendant of the benefit;
and [3] the acceptance or retention by the defendant of the benefit under such circumstances as to

1   make it inequitable for the defendant to retain the benefit without the payment of its

2   value." Young v. Young, 164 Wn.2d 477, 484 (2008) (internal citation and quotation omitted).

3          Plaintiffs put forth sufficient evidence to demonstrate that common proof will apply to

4   the class as a whole. Plaintiffs submitted a report by their damages expert, Corwin Zass, that

5   demonstrates the benefit conferred upon Defendant through a fair commutation damages

6   methodology. (See Chase Dec. Ex. 1.) As to the appreciation or knowledge element, Plaintiffs

7   allege that will be demonstrated through Defendants' internal documents that illustrate their

8   desire to receive such a benefit. (Pls. Mot. for Class Cert at 8; Chase Dec. Ex. 8 at

9   DEFESI_142120; Ex. 25 at DEFESI_054674.) The Court similarly finds persuasive Plaintiffs'

10  argument that the circumstances under which Defendants retained such benefit will be common

11  to the entire class based upon Defendants' role as annuity issuer and assignment company. All of

12  these factors focus on Defendant Symetra against whom this claim is brought and will be

13  applicable to the class as a whole meeting predominance and commonality requirements.

14          **6.**     **Contract Claims**

15                 **a.**     **Breach of Contract Claim**

16          Plaintiffs seek to certify a subclass whose contracts all contain language stating the

17  annuitant lacks the power to assign their SSA payments. As the Court notes in its Order on

18  Plaintiffs' Motion for Partial Summary Judgment on Choice of Law, form contracts are generally

19  suitable for class certification. See Order on Choice of Law at 5 (Dkt. No. 120); Am. Airlines,

20  Inc. v. Wolens, 513 U.S. 219, 233 n.8 (1995) (stating that "[b]ecause contract law is not at its

21  core 'diverse, nonuniform, and confusing,' we see no large risk of nonuniform adjudication);

22          Plaintiffs argue that all SSAs have standard anti-assignment language under 26 U.S.C. §

23  130. In the relevant part, 26 U.S.C. §130(c)(2) states that in instances of a qualified assignment

24

1  in which the assignee assumes liability to make periodic payments "such periodic payments

2  cannot be accelerated, deferred, increased or decreased by the recipient of such payments."

3  Proposed subclass members' initial settlement agreements go further to include "power

4  language," which prohibits annuitants from having the power to sell, mortgage, anticipate or

5  encumber the payments. (See Pls. Mot. for Class Cert at 11; Chase Dec. Ex. 50 at PL_00000405;

6  Reply at 16, Exs. 71-74.) These provisions are essentially uniform across settlement agreements.

7  To the extent that variations in the language do exist, this is not enough to defeat predominance

8  or commonality. See Bel-Ray Co. v. Chemrite (Pty) Ltd., 181 F.3d 435, 442 (3d Cir. 1999)

9  (noting that the parties' clearly manifested intention controls). And Plaintiffs point to evidence

10  that Defendants routinely ignored such language in the paperwork they prepared for annuitants

11  and submitted to courts on annuitants' behalf, all of which contain identical language. (See Pls.

12  Mot. for Class Cert at 15; Chase Dec. Ex. 66 at DEFESI_005196; Ex. 67 at DEFESI_004797;

13  Ex. 68 at DEFESI_007532; Ex. 69 at DEFESI_060741.)

14        The Court also finds inadequate Defendants' argument that individualized defenses

15  would emerge as to whether each class member was aware of the anti-assignment language and

16  whether they represented to courts that they had the power and right to enter into a factoring

17  transaction. In support of their assertion that individualized defenses would occur, Defendants

18  point to the purchase and sale agreement between named Plaintiffs and Defendants that contain a

19  paragraph stating that the seller (annuitants) confirms that they have the power and right to enter

20  into the agreement. (See Declaration of Medora Marisseau, Exs. 2, 4, 5.)  But Defendants'

21  argument is counterintuitive as the agreements Plaintiffs submitted to courts are form contracts

22  prepared by Defendants. (Id.) The uniformity among power language and Defendants' form

23

24

1    contract is sufficient evidence to demonstrate common proof exists for Plaintiffs' breach of

2    contract claim so as to find commonality and predominance.

3         As to damages, Plaintiffs are entitled to the benefit of the bargain: "Contract damages are

4    ordinarily based on the injured party's expectation interest and are intended to give that party the

5    benefit of the bargain by awarding him or her a sum of money that will, to the extent possible,

6    put the injured party in as good a position as that party would have been in had the contract been

7    performed." Ford v. Trendwest Resorts, Inc., 146 Wn.2d 146, 155 (2002) (citation and quotation

8    omitted). Plaintiffs' expert report has established a common measurement to determine the

9    expectancy interest damages on a class wide basis. (See Chase Dec. Ex. 1.) The Zass report

10   demonstrates that Plaintiffs can calculate damages for breach by comparing the purchase price

11   paid to subclass members to the IRS-mandated value of the SSA payments at the time of

12   factoring. The IRS-mandated value at the time of factoring would have been what the subclass

13   would have received had they not entered into a factoring transaction with Defendants. (Id. at 16,

14   22-24.) This is a reasonable and manageable model, and one which Defendants' challenge only

15   as its ability to demonstrate injury for all Plaintiffs' claims, which is not relevant here and

16   difficult to parse for Defendants' arguments as to each of Plaintiffs' claims.

17        Defendants submit four arguments against the subclass certification, none of which are

18   persuasive. First, Defendants argue that these anti-assignment provisions are to protect the

19   obligor, meaning assignment companies such as themselves, who may waive and consent to

20   assignment. But the validity of that argument is irrelevant at this stage. Whether Defendants are

21   correct in asserting they may waive such provisions speaks to the merits of the claim and will be

22   applicable to the subclass as a whole.

23

24

Second, Defendants assert that the language of these provisions varies widely and would require an individual review. In Plaintiffs' request to certify the subclass, they ask that the subclass be certified for all members whose contract explicitly states the annuitants lack the power to transfer their SSA payments. Plaintiffs do not contend that each provision is uniform, but they have limited the class to those contracts which include the limitation on transfers. So long as the contract contains a statement restricting class members ability to transfer payments the variances in the language of these contracts does not appear to have a material effect on the question of commonality and predominance because they could not alter the question of assignability.

Third, Defendants rehashing of their choice of law argument is unsuccessful. Defendants argue that the anti-assignment—or power language—claims are attached to each subclass members' respective settlement agreement, many of which contain choice of law provisions and that state law varies as to the enforceability of these provisions. But Defendants have only demonstrated three class members have choice of law provisions in their settlement agreement. (See Defendants' Resp. in Opp. to Choice of Law at 7 (Dkt. No. 97).) And the Court has already determined that there's generally no conflict between states as to breach of contract claims. To the extent there is a valid and enforceable choice of law provision, the Court will apply the law provided for in the contract. But three choice of law provisions in a large subclass is not enough to overcome predominance and commonality. Lara v. First Nat'l Ins. Co. of Am., 25 F.4th 1134, 1138 (9th Cir. 2022) ("The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.") (internal quotation and citation omitted).

Finally, Defendants claim there will be individualized defenses, including waiver and ratification that would result in mini-trials incompatible with class treatment. But all the cases Defendants cite to are easily distinguishable. For instance, Defendants cite to <u>Hanon</u>, where the Ninth Circuit court reasoned that plaintiff's motion for class certification should be denied when there was a danger the class representative would have unique defenses atypical for the class. 976 F.2d at 508. But that case dealt with a typicality issue for the class representative, not a predominance issue. <u>Id.</u> And Defendants' argument fails to demonstrate how these defenses will vary for each subclass member. Defendants point to White's and Nadeau's confirmations that they were aware of the power language and their assurances to the courts that they had the to power to enter into the transaction as evidence that Defendants would have to conduct individualized inquiries to determine the knowledge and understanding of each subclass member regarding the provision. But given Defendants' use of form contracts and call scripts, they could also use common proof to defend against Plaintiffs' claims. The Court is not convinced that Defendants' individualized defenses are sufficient to rule against predominance and commonality.

### b.    Breach of Good Faith and Fair Dealing and Tortious Interference

Plaintiffs demonstrate common proof for breach for both their good faith and fair dealing and tortious interference claims, and Defendants make no contrary argument. The Court also finds that common issues predominate over individualized ones as to both claims.

Good faith and fair dealing is implied in every contract. <u>Microsoft Corp. v. Motorola, Inc.</u>, 963 F. Supp. 2d 1176, 1184 (W.D. Wash. 2013) While there is no standard definition of good faith and fair dealing, rather the duty varies depending on context, a factfinder may consider: "(1) whether the defendant's actions were contrary to the reasonable and justified

1  expectations of other parties to the contract, (2) whether the defendant's conduct would frustrate

2  the purpose of the contract, (3) whether the defendant's conduct was commercially reasonable,

3  (4) whether and to what extent the defendant's conduct conformed with ordinary custom or

4  practice in the industry, (5) to the extent the contract vested the defendant with discretion in

5  deciding how to act, whether that discretion was exercised reasonably, and (6) subjective factors

6  such as the defendant's intent and motive." Id. at 184–85 (internal citations and quotations

7  omitted).

8      The elements for tortious interference under Washington law are: (1) the existence of a

9  valid contractual relationship or business expectancy; (2) the defendant's knowledge of and

10  intentional interference with that relationship or expectancy; (3) a breach or termination of that

11  relationship or expectancy induced or caused by the interference; (4) an improper purpose or the

12  use of improper means by the defendant that caused the interference; and (5) resulting damage.

13  Eugster v. City of Spokane, 121 Wn. App. 799, 810 (2004). However, "Washington does not

14  appear to require an independently unlawful act even though an unlawful act would suffice to

15  show improper purpose or means." Earthbound Corp. v. MiTek USA, Inc., No.

16  CV167223DMGJPRX, 2017 WL 2919101, at *10 (C.D. Cal. Feb. 10, 2017) (collecting cases).

17      Plaintiffs correctly point out that all of the factors for both claims focus on Defendants'

18  conduct that is common to all class members. And Defendants do not challenge these claims,

19  except as they apply to Plaintiffs' breach of contract claim. Focusing on the elements that look to

20  Defendants' conduct Plaintiffs focus on and evidence of Defendants' internal documents and

21  business plan are evidence of common proof that can be applied to the class. Plaintiffs' evidence

22  includes marketing plans, Defendants' internal research, and internal communications and

23  training materials. (See Chase Dec. Exs. 3, 6, 18.) By the nature of the class definition, class

24

members had to have a contractual relationship with Defendants. As to damages for violation of good faith and fair dealing, plaintiffs "must prove actual harm, and its damages are limited to the amounts it has incurred as a result of the bad faith . . . as well as general tort damages." Fire & Marine Ins. Co. v. Onvia, Inc., 165 Wn.2d 122, 133 (2008). Plaintiffs have put forth a method for calculating such damages via expectancy measures. (Chase Dec. Ex. 1.) The Zass report has established a common measurement for the expectancy interests, which as previously stated, is a reasonable and manageable model.

**F.    Class Treatment is Superior and Manageable**

"In determining superiority, courts must consider the four factors of Rule 23(b)(3)." Zinser v. Accufix Rsch. Inst., Inc., 253 F.3d 1180, 1190 (9th Cir.), as amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001). The four factors are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

Plaintiff has shown sufficient superiority here. First, this case involves modest recoveries, as demonstrated by Plaintiffs' expert report. The largest damage figure yields an average recovery of $18,323.21. As the Ninth Circuit has explained, "[w]here damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action." Zinser v. Accufix Rsch. Inst., Inc., 253 F.3d 1180, 1190 (9th Cir.), as amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001); see Fed. R. Civ. P. 23(b)(3)(A). Moreover, Plaintiffs' damage calculations are largely Defendant focused. Second, neither party has identified any

1    other cases involving these kinds of claims against Defendants. See Fed. R. Civ. P. 23(b)(3)(B).

2    Third, given the choice of law analysis, there is good reason to focus the claims in Washington,

3    which has the most significant relationship to the claims. See Fed. R. Civ. P. 23(b)(3)(C). Fourth,

4    notwithstanding Defendants' arguments discussed below, there are no obvious difficulties in

5    managing this on a class basis. See Fed. R. Civ. P. 23(b)(3)(D).

6           Defendants argue that individualized issues mean the class action treatment will not be

7    superior. But for all the reasons stated above, the Court is unconvinced that individualized issues

8    predominant so as to make certification improper. Defendants also argue that individual

9    recoveries are not so small as to effectively bar any individual from recovering. Defendants cite

10   to In re NCAA I-A Walk-On Football Players Litig., No. C04-1254C, 2006 WL 1207915, at *14

11   (W.D. Wash. May 3, 2006) in support of this premise. In re NCAA is not particularly apt. There,

12   the court found that class treatment was inferior, particularly because individual issues

13   predominated over common ones. The amount of recovery was also significant – the cost of an

14   entire college education in some cases. But ultimately, because the case was decided based on

15   predominance, the issue of recovery was ancillary. In contrast, in Peoples v. United Servs. Auto.

16   Ass'n, No. C18-1173RSL, 2019 WL 1875373, at *3 (W.D. Wash. Apr. 26, 2019), an insurance

17   class action, the court found the action to be superior, reasoning that "[a]lthough putative class

18   members may have individual claims in the hundreds or even thousands of dollars, that amount

19   pales in comparison to the costs of litigation." The reasoning in Peoples is applicable here,

20   because the cost of individually litigating these claims for each class member would likely be

21   uneconomical.

22   //

23   //

24

1   **G.    Surreply**

2          Defendants ask the Court to strike two arguments that they allege Plaintiffs made for the

3   first time in their Reply in Support of Class Certification: (1) that Defendants misused putative

4   class members' confidential medical information; and (2) that Defendants made related

5   omissions regarding their use of confidential information. (Surreply at 1 (Dkt. No. 100).) In the

6   alternative, Defendants ask that the Court consider the argument in their surreply. The Court

7   DENIES Defendants' request to strike.

8          First, as to the allegation that Defendants misused putative class members' confidential

9   medical information, the Court agrees Plaintiffs did not argue this in their Motion for Class

10  Certification, though they could have. Plaintiffs make this argument in their Amended Complaint

11  and again in their Brief in Opposition to Defendants Motion to Dismiss. But Defendants raise the

12  issue in their Response in Opposition to the Class Certification. Defendants argue that Plaintiffs

13  criticize Defendants for sending mailings about annuitants selling payments based on the claim

14  that this information is confidential, but Defendants argue that Plaintiffs point to no evidence to

15  support their assertion that sending quarterly mailings using an annuitant's address is improper.

16  (See Response at 6.) In a footnote in the Response, Defendants argue that because Plaintiffs, in

17  finding no evidence, have abandoned their claim that Defendants used payee's medical or

18  underwriting information. (Id. at 6 fn 2.) Plaintiffs' reply then responded to this argument. (See

19  Reply at 2-3.) Because this argument was responsive, Plaintiffs were entitled to present it.

20         Second, the Court does not agree to strike the sentence stating Defendants made

21  omissions about the use of confidential information. Plaintiffs argue that Defendants used

22  confidential information to their own benefit in their argument that commonality exists for their

23

24

1    breach of contract claim. (See Pls. Mot. for Class Cert. at 15.) As such, this is not an issue argued

2    for the first time in a reply brief. The Court therefore DENIES Defendants' request to strike.

3                                                   **CONCLUSION**

4            Plaintiffs have provided sufficient evidence to establish by a preponderance the class

5    certification is appropriate and proper for their claims under RICO, Washington CPA, civil

6    conspiracy, unjust enrichment and contract claims under Rule 23(a) and 23(b)(3). The Court

7    DENIES Plaintiffs Motion to Certify a Class as to their breach of fiduciary duty claims. The

8    Court certifies the following classes:

9            **Nationwide Class**

10           "All persons who are or were, at any time, annuitants of an SSA that contemplated life
             contingent payments issued by Symetra and who subsequently sold to a Symetra affiliate
11           the right to receive payments from that SSA in a factoring transaction."

12           **Void Ab Initio Subclass**

13           "All members of the Class whose contract defining the annuity at issue included language
             explicitly stating that the annuitants lack the power to transfer their future SSA
14           payments."

15           The Court also appoints Alison Chase, Gretchen Freeman Cappio, Lynn Lincoln Sarko,

16   Adele Daniel, and Sydney Read of Keller Rohrback LLP, and Daniel Simons of Marcus &

17   Marcus PC, Edward Stone of Edward Stone Law PC, and Jerome Marcus and Jonathon

18   Auerbach of Marcus & Auerbach LLC as class counsel.

19           The Court also DENIES Defendants request to strike.

20           The clerk is ordered to provide copies of this order to all counsel.

21           Dated August 3, 2022.

22

23                                                   Marsha J. Pechman
                                                     United States Senior District Judge

24